Rachel C. Strickland
Andrew S. Mordkoff
Ciara A. Sisco
WILLKIE FARR & GALLAGHER LLP
787 Seventh Avenue
New York, New York 10019
Telephone: (212) 728-8000
Facsimile: (212) 728-8111

*Counsel for the Debtors and*
*Debtors in Possession*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------x
| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| GBG USA Inc., et al.,[1] | : | Case No. 21-11369 (MEW) |
| | : | |
| Debtors. | : | (Jointly Administered) |

---------------------------------------------------------x
| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| GBG Sean John LLC,[2] | : | Case No. 21- |
| | : | |
| Debtor. | : | (Joint Administration Pending) |

---------------------------------------------------------x

## NOTICE OF DESIGNATION OF STALKING HORSE BID AND
## STALKING HORSE BID PROTECTIONS (SEAN JOHN ASSETS)

**PLEASE TAKE NOTICE THAT:**

On August 31, 2021, the Court entered the *Order (A) Authorizing and Approving Bid Procedures in Connection With Sale of Substantially All of the Debtors' Assets, (B) Authorizing and Approving Bid Protections, (C) Scheduling Related Auction and Hearing to Consider Approval of the Sale, (D) Approving Procedures Related to Assumption and Assignment of Executory Contracts and Unexpired Leases, (E) Approving Form and Manner of Notice Thereof,*

---

[1]  The Initial Debtors in these chapter 11 cases and the last four digits of each Initial Debtor's federal taxpayer identification number are as follows: GBG USA Inc. (2467), Jimlar Corporation (8380), GBG North America Holdings Co., Inc. (5576), Homestead International Group Ltd. (0549), IDS USA Inc. (7194), MESH LLC (8424), Frye Retail, LLC (1352), Krasnow Enterprises, Inc. (0122), Krasnow Enterprises Ltd. (0001), Pacific Alliance USA, Inc. (0435), and GBG Spyder USA LLC (9108).  The Initial Debtors' mailing address is located at GBG USA Inc., P.O. Box 4965 Greensboro, NC 27404.

[2]  The last four digits of GBG Sean John LLC's federal taxpayer identification number is 1287 and its mailing address is located at GBG USA Inc., P.O. Box 4965 Greensboro, NC 27404.

*and (F) Granting Related Relief* [Docket No. 141] (the "**Bidding Procedures Order**"),[3] in connection with the sale of the Debtors' assets, which authorized the Debtors to, among other things, (i) designate one or more Stalking Horse Bidders for the Debtors' assets, (ii) enter into Stalking Horse Agreements with Stalking Horse Bidders, and (iii) offer Stalking Horse Bid Protections, in each case where the Debtors determine, in the exercise of their reasonable business judgment, that setting a floor price for the relevant assets at auction is in the best interests of their estates and creditors.

## Stalking Horse Bid

The Debtors have accepted a stalking horse bid for assets related to their Sean John brand (the "**Stalking Horse Bid**") submitted by SLC Fashion LLC as (Purchaser) (the "**Purchaser**" or "**Stalking Horse Bidder**") and CeOpCo, LLC (as Guarantor). Specifically, GBG Sean John LLC and Pacific Alliance USA Inc. (collectively, the "**Sellers**") and the Stalking Horse Bidder have executed that certain *Asset Purchase Agreement* (the "**Stalking Horse Agreement**"), dated as of December 1, 2021, for the purchase of certain of the Debtors' Sean John assets. The material terms of the Stalking Horse Bid are identified in the summary attached hereto as **Exhibit A**. A copy of the Stalking Horse Agreement is attached hereto as **Exhibit B**. The Stalking Horse Bid is subject to higher or better offers to the extent such offers are determined by the Debtors to constitute Qualified Bids in accordance with the Bidding Procedures Order. The Purchase Price payable to the Debtors under the Stalking Horse Agreement is $3.3 million plus certain assumed liabilities.

## Bid Protections

In accordance with the Bidding Procedures Order, the Debtors have agreed to provide the Stalking Horse Bidder with certain protections as set forth in Section 5.1 of the Stalking Horse Agreement. The Stalking Horse Bid Protections for the Stalking Horse Bidder include:

- Reimbursement up to $33,000 of the actual, reasonable, and documented out-of-pocket fees and expenses incurred by the Purchaser (the "**Expense Reimbursement**"), which represents 1.0% of the cash portion of the Purchase Price; plus

- A fee of $99,000 less the amount of any Expense Reimbursement (the "**Break-Up Fee**", and together with the Expense Reimbursement, the "**Bid Protections**"), which represents 3.0% of the cash portion of the Purchase Price.

The payment of any Bid Protections shall be made out of the proceeds of, and only upon consummation of, an Alternative Transaction. The obligations of the Sellers to pay the Bid

---

[3]    Capitalized terms used but not defined herein shall have the respective meanings given to them in the Bidding Procedures Order and the Bidding Procedures approved therein or the Stalking Horse Agreement (as defined herein), as applicable. Any summary of the Bidding Procedures Order, the Bidding Procedures, and the Stalking Horse Agreement contained herein is qualified in its entirety by the actual terms and conditions thereof. To the extent that there is any inconsistency between any such summary and such actual terms and conditions, the actual terms and conditions shall control.

Protections are subject to approval by the Bankruptcy Court and shall survive the termination of this Agreement in accordance with <u>Section 8.2</u> of the Stalking Horse Agreement.

Because the Consultation Parties and the U.S. Trustee have already consented to the Bid Protections, in accordance with the Bid Procedures Order the Bid Protections shall be deemed approved without further action or order by the Court.

### Important Dates and Deadlines

- ***Bid Deadline***. The deadline to submit higher or better bids on the Debtors' Sean John assets and deliver electronic copies of such bid in accordance with the Bidding Procedures is **December 15, 2021 at 5:00 p.m. (prevailing Eastern Time)**.

- ***Auction***. The Auction, if necessary, for the Debtors' Sean John assets will take place on **December 17, 2021 at 10:00 a.m. (prevailing Eastern Time)** and will be conducted virtually via Zoom The Debtors have the right, in their reasonable business judgment, in a manner consistent with their fiduciary duties and applicable law, to adjourn or cancel the Auction.

- ***Sale Objection Deadline***. Objections to the sale of the Debtors' Sean John assets must be filed with the Court in accordance with the Bidding Procedures Order by no later than **December 20, 2021 at 4:00 p.m. (prevailing Eastern Time)**.

- ***Sale Hearing***. The Sale Hearing is scheduled for **[    ], 2021[4] at [  ] [ ].m. (prevailing Eastern Time)** before the Honorable Michael E. Wiles, United States Bankruptcy Court, Southern District of New York, via Court Solutions LLC at www.court-solutions.com. Instructions to register for Court Solutions LLC are attached to General Order M-543.

### Additional Information

Parties interested in purchasing any of the Debtors' assets, including the Sean John assets, should contact the Debtors' investment bankers, Ducera Partners LLC (Attn: Agnes Tang (atang@ducerapartners.com), David Skatoff (dskatoff@ducerapartners.com) and Jonathan Cremeans (jcremeans@ducerapartners.com)).

Copies of the Bidding Procedures Order, the Stalking Horse Agreement and other Court documents may be obtained free of charge at the website dedicated to the Debtors' chapter 11 cases maintained by their claims and noticing agent and administrative advisor, Prime Clerk, LLC, by phone at (877) 635-8928 (U.S./Canada) or (929) 203-3305 (International), or at https://cases.primeclerk.com/gbg.

---

[4] [Subject to Court availability].

Dated: December 1, 2021
New York, New York

/s/  Andrew S. Mordkoff
Rachel C. Strickland
Andrew S. Mordkoff
Ciara A. Sisco
WILLKIE FARR & GALLAGHER LLP
787 Seventh Avenue
New York, New York 10019
Telephone: (212) 728-8000
Facsimile: (212) 728-8111

*Counsel for the Debtors and Debtors in Possession*

## Exhibit A

**Material Terms of the Stalking Horse Bid**

## Material Terms of the Stalking Horse Bid

*The following chart contains a summary of certain material terms of the Stalking Horse Agreement, together with references to the applicable sections of the Stalking Horse Agreement. The summary set forth below does not contain all of the terms of the Stalking Horse Agreement and should not be used or relied upon as a substitute for the full terms and conditions set forth in the Stalking Horse Agreement. The summary of the Stalking Horse Agreement contained herein is qualified in its entirety by the actual terms and conditions thereof. To the extent that there is any conflict between any such summary and such actual terms and conditions, the actual terms and conditions shall control.*

| SUMMARY OF MATERIAL TERMS OF THE STALKING HORSE BID[5] | |
| --- | --- |
| **Sellers** | GBG Sean John LLC and Pacific Alliance USA Inc. |
| **Buyer** | SLC Fashion LLC, a Delaware limited liability company as (Purchaser) and CeOpCo, LLC, a Delaware limited liability company (as Guarantor) |
| **Acquired Assets** (*Section 1.1*) | All of the properties, rights, interests and other assets of (i) SJ LLC and (ii) Pacific Alliance solely to the extent primarily related to the Acquired Business or the Company, in each case of the foregoing clauses (i) and (ii), whether tangible or intangible, real, personal or mixed, wherever located and whether or not required to be reflected on a balance sheet prepared in accordance with GAAP, and including the following assets of the Sellers, but excluding in all cases, and notwithstanding anything to the contrary in this Section **Error! Reference source not found.** or otherwise, the Excluded Assets:<br><br>(a)    the Contracts listed on Schedule 1.1(a) (the "Assigned Contracts");<br><br>(b)    all Documents (including all originals and copies of such Documents under Sellers' possession or control);<br><br>(c)    all machinery, fixtures, fixed assets, furniture, equipment, materials, parts, supplies, tools, servers, appliances, spare parts and other tangible property of every kind and description (other than Inventory) (the "Tangible Personal Property"); |

---

[1]    Capitalized terms used in this section but not defined therein shall have the respective meanings ascribed to such terms in the Stalking Horse Agreement. Article and Section references in this summary are to Articles and Sections of the Stalking Horse Agreement unless otherwise provided.

(d)      all of the rights, interests and benefits accruing under all permits and all pending applications therefor, to the extent transferable under applicable Law ("Assigned Permits");

(e)      all Intellectual Property (including (i) the SEAN JOHN, ENYCE, VOTE OR DIE and the other trademarks and trade names listed on Schedule 1.1(e)), service marks, trade names, brand names, logos, trade dress, together with the goodwill connected with the use of such trademarks and (ii) internet domain names, whether or not trademarks, registered in any top-level domain by any authorized private registrar or Governmental Body, web addresses, web pages, websites and related content, accounts with LinkedIn, Twitter, Facebook and other social media companies (to the extent that such accounts are transferable pursuant to the terms, conditions, and policies of each applicable social media platform) and the content found thereon and related thereto and URLs), including all claims, demands, income, damages, royalties, payments, accounts, and accounts receivable now or hereafter due and payable, and rights to causes of action and remedies, arising from any such Intellectual Property, including all proceeds from infringement suits, the right to sue and prosecute for past, present, and future infringement, misappropriation, or other violation of rights related to any such Intellectual Property, and all Documentation or other tangible embodiments of Sellers that comprise, embody, disclose or describe such Intellectual Property, including engineering drawings, technical documentation, databases, spreadsheets, business records, inventors' notebooks, invention disclosures, digital files, software code embodied in media or firmware, and files related to the prosecution or enforcement of any such Intellectual Property, including such patent, trademark or copyright prosecution or enforcement files in the custody of the Sellers' outside legal counsel, and all attorney client privileges and work product immunities associated with such files and such prosecution and enforcement activities (collectively, "Transferred Intellectual Property");

(f)      all customer data and information;

(g)      all rights of publicity and similar rights, including all marketing assets, including upcoming campaign material, current point-of-purchase material and historical digital assets;

(h)      insurance proceeds and awards received by Sellers from and after the Closing, if any, with respect to any of the Acquired Assets which are not in respect of any Retained Liabilities or the Retained Business;

|  | (i) all goodwill, including the right to represent to third parties that Purchaser is the successor to the Acquired Business; |
|  | (j) solely to the extent arising from or related to (i) all claims, causes of action and other legal rights and remedies of any nature, by counterclaim or otherwise, against other Persons under the Assigned Contracts or (ii) facts and circumstances that occurred from and after the Closing, all claims, causes of action and other legal rights and remedies of any nature, by counterclaim or otherwise, against other Persons; |
|  | (k) all information technology assets, including software and hardware exclusively related to the Acquired Business or the ownership or operation of the Acquired Assets or the Acquired Business; |
|  | (l) all five-digit UPC codes and customer service phone numbers exclusively related to the Acquired Business; |
|  | (m) all accounts receivable for revenue generated from and after the Closing; and |
|  | (n) all inventory wherever located (including finished goods, inventory in transit, supplies, raw materials, work in progress, spare, replacement and component parts) (collectively, the "Inventory"). |
| **Purchase Price;** (*Section 2.1*) | The aggregate consideration (the "Purchase Price") to be paid by Purchaser for the purchase of the Acquired Assets shall be: (i) the assumption of Assumed Liabilities and (ii) a cash payment of $3,300,000 (the "Cash Payment"). |
| **Assumption of Liabilities** (*Section 1.3*) | On the terms and subject to the conditions set forth in the Stalking Horse Agreement, the Bidding Procedures Order and the Sale Order, effective as of the Closing, Purchaser shall irrevocably assume from Sellers (and from and after the Closing pay, perform, discharge or otherwise satisfy in accordance with their respective terms (or on such other terms as are agreed as between Purchaser and the Person to which such Liabilities are owed)), and Sellers shall irrevocably convey, transfer and assign to Purchaser the following Liabilities, in each case except to the extent constituting Excluded Liabilities (collectively, the "Assumed Liabilities"): |
|  | (a) all Liabilities and obligations under the Assigned Contracts arising from and after the Closing; |

|  | |
|---|---|
|  | (b)    all cure costs required to be paid pursuant to Section 365 of the Bankruptcy Code in connection with the assumption and assignment of the Assigned Contracts as finally determined by the Bankruptcy Court (the "Cure Costs");<br><br>(c)    all Liabilities (including all Assumed Taxes (including personal property Taxes) and Transfer Taxes, in each case determined in accordance with ARTICLE IX), arising out of the conduct of the Acquired Business or the ownership of the Acquired Assets, in each case, from and after the Closing Date; and<br><br>(d)    all accounts payable of the Acquired Business incurred after the Closing in the ordinary course of business that are entitled to priority status under Section 503(b) of the Bankruptcy Code (it being understood that such amounts shall not include any fees or expenses due to professional persons retained by Sellers or any other party involved in the Bankruptcy Case, including any creditors' committee). |
| **Excluded Assets** (*Section 1.2*) | Notwithstanding anything to the contrary in this Agreement, in no event shall Sellers sell, transfer, assign, convey or deliver, or be deemed to sell, transfer, assign, convey or deliver, and Sellers shall retain, all right, title and interest to, in and under the following assets, properties, privileges, interests and rights of each such Seller (collectively, the "<u>Excluded Assets</u>"):<br><br>(a)    all cash (or cash-equivalent) receipts for revenue generated prior to the Closing in connection with goods or services delivered prior to the Closing;<br><br>(b)    all accounts receivable for revenue generated prior to the Closing in connection with goods or services delivered prior to the Closing;<br><br>(c)    any Contracts which are not listed on Schedule 1.1(a);<br><br>(d)    any leased real property and any leasehold improvements and any permanent fixtures, improvements or appurtenances thereto;<br><br>(e)    all Documents (i) to the extent they relate to any of the Excluded Assets or Excluded Liabilities, or (ii) that any Seller is (x) required by Law to retain or (y) is prohibited by Law from providing a copy thereof to Purchaser (provided that with respect to clause (ii)(x), to |

the extent not prohibited by Law, Purchaser shall have the right to review and receive and make copies of any such Documents);

(f)    all shares of capital stock or other equity interests of the Company (except to the extent already owned by the Purchaser or any member of the Purchaser Group prior to the date hereof (including the Class B Units of the Company owned by the Class B Members and any rights of such Class B Members under the Company Operating Agreement)) and the other Sellers or securities convertible into, exchangeable or exercisable for any such shares of capital stock or other equity interests;

(g)    (i) any preference or avoidance claims or actions arising under the Bankruptcy Code, (ii) any other rights, claims, actions, rights of recovery, rights of set-off and rights of recoupment as of the Closing of any Seller, in each case, arising out of or relating to events occurring on or prior to the Closing Date, (iii) all claims or actions that any Seller may have against any Person with respect to any other Excluded Assets or any Excluded Liabilities and (iv) any claims against any Seller or Affiliate thereof or any director, officer or agent of any Seller;

(h)    all director and officer insurance policies ("D&O Insurance Policies"), employment practices liability insurance policies ("EPLI Insurance Policies"), errors and omissions insurance policies ("E&O Insurance Policies") and any other similar insurance policies providing coverage to Sellers' directors and officers (collectively with the D&O Insurance Policies, EPLI Insurance Policies, E&O Insurance Policies, the "D&O Related Insurance Policies"), and all rights and benefits of any Sellers of any nature with respect to the D&O Related Insurance Policies, including all insurance recoveries or proceeds thereunder and rights to assert claims or actions with respect to any such insurance recoveries or proceeds;

(i)    financial accounting books and records, corporate charter, minute and stock record books, Tax Returns and other Tax records, corporate seal, checkbooks and canceled checks of the Company (except to the extent already owned by the Purchaser or any member of the Purchaser Group prior to the date hereof (including the Class B Members and any rights of such Class B Members under the Company Operating Agreement));

(j)    Sellers' rights under this Agreement, including the Purchase Price hereunder, or any Transaction Document, or any other agreement between any Seller and Purchaser entered into on or after the date hereof;

(k)      (i) all attorney-client work product and other legal privilege of each Seller, (ii) all records and reports prepared or received by Sellers or any of their Affiliates in connection with the sale of the Acquired Assets or any portion thereof, the Bankruptcy Case and the transactions contemplated hereby (copies of which Sellers shall, from and after the Closing, provide to Purchaser upon reasonable written request), and (iii) all confidentiality agreements with prospective purchasers of the Acquired Assets or any portion thereof, and all bids and expressions of interest received from third parties with respect thereto;

(l)      any Tax refunds, Tax abatements, Tax assets or other Tax recoveries receivable by any Seller or any of their Affiliates (together with any interest due thereon or penalty rebate arising therefrom) and all other Tax assets in each case arising from or attributable to the Acquired Assets or Assumed Liabilities in a Pre-Closing Tax Period;

(m)      all Seller Plans and all right, title and interest in any assets thereof or relating thereto;

(n)      all security, vendor, utility, and other similar deposits, prepaid expenses, advances, advance payments, prepayments, deferred charges or rebates in favor of the Sellers;

(o)      solely to the extent arising from or related to facts and circumstances that occurred prior to the Closing (except those arising from or related to the Assigned Contracts), all claims, causes of action and other legal rights and remedies of any nature, by counterclaim or otherwise, against other Persons; and

(p)      all assets of Pacific Alliance that are not primarily related to the Acquired Business or the Company.

| | |
|---|---|
| **Excluded Liabilities** (*Section 1.4*) | Notwithstanding the foregoing and for the avoidance of doubt, (a) other than (i) the Assumed Liabilities and (ii) to the extent already owned by the Purchaser or any member of the Purchaser Group prior to the date hereof (including the Class B Members), Purchaser shall not assume or be liable for any Liabilities of any Seller or any of their respective Affiliates, whether or not related to the Acquired Business or the Acquired Assets, and Seller shall retain and be responsible for all other Liabilities of Seller and their respective Affiliates of all kinds, of any Retained Business or other business by Sellers or any of their Affiliates at any time and (b) Assumed Liabilities shall not include any Liability primarily relating to or primarily arising out of the Retained Business (all such Liabilities that Purchaser is not assuming being referred to collectively herein as the |

"Excluded Liabilities").  Without limiting the foregoing, the Excluded Liabilities shall include:

(a)    any Liability for Taxes (A) of a Seller or any of its Affiliates or any member or equity owner of such Seller or Affiliate or (B) relating to the Acquired Assets or the Assumed Liabilities for any taxable period (or portion thereof) ending on or before the Closing Date;

(b)    all professional fees and expenses for advisers of a Seller or its Affiliates, including advisers retained pursuant to an order of the Bankruptcy Court;

(c)    any Liability of a Seller, any of its Affiliates or any of its or their respective directors, officers, stockholders or agents (acting in such capacities), arising out of, or relating to, this Agreement or the other Transaction Documents, whether incurred prior to, at, or subsequent to, the Closing, including all finder's or broker's fees and expenses and any and all fees and expenses of any representatives of any of them;

(d)    other than as specifically set forth herein, any Liability relating to, occurring or existing in connection with, or arising out of, the ownership or operation of the Acquired Business or Acquired Assets prior to the Closing (including any lawsuits outstanding as of the Closing where any of the Acquired Assets are subject or where a Seller is a defendant);

(e)    except as otherwise expressly set forth in the Transition Services Agreement, if any, any Liability with respect to any GBG Business Employee, GBG Business Contractor, other employee or any other Person at any time employed or retained by or otherwise providing services to a Seller or any of its Affiliates, including any Liability relating to or arising out of the employment or service relationship or termination of the employment or service relationship of any such Person and any compensation or benefits of any such Person;

(f)    all Liability related to or arising under the Seller Plans;

(g)    any Liability relating to or arising out of the ownership, possession, use, operation or sale or other disposition of any Excluded Asset;

(h)    all accounts payable owed by Sellers in connection with goods or services received prior to the Closing; and

| | |
|---|---|
| | (i)     all open purchase orders, including the orders described on Schedule 1.4(i). |
| **Assumption and Assignment of Contracts** (*Schedule 1.1(a)*) | The Contracts listed on Schedule 1.1(a) of the Stalking Horse Agreement. |
| **Closing Conditions** (*Article VII*) | <u>Seller and Purchaser Closing Conditions</u>.  The respective obligations of each Party to this Agreement to consummate the Closing are subject to the satisfaction (or to the extent permitted by Law, written waiver by each Seller and Purchaser, each in their sole discretion) on or prior to the Closing Date, of each of the following conditions:<br><br>     (a)     no court or other Governmental Body has issued, enacted, entered, promulgated or enforced any Law or Order (that is final and non-appealable and that has not been vacated, withdrawn or overturned) restraining, enjoining or otherwise prohibiting the transactions contemplated by this Agreement;<br><br>     (b)     Purchaser shall be the successful bidder at the auction in accordance with the Bidding Procedures Order; and<br><br>     (c)     the Bankruptcy Court shall have entered the Sale Order and such Order shall be a Final Order.<br><br><u>Purchaser Closing Conditions</u>.  The obligations of Purchaser to consummate the Closing are subject to the satisfaction (or to the extent permitted by Law, written waiver by Purchaser in its sole discretion), on or prior to the Closing Date, of each of the following conditions:<br><br>     (a)     the representations and warranties made by Sellers in **Error! Reference source not found.** shall be true and correct as of the Closing Date (disregarding all qualifications or limitations as to "materiality" or "Material Adverse Effect" and words of similar import set forth therein), as though such representations and warranties had been made on and as of the Closing Date (except that representations and warranties that are made as of a specified other date need to be true and correct only as of such other date), except where the failure of such representations and warranties to be true and correct has not had, and would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect; provided that the representations set forth in <u>Sections 3.1</u>, <u>3.2</u> and 3.3(a)(i) will be true and correct in all respects; |

(b)    Sellers shall have performed in all material respects the covenants and agreements required to be performed by them under this Agreement at or prior to the Closing; and

(c)    Sellers shall have delivered all items and satisfied all obligations pursuant to Section 2.4.

Seller Closing Conditions.  The obligations of Sellers to consummate the transactions contemplated by this Agreement are subject to the satisfaction (or to the extent permitted by Law, written waiver by Sellers in their sole discretion), on or prior to the Closing Date, of each of the following conditions:

(a)    the representations and warranties made by Purchaser in **Error! Reference source not found.** shall be true and correct in all material respects (without giving effect to any materiality or similar qualification contained therein), in each case as of the date hereof and as of the Closing Date, with the same force and effect as though all such representations and warranties had been made as of the Closing Date (other than representations and warranties that by their terms address matters only as of another specified date, which shall be so true and correct only as of such other specified date), except where the failure of such representations or warranties to be so true and correct has not had, and would not reasonably be expected to have, individually or in the aggregate, a material adverse effect on Purchaser's ability to consummate the transactions contemplated hereby; provided that the representations set forth in Sections 4.1, 4.2 and 4.3(a)(i) will be true and correct in all respects;

(b)    Purchaser shall have performed in all material respects all of the covenants and agreements required to be performed by it under this Agreement at or prior to the Closing;

(c)    Purchaser shall have delivered all items and satisfied all obligations pursuant to Section 2.5.

(d)    Purchaser shall have paid all Cure Costs for all Assigned Contracts for which Cure Costs have been consensually agreed with the Contract counterparty or fixed by an order of the Bankruptcy Court as of the Closing Date; and

(e)    The Class B Member Written Consent shall remain in full force and effect as of the Closing Date.

| **Termination** (*Section 8.1*) | This Agreement may be terminated at any time prior to the Closing:

(a)    by the mutual written consent of the Sellers and the Purchaser;

(b)    by written notice of either Purchaser or the Sellers, upon the issuance by any Governmental Body of an Order restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated by this Agreement or declaring unlawful the transactions contemplated by this Agreement, and such Order having become final, binding and non-appealable; provided that no termination may be made by a Party under this Section 8.1(b) if the issuance of such Order was caused by the breach or action or inaction of such Party;

(c)    by written notice of either Purchaser or the Sellers, if the Closing shall not have occurred on or before December 31, 2021 (the "Outside Date"); provided that a Party shall not be permitted to terminate this Agreement pursuant to this Section 8.1(c) if the failure of the Closing to have occurred by the Outside Date was caused by the breach or action or inaction of such Party;

(d)    by written notice of either Purchaser or the Sellers, if the Bankruptcy Case is dismissed or converted to a case or cases under Chapter 7 of the Bankruptcy Code, or if a trustee or examiner with expanded powers to operate or manage the financial affairs or reorganization of the Sellers is appointed in the Bankruptcy Case;

(e)    by written notice from the Sellers to Purchaser, upon a breach of any covenant or agreement on the part of Purchaser, or if any representation or warranty of Purchaser will have become untrue, in each case, such that the conditions set forth in Section 7.3(a) or 7.3(b) would not be satisfied, including a breach of Purchaser's obligation to consummate the Closing; provided that (i) if such breach is curable by Purchaser then the Sellers may not terminate this Agreement under this Section 8.1(e) unless such breach has not been cured by the date which is the earlier of (A) two (2) Business Days prior to the Outside Date and (B) ten (10) Business Days after the Sellers notify Purchaser of such breach and (ii) the right to terminate this Agreement pursuant to this Section 8.1(e) will not be available to the Sellers at any time that any Seller is in material breach of any covenant, representation or warranty hereunder;

(f)    by written notice from Purchaser to the Sellers, upon a breach of any covenant or agreement on the part of any Seller, or if any representation or warranty of any Seller will have become untrue, in each case, such that the conditions set forth in Section 7.2(a) or 7.2(b) |

would not be satisfied; provided that (i) if such breach is curable by such Seller then Purchaser may not terminate this Agreement under this Section 8.1(f) unless such breach has not been cured by the date which is the earlier of (A) two (2) Business Days prior to the Outside Date and (B) ten (10) Business Days after Purchaser notifies the Sellers of such breach and (ii) the right to terminate this Agreement pursuant to this Section 8.1(f) will not be available to Purchaser at any time that Purchaser is in material breach of any covenant, representation or warranty hereunder;

(g)    by written notice from the Sellers to Purchaser, if all of the conditions set forth in Sections 7.1 and 7.2 have been satisfied (other than conditions that by their nature are to be satisfied at the Closing, but subject to the satisfaction or waiver of such conditions at the Closing) or waived and Purchaser fails to complete the Closing at the time required by Section 2.3;

(h)    by written notice from the Sellers to Purchaser, if any Seller or the board of directors, board of managers, or similar governing body of any Seller determines in good faith, on advice in the opinion of outside legal counsel, that proceeding with the transactions contemplated by this Agreement or failing to terminate this Agreement would violate applicable Law or its or breach such Person's or body's fiduciary obligations under applicable Law;

(i)    by written notice of either Purchaser or the Sellers, if (i) any Seller enters into (or provides written notice to Purchaser of its intent to enter into) one or more Alternative Transactions with one or more Persons other than Purchaser or the Successful Bidder or the Backup Bidder at the Auction or (ii) the Bankruptcy Court approves an Alternative Transaction other than with the Successful Bidder or the Backup Bidder;

(j)    by written notice from Purchaser to the Sellers, if Purchaser is not the Successful Bidder or the Backup Bidder at the Auction; provided that Purchaser shall not be permitted to terminate this Agreement pursuant to this Section 8.1(j) until after the twenty-fifth (25th) day following entry by the Bankruptcy Court of an Order authorizing and approving an Alternative Transaction with the Successful Bidder at the Auction (and, notwithstanding Purchaser not having been the Successful Bidder or the Backup Bidder at the Auction, until such time (if any) as Purchaser terminates this Agreement pursuant to this Section 8.1(j), the obligations of Purchaser to consummate the transactions contemplated by this Agreement and any Transaction Document shall remain unaffected by Purchaser's right to terminate this Agreement pursuant to this Section 8.1(j)); or

|  | (k)      by written notice of either Purchaser or Sellers if the Bankruptcy Court shall have stated unconditionally that it will not enter the Sale Order approving the sale to the Purchaser. |
|---|---|
| **Break-Up Fee; Expense Reimbursement** *(Section 5.1(a)).* | If this Agreement is terminated pursuant to (i) <u>Section 8.1</u> (other than (A) <u>Section 8.1(a)</u>, <u>8.1(e)</u> or <u>8.1(g)</u> or (B) by Purchaser pursuant to Section 8.1(b), 8.1(c) or 8.1(d), in each case of this clause (B), in circumstances where the Sellers would be entitled to terminate this Agreement pursuant to <u>Section 8.1(e)</u> or <u>8.1(g)</u>), Purchaser shall be entitled to the reimbursement of, and the Sellers shall promptly reimburse Purchaser in immediately available funds for, the actual, reasonable and documented out-of-pocket fees and expenses incurred by Purchaser (including reasonable and documented professional's fees and expenses) and its Advisors in connection with the diligence, preparation, execution and negotiation of this Agreement, in the maximum amount of 1% (the "Expense Reimbursement"), and (ii) <u>Section 8.1(h)</u>, <u>8.1(i)</u> or <u>8.1(j)</u>, Purchaser shall be entitled to the payment of a break-up fee in an amount equal to 3% of the Cash Payment less the amount of any Expense Reimbursement payable pursuant to the foregoing clause (i) (the "Break-Up Fee", and together with the Expense Reimbursement, the "Bid Protections"); provided that payment of any Bid Protections shall be made out of the proceeds of, and only upon consummation of, an Alternative Transaction.  Purchaser's entitlement to the Bid Protections shall not be relinquished or forfeited by Purchaser's participation in any Auction required by the Bidding Procedures Order. |

**Exhibit B**

**Asset Purchase Agreement**

**Execution Version**

**ASSET PURCHASE AGREEMENT**

**DATED AS OF DECEMBER 1, 2021**

**BY AND AMONG**

**SLC FASHION, LLC, AS THE PURCHASER,**

**CEOPCO, LLC, AS THE GUARANTOR**

**GBG SEAN JOHN LLC AND PACIFIC ALLIANCE USA INC., AS THE SELLERS**

*This is a draft agreement only, and delivery or discussion of this draft agreement is not, and will not be deemed or construed to be, an offer or commitment with respect to the proposed transaction to which this draft agreement relates. Notwithstanding the delivery of this draft agreement or any other past, present or future written or oral indications of assent, or indications of the result of negotiations or agreements, no party to the proposed transaction (and no person or entity related to any such party) will be under any legal obligation whatsoever unless and until the definitive agreement providing for the transaction has been executed and delivered by all parties thereto.*

# TABLE OF CONTENTS

**Page**

**Article I PURCHASE AND SALE OF THE ACQUIRED ASSETS; ASSUMPTION OF ASSUMED LIABILITIES** ................................................................................................................ **5**

    1.1    Purchase and Sale of the Acquired Assets ..................................................... 5
    1.2    Excluded Assets ............................................................................................. 7
    1.3    Assumption of Liabilities .............................................................................. 8
    1.4    Excluded Liabilities ...................................................................................... 9
    1.5    Assumption/Rejection of Certain Contracts ................................................ 10

**Article II CONSIDERATION; PAYMENT; CLOSING** ................................................... **12**

    2.1    Consideration; Payment ............................................................................... 12
    2.2    Deposit ........................................................................................................ 13
    2.3    Closing ........................................................................................................ 13
    2.4    Closing Deliveries by Sellers ...................................................................... 14
    2.5    Closing Deliveries by Purchaser ................................................................. 14

**Article III REPRESENTATIONS AND WARRANTIES OF SELLERS** .................................. **15**

    3.1    Organization and Qualification ................................................................... 15
    3.2    Authorization of Agreement ........................................................................ 15
    3.3    Conflicts; Consents ..................................................................................... 16
    3.4    Condition and Sufficiency of Assets ........................................................... 16
    3.5    Title to Acquired Assets .............................................................................. 17
    3.6    Assigned Contracts. .................................................................................... 17
    3.7    Inventory. .................................................................................................... 17
    3.8    Material Customers and Suppliers. .............................................................. 17
    3.9    Legal Proceedings; Government Orders ...................................................... 18
    3.10    Compliance with Laws. ............................................................................... 18
    3.11    Employee Matters. ....................................................................................... 18
    3.12    Intellectual Property Matters; Data Privacy. ............................................... 19
    3.13    Brokers ........................................................................................................ 20
    3.14    Taxes ........................................................................................................... 20
    3.15    Financial Information. ................................................................................. 21
    3.16    Accounts Receivable. .................................................................................. 21
    3.17    Absence of Certain Developments ............................................................... 21
    3.18    Related Party Transactions. ......................................................................... 21
    3.19    No Other Representations or Warranties. ..................................................... 21

**Article IV REPRESENTATIONS AND WARRANTIES OF PURCHASER** ............................ **22**

    4.1    Organization and Qualification ................................................................... 22
    4.2    Authorization of Agreement ........................................................................ 22
    4.3    Conflicts; Consents ..................................................................................... 23
    4.4    Financing. .................................................................................................... 23

i

4.5     Brokers ........................................................................................................24
4.6     No Litigation ...............................................................................................24
4.7     Guarantor Financial Capabilities. ..............................................................24
4.8     No Outside Reliance ...................................................................................24

**Article V BANKRUPTCY COURT MATTERS** ...................................................................**25**
5.1     Bid Protections and Auction Matters ..........................................................25
5.2     Cure Costs ...................................................................................................26

**Article VI COVENANTS AND AGREEMENTS** ..................................................................**27**
6.1     Conduct of Business of Sellers ...................................................................27
6.2     Access to Information ..................................................................................28
6.3     Employee Matters ........................................................................................30
6.4     Reasonable Best Efforts; Cooperation ........................................................30
6.5     Further Assurances.......................................................................................30
6.6     Acknowledgment by Purchaser ...................................................................31
6.7     Confidentiality. ...........................................................................................32

**Article VII CONDITIONS TO CLOSING** ...........................................................................**33**
7.1     Conditions Precedent to the Obligations of Purchaser and Sellers .......33
7.2     Conditions Precedent to the Obligations of Purchaser .............................33
7.3     Conditions Precedent to the Obligations of the Sellers ...........................34
7.4     Waiver of Conditions ..................................................................................34

**Article VIII Termination** .............................................................................................**35**
8.1     Termination of Agreement...........................................................................35
8.2     Effect of Termination ..................................................................................36

**Article IX TAXES** ..........................................................................................................**37**
9.1     Transfer Taxes .............................................................................................37
9.2     Allocation of Purchase Price .......................................................................37
9.3     Cooperation .................................................................................................37
9.4     Straddle Period ...........................................................................................38

**Article X MISCELLANEOUS** ...........................................................................................**38**
10.1    Non-Survival of Representations and Warranties and Certain Covenants ...........38
10.2    Expenses ......................................................................................................38
10.3    Notices .........................................................................................................39
10.4    Binding Effect; Assignment ........................................................................40
10.5    Amendment and Waiver ..............................................................................40
10.6    Third Party Beneficiaries ............................................................................41
10.7    Non-Recourse ..............................................................................................41
10.8    Severability ..................................................................................................41
10.9    Construction .................................................................................................41
10.10   Schedules .....................................................................................................41

10.11    Complete Agreement ..................................................................................42
10.12    Specific Performance ................................................................................42
10.13    Jurisdiction and Exclusive Venue ............................................................43
10.14    Governing Law; Waiver of Jury Trial ......................................................43
10.15    No Right of Set-Off ..................................................................................44
10.16    Counterparts and PDF...............................................................................44
10.17    Publicity ...................................................................................................45
10.18    Bulk Sales Laws........................................................................................45
10.19    Waiver of Conflicts...................................................................................45
10.20    Guarantee. ................................................................................................45

**Article XI ADDITIONAL DEFINITIONS AND INTERPRETIVE MATTERS .......................................47**
11.1    Certain Definitions....................................................................................47
11.2    Index of Defined Terms ............................................................................53
11.3    Rules of Interpretation ..............................................................................53

## INDEX OF EXHIBITS

EXHIBIT A    FORM OF BILL OF SALE

EXHIBIT B    FORM OF ASSIGNMENT AND ASSUMPTION AGREEMENT

EXHIBIT C    FORM OF TRANSITION SERVICES AGREEMENT

## ASSET PURCHASE AGREEMENT

This ASSET PURCHASE AGREEMENT (this "Agreement"), dated as of December 1, 2021, by and among SLC FASHION, LLC, a Delaware limited liability company ("Purchaser"), CEOPCO, LLC, a Delaware limited liability company ("Guarantor"), GBG SEAN JOHN LLC, a Delaware limited liability company (the "Company" or "SJ LLC") and PACIFIC ALLIANCE USA, INC., a Delaware corporation ("Pacific Alliance", and together with SJ LLC, each a "Seller" and collectively "Sellers"). Purchaser and Sellers are referred to herein individually as a "Party" and collectively as the "Parties." Capitalized terms used herein shall have the meanings set forth herein or in Article XI.

## RECITALS

WHEREAS, Pacific Alliance, together with certain of its affiliates including GBG USA Inc. a Delaware corporation (collectively, the "Initial Debtors") filed voluntary petitions for relief on July 29, 2021 under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"), which cases are being jointly administered for procedural purposes only (collectively, the "Bankruptcy Case");

WHEREAS, SJ LLC (collectively with the Initial Debtors, the "Debtors") shall, as promptly as practicable after the execution hereof, commence a voluntary bankruptcy case under Chapter 11 of the Bankruptcy Code as an additional Debtor in the Bankruptcy Case (the "SJ LLC Bankruptcy Filing");

WHEREAS, concurrently with the execution of this Agreement (and contingent thereupon), the Class B Members (as defined herein) are executing and delivering that certain written consent with respect to the SJ LLC Bankruptcy Filing (the "Class B Member Written Consent");

WHEREAS, Sellers intend to continue managing their properties and operating their businesses as "debtors-in-possession" under the jurisdiction of the Bankruptcy Court and in accordance with the applicable provisions of the Bankruptcy Code;

WHEREAS, Purchaser desires to purchase the Acquired Assets and assume the Assumed Liabilities from Sellers, and Sellers desire to sell, convey, assign and transfer to Purchaser all rights, title and interests in and to the Acquired Assets together with the Assumed Liabilities, in a sale authorized by the Bankruptcy Court pursuant to section 363 of the Bankruptcy Code, all on the terms and subject to the conditions set forth in this Agreement, the Bidding Procedures Order and the Sale Order; and

WHEREAS, the Acquired Assets and Assumed Liabilities shall be purchased and assumed by Purchaser pursuant to the Sale Order approving such sale, free and clear of all Encumbrances and any successor liability (other than Permitted Encumbrances), pursuant to Sections 363 and 365 of the Bankruptcy Code, and Rules 6004 and 6006 of the Federal Rules of Bankruptcy Procedure, which Order will include the authorization for the assumption by the applicable Seller and assignment by the applicable Seller to Purchaser of the Assigned Contracts and the Liabilities thereunder in accordance with Section 365 of the Bankruptcy Code, all in the manner and subject

4

to the terms and conditions set forth in this Agreement, the Bidding Procedures Order and the Sale Order and in accordance with other applicable provisions of the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure and the local rules for the Bankruptcy Court (together, the "Bankruptcy Rules").

NOW, THEREFORE, in consideration of the foregoing and the mutual representations, warranties, covenants and agreements set forth herein, and intending to be legally bound, Purchaser, Guarantor and Sellers hereby agree as follows.

## ARTICLE I

## PURCHASE AND SALE OF THE ACQUIRED ASSETS; ASSUMPTION OF ASSUMED LIABILITIES

1.1    Purchase and Sale of the Acquired Assets

Pursuant to Sections 363 and 365 of the Bankruptcy Code and on the terms and subject to the conditions set forth herein and in the Bidding Procedures Order and Sale Order, at the Closing, Sellers shall, to the extent permitted by applicable Law, sell, transfer, assign, convey and deliver to Purchaser, and Purchaser shall purchase, acquire and accept from Sellers, all of the Acquired Assets, free and clear of all Encumbrances and any successor liability (other than Permitted Encumbrances). "Acquired Assets" means all of the properties, rights, interests and other assets of (i) SJ LLC and (ii) Pacific Alliance solely to the extent primarily related to the Acquired Business or the Company, in each case of the foregoing clauses (i) and (ii), whether tangible or intangible, real, personal or mixed, wherever located and whether or not required to be reflected on a balance sheet prepared in accordance with GAAP, and including the following assets of the Sellers, but excluding in all cases, and notwithstanding anything to the contrary in this Section 1.1 or otherwise, the Excluded Assets:

(a)    the Contracts listed on Schedule 1.1(a) (the "Assigned Contracts");

(b)    all Documents (including all originals and copies of such Documents under Sellers' possession or control);

(c)    all machinery, fixtures, fixed assets, furniture, equipment, materials, parts, supplies, tools, servers, appliances, spare parts and other tangible property of every kind and description (other than Inventory) (the "Tangible Personal Property");

(d)    all of the rights, interests and benefits accruing under all permits and all pending applications therefor, to the extent transferable under applicable Law ("Assigned Permits");

(e)    all Intellectual Property (including (i) the SEAN JOHN, ENYCE, VOTE OR DIE and the other trademarks and trade names listed on Schedule 1.1(e)), service marks, trade names, brand names, logos, trade dress, together with the goodwill connected with the use of such trademarks and (ii) internet domain names, whether or not trademarks, registered in any top-level domain by any authorized private registrar or Governmental Body, web addresses, web pages, websites and related content, accounts with LinkedIn, Twitter, Facebook and other social media

5

companies (to the extent that such accounts are transferable pursuant to the terms, conditions, and policies of each applicable social media platform) and the content found thereon and related thereto and URLs), including all past, present and future claims, counterclaims, demands, income, damages, royalties, payments, accounts, and accounts receivable now or hereafter due and payable, and rights to causes of action and remedies, arising from any such Intellectual Property, including all proceeds from infringement suits, the right to sue and prosecute for past, present, and future infringement, misappropriation, or other violation of rights related to any such Intellectual Property, and all Documentation or other tangible embodiments of Sellers that comprise, embody, disclose or describe such Intellectual Property, including engineering drawings, technical documentation, databases, spreadsheets, business records, inventors' notebooks, invention disclosures, digital files, software code embodied in media or firmware, and files related to the prosecution or enforcement of any such Intellectual Property, including such patent, trademark or copyright prosecution or enforcement files in the custody of the Sellers' outside legal counsel, and all attorney client privileges and work product immunities associated with such files and such prosecution and enforcement activities (collectively, "Transferred Intellectual Property");

(f)    all customer data and information;

(g)    all rights of publicity and similar rights, including all marketing assets, including upcoming campaign material, current point-of-purchase material and historical digital assets;

(h)    insurance proceeds and awards received by Sellers from and after the Closing, if any, with respect to any of the Acquired Assets which are not in respect of any Retained Liabilities or the Retained Business;

(i)    all goodwill, including the right to represent to third parties that Purchaser is the successor to the Acquired Business;

(j)    solely to the extent arising from or related to (i) all claims, causes of action and other legal rights and remedies of any nature, by counterclaim or otherwise, against other Persons under the Assigned Contracts or (ii) facts and circumstances that occurred from and after the Closing, all claims, causes of action and other legal rights and remedies of any nature, by counterclaim or otherwise, against other Persons;

(k)    all information technology assets, including software and hardware exclusively related to the Acquired Business or the ownership or operation of the Acquired Assets or the Acquired Business;

(l)    all five-digit UPC codes and customer service phone numbers exclusively related to the Acquired Business;

(m)    all accounts receivable for revenue generated from and after the Closing; and

(n)    all inventory wherever located (including finished goods, inventory in transit, supplies, raw materials, work in progress, spare, replacement and component parts) (collectively, the "Inventory").

6

1.2    <u>Excluded Assets</u>

Notwithstanding anything to the contrary in this Agreement, in no event shall Sellers sell, transfer, assign, convey or deliver, or be deemed to sell, transfer, assign, convey or deliver, and Sellers shall retain, all right, title and interest to, in and under the following assets, properties, privileges, interests and rights of each such Seller (collectively, the "<u>Excluded Assets</u>"):

(a)    all cash (or cash-equivalent) receipts for revenue generated prior to the Closing in connection with goods or services delivered prior to the Closing;

(b)    all accounts receivable for revenue generated prior to the Closing in connection with goods or services delivered prior to the Closing;

(c)    any Contracts which are not listed on <u>Schedule 1.1(a)</u>;

(d)    any leased real property and any leasehold improvements and any permanent fixtures, improvements or appurtenances thereto;

(e)    all Documents (i) to the extent they relate to any of the Excluded Assets or Excluded Liabilities, or (ii) that any Seller is (x) required by Law to retain or (y) is prohibited by Law from providing a copy thereof to Purchaser (<u>provided</u> that with respect to clause (ii)(x), to the extent not prohibited by Law, Purchaser shall have the right to review and receive and make copies of any such Documents);

(f)    all shares of capital stock or other equity interests of the Company (except to the extent already owned by the Purchaser or any member of the Purchaser Group prior to the date hereof (including the Class B Units of the Company owned by the Class B Members and any rights of such Class B Members under the Company Operating Agreement)) and the other Sellers or securities convertible into, exchangeable or exercisable for any such shares of capital stock or other equity interests;

(g)    (i) any preference or avoidance claims or actions arising under the Bankruptcy Code, (ii) any other rights, claims, actions, rights of recovery, rights of set-off and rights of recoupment as of the Closing of any Seller, in each case, arising out of or relating to events occurring on or prior to the Closing Date, (iii) all claims or actions that any Seller may have against any Person with respect to any other Excluded Assets or any Excluded Liabilities and (iv) any claims against any Seller or Affiliate thereof or any director, officer or agent of any Seller;

(h)    all director and officer insurance policies ("<u>D&O Insurance Policies</u>"), employment practices liability insurance policies ("<u>EPLI Insurance Policies</u>"), errors and omissions insurance policies ("<u>E&O Insurance Policies</u>") and any other similar insurance policies providing coverage to Sellers' directors and officers (collectively with the D&O Insurance Policies, EPLI Insurance Policies, E&O Insurance Policies, the "<u>D&O Related Insurance Policies</u>"), and all rights and benefits of any Sellers of any nature with respect to the D&O Related Insurance Policies, including all insurance recoveries or proceeds thereunder and rights to assert claims or actions with respect to any such insurance recoveries or proceeds;

(i)      financial accounting books and records, corporate charter, minute and stock record books, Tax Returns and other Tax records, corporate seal, checkbooks and canceled checks of the Company (except to the extent already owned by the Purchaser or any member of the Purchaser Group prior to the date hereof (including the Class B Members and any rights of such Class B Members under the Company Operating Agreement));

(j)      Sellers' rights under this Agreement, including the Purchase Price hereunder, or any Transaction Document, or any other agreement between any Seller and Purchaser entered into on or after the date hereof;

(k)      (i) all attorney-client work product and other legal privilege of each Seller, (ii) all records and reports prepared or received by Sellers or any of their Affiliates in connection with the sale of the Acquired Assets or any portion thereof, the Bankruptcy Case and the transactions contemplated hereby (copies of which Sellers shall, from and after the Closing, provide to Purchaser upon reasonable written request), and (iii) all confidentiality agreements with prospective purchasers of the Acquired Assets or any portion thereof, and all bids and expressions of interest received from third parties with respect thereto;

(l)      any Tax refunds, Tax abatements, Tax assets or other Tax recoveries receivable by any Seller or any of their Affiliates (together with any interest due thereon or penalty rebate arising therefrom) and all other Tax assets in each case arising from or attributable to the Acquired Assets or Assumed Liabilities in a Pre-Closing Tax Period;

(m)      all Seller Plans and all right, title and interest in any assets thereof or relating thereto;

(n)      all security, vendor, utility, and other similar deposits, prepaid expenses, advances, advance payments, prepayments, deferred charges or rebates in favor of the Sellers;

(o)      solely to the extent arising from or related to facts and circumstances that occurred prior to the Closing (except those arising from or related to the Assigned Contracts), all claims, causes of action and other legal rights and remedies of any nature, by counterclaim or otherwise, against other Persons; and

(p)      all assets of Pacific Alliance that are not primarily related to the Acquired Business or the Company.

1.3      Assumption of Liabilities

On the terms and subject to the conditions set forth in this Agreement, the Bidding Procedures Order and the Sale Order, effective as of the Closing, Purchaser shall irrevocably assume from Sellers (and from and after the Closing pay, perform, discharge or otherwise satisfy in accordance with their respective terms (or on such other terms as are agreed as between Purchaser and the Person to which such Liabilities are owed)), and Sellers shall irrevocably convey, transfer and assign to Purchaser the following Liabilities, in each case except to the extent constituting Excluded Liabilities (collectively, the "Assumed Liabilities"):

8

(a)    all Liabilities and obligations under the Assigned Contracts arising from and after the Closing;

(b)    all cure costs required to be paid pursuant to Section 365 of the Bankruptcy Code in connection with the assumption and assignment of the Assigned Contracts as finally determined by the Bankruptcy Court (the "Cure Costs");

(c)    all Liabilities (including all Assumed Taxes (including personal property Taxes) and Transfer Taxes, in each case determined in accordance with ARTICLE IX), arising out of the conduct of the Acquired Business or the ownership of the Acquired Assets, in each case, from and after the Closing Date; and

(d)    all accounts payable of the Acquired Business incurred after the Closing in the ordinary course of business that are entitled to priority status under Section 503(b) of the Bankruptcy Code (it being understood that such amounts shall not include any fees or expenses due to professional persons retained by Sellers or any other party involved in the Bankruptcy Case, including any creditors' committee).

1.4    Excluded Liabilities

Notwithstanding the foregoing and for the avoidance of doubt, (a) other than (i) the Assumed Liabilities and (ii) to the extent already owned by the Purchaser or any member of the Purchaser Group prior to the date hereof (including the Class B Members), Purchaser shall not assume or be liable for any Liabilities of any Seller or any of their respective Affiliates, whether or not related to the Acquired Business or the Acquired Assets, and Seller shall retain and be responsible for all other Liabilities of Seller and their respective Affiliates of all kinds, of any Retained Business or other business by Sellers or any of their Affiliates at any time and (b) Assumed Liabilities shall not include any Liability primarily relating to or primarily arising out of the Retained Business (all such Liabilities that Purchaser is not assuming being referred to collectively herein as the "Excluded Liabilities").  Without limiting the foregoing, the Excluded Liabilities shall include:

(a)    any Liability for Taxes (A) of a Seller or any of its Affiliates or any member or equity owner of such Seller or Affiliate or (B) relating to the Acquired Assets or the Assumed Liabilities for any taxable period (or portion thereof) ending on or before the Closing Date;

(b)    all professional fees and expenses for advisers of a Seller or its Affiliates, including advisers retained pursuant to an order of the Bankruptcy Court;

(c)    any Liability of a Seller, any of its Affiliates or any of its or their respective directors, officers, stockholders or agents (acting in such capacities), arising out of, or relating to, this Agreement or the other Transaction Documents, whether incurred prior to, at, or subsequent to, the Closing, including all finder's or broker's fees and expenses and any and all fees and expenses of any representatives of any of them;

(d)    other than as specifically set forth herein, any Liability relating to, occurring or existing in connection with, or arising out of, the ownership or operation of the Acquired

9

Business or Acquired Assets prior to the Closing (including any lawsuits outstanding as of the Closing where any of the Acquired Assets are subject or where a Seller is a defendant);

(e)     except as otherwise expressly set forth in the Transition Services Agreement, if any, any Liability with respect to any GBG Business Employee, GBG Business Contractor, other employee or any other Person at any time employed or retained by or otherwise providing services to a Seller or any of its Affiliates, including any Liability relating to or arising out of the employment or service relationship or termination of the employment or service relationship of any such Person and any compensation or benefits of any such Person;

(f)     all Liability related to or arising under the Seller Plans;

(g)     any Liability relating to or arising out of the ownership, possession, use, operation or sale or other disposition of any Excluded Asset;

(h)     all accounts payable owed by Sellers in connection with goods or services received prior to the Closing; and

(i)     all open purchase orders, including the orders described on <u>Schedule 1.4(i)</u>.

1.5     <u>Assumption/Rejection of Certain Contracts</u>

(a)     <u>Assumption and Assignment of Executory Contracts</u>.  Sellers shall use commercially reasonable efforts to take all actions required to assign the Assigned Contracts to Purchaser (subject to payment by Purchaser of the Closing Cure Costs Amount and provision by Purchaser of adequate assurance of future performance as may be required under Section 365 of the Bankruptcy Code), including but not limited to all commercially reasonable efforts to obtain, and to cooperate in obtaining, all Consents and Governmental Authorizations necessary to assume and assign such Assigned Contracts and Assigned Permits to Purchaser.  Sellers shall use commercially reasonable efforts to facilitate any negotiations with the counterparties to such Assigned Contracts and all Assigned Permits, including, at the reasonable request of the Purchaser, to enter into amendments to any Assigned Contracts to the extent such amendments are required by the applicable counterparty for Purchaser's assumption of such Assigned Contract, and to obtain an Order (which may be the Sale Order) containing a finding that the proposed assumption and assignment of the Assigned Contracts to Purchaser satisfies all applicable requirements of Section 365 of the Bankruptcy Code. Sellers shall have no obligation to Purchaser to provide adequate assurance of future performance under any Assigned Contract in connection with the assignment and assumption thereof by Sellers. Notwithstanding anything contained herein to the contrary, Purchaser agrees that no Seller shall be required to pay any fee to obtain any Consent to assign the Assigned Contracts or Assigned Permits or make any commercial concession that negatively impacts any Seller, the Excluded Assets or the Retained Business. At the Closing, Sellers shall, pursuant to the Bidding Procedures Order, Sale Order and any Assignment and Assumption Agreement(s), assign to Purchaser (the consideration for which is included in the Purchase Price), all Assigned Contracts that may be assigned by any such Seller to Purchaser pursuant to Sections 363 and 365 of the Bankruptcy Code subject to provision by Purchaser of adequate assurance of future performance as may be required under Section 365 of the Bankruptcy Code and payment by Purchaser of the Closing Cure Costs Amount in respect of Assigned

Contracts pursuant to and in accordance with Section 365 of the Bankruptcy Code, the Bidding Procedures Order and the Sale Order.  At the Closing, Purchaser shall assume, and thereafter in due course and in accordance with its respective terms pay, fully satisfy, discharge and perform all of the obligations under each Assigned Contract pursuant to Section 365 of the Bankruptcy Code.

(b)    Deemed Consents. As part of the Sale Order, the Sellers shall request that by virtue of a Seller providing fourteen (14) days' notice of its intent to assume and assign any Contract, the Bankruptcy Court shall bar any non-debtor party to such Contract from objecting to its assignment and assumption if an objection is not filed with the Bankruptcy Court by such non-debtor party during the applicable notice period, solely to the extent that, pursuant to the Sale Order or other Bankruptcy Court Order, the applicable Seller is authorized to assume and assign the Contract to the Purchaser and the Purchaser is authorized to accept such Assigned Contract pursuant to Section 365 of the Bankruptcy Code.

(c)    Non-Assignment.  Notwithstanding the foregoing, an Assigned Contract shall not be assigned to, or assumed by, Purchaser on the Closing Date to the extent that such Contract (i) is terminated by a Seller or the other party thereto, or terminates or expires by its terms, on or prior to the Closing Date and is not continued or otherwise extended upon assumption or (ii) requires a Consent or Governmental Authorization (other than, and in addition to, that of the Bankruptcy Court) in order to permit the sale or transfer to Purchaser of the applicable Seller's rights under such Contract, and, despite Sellers undertaking commercially reasonable efforts to obtain, and to cooperate in obtaining, such Consent or Governmental Authorization has not been obtained on or prior to the Closing Date.  In addition, an Assigned Permit shall not be assigned to, or assumed by, Purchaser on the Closing Date to the extent that such permit requires a Consent or Governmental Authorization (other than, and in addition to, that of the Bankruptcy Court) in order to permit the sale or transfer to Purchaser of the applicable Seller's rights under such Assigned Permit, and despite the Seller undertaking all commercially reasonable efforts to obtain, and to cooperate in obtaining, such Consent or Governmental Authorization, no such Consent or Governmental Authorization has been obtained on or prior to the Closing Date.  In the event that any Assigned Contract or Assigned Permit is deemed not to be assigned pursuant to this Section 1.5(c), the Closing shall nonetheless take place subject to the terms and conditions set forth herein and, thereafter, through the earlier of such time as such Consent or Governmental Authorization is obtained and 90 days following the Closing (or the remaining term of such Contract, if shorter), Sellers and Purchaser shall (A) use commercially reasonable efforts to secure such Consent or Governmental Authorization as promptly as practicable after the Closing and (B) cooperate in good faith in any lawful and commercially reasonable arrangement reasonably proposed by Purchaser, including subcontracting, licensing or sublicensing to Purchaser, to the extent permitted under the Assigned Permit or Assigned Contract, as applicable, any or all of any Seller's rights and obligations with respect to any such Assigned Contract or Assigned Permit, as applicable, under which (1) Purchaser shall obtain (without infringing upon the legal rights of such third party or violating any applicable Law) the economic rights and benefits (net of the amount of any reasonable and documented out-of-pocket costs imposed on Sellers or their respective affiliates relating to such arrangement with Purchaser) under such Assigned Contract or Assigned Permit, as applicable, with respect to which the Consent and/or Governmental Authorization has not been obtained and (2) Purchaser shall assume any related liability (but shall also receive the benefit of any corresponding Tax benefit obtained by Sellers or their respective affiliates related thereto) and

11

obligation (including performance) with respect to such Assigned Contract or Assigned Permit, as applicable. Upon satisfying any requisite Consent or Governmental Authorization requirement applicable to such Assigned Contract or Assigned Permit, as applicable, after the Closing, such Assigned Contract or Assigned Permit, as applicable, shall promptly be transferred and assigned to Purchaser in accordance with the terms of this Agreement. In connection with and without limiting the foregoing, for so long as an Assigned Contract is not transferred to Purchaser, each party will use commercially reasonable efforts and cooperate in good faith with the other party to allow Purchaser to perform the services thereunder on Sellers' behalf, in all cases without infringing upon the legal rights of any third party or violating any applicable Law and subject to the other terms of this Section 1.5(c), such that Sellers may provide delivery with respect to customer commitments thereunder and Purchaser shall obtain the economic rights and benefits under such Assigned Contract.

(d)     If after the Closing (i) Purchaser holds any Excluded Assets or Excluded Liabilities or (ii) any Seller holds any Acquired Assets or Assumed Liabilities, Purchaser or the applicable Seller will transfer (or cause to be transferred), as promptly as is reasonably practicable, such assets or assume (or cause to be assumed) such Liabilities to or from (as the case may be) the other Party, subject to Section 1.5(c), which shall apply, mutatis mutandis, to any such transfer as applicable. Prior to any such transfer, the Party receiving or possessing any such asset will hold it in trust for the benefit of such other Party.

## ARTICLE II

## CONSIDERATION; PAYMENT; CLOSING

2.1     Consideration; Payment

(a)     The aggregate consideration (the "Purchase Price") to be paid by Purchaser for the purchase of the Acquired Assets shall be:  (i) the assumption of Assumed Liabilities, plus (ii) a cash payment of $3,300,000 (the "Cash Payment").

(b)     At the Closing,

(i)     Purchaser shall deliver, or cause to be delivered, to the Sellers (i) the Cash Payment less (ii) the Deposit less (iii) the Closing Cure Costs Amount (the "Closing Date Payment");

(ii)     Purchaser shall deposit with the Escrow Agent the Closing Cure Costs Amount; and

(iii)     the Parties shall cause Ankura Trust Company, LLC (the "Escrow Agent") to deliver the Deposit to the Sellers.

The Closing Date Payment, the Closing Cure Costs Amount and any payment required to be made pursuant to any other provision hereof shall be made in cash by wire transfer of immediately available funds to such bank account as shall be designated in writing by the applicable Party at least two (2) Business Days prior to the date such payment is to be made.

(c)    Purchaser will be entitled to deduct and withhold (or cause to be deducted and withheld) from any payment made pursuant to this Agreement such amounts as are required to be deducted and withheld with respect to such payment under the Code or any other provision of applicable Tax Law.  If Purchaser determines that any amount is required to be deducted or withheld, Purchaser shall use reasonable best efforts to: (i) provide at least two Business Days written notice to the Sellers, together with reasonably sufficient details regarding the relevant withholding Law; (ii) cooperate in good faith with the other party to reduce or eliminate the deduction or withholding of such amount; and (iii) provide the other party a reasonable opportunity to provide forms or documentation that would exempt such amounts from withholding.  To the extent that any amounts are so withheld and properly remitted to the applicable Governmental Body, such amounts will be treated for all purposes of this Agreement as having been paid to the Person in respect of which such withholding was made.

2.2    <u>Deposit</u>

(a)    Prior to or concurrently with the execution of this Agreement, Purchaser shall make an earnest money deposit in an amount equal to $330,000 (the "<u>Deposit</u>") by wire transfer of immediately available funds to Ankura Trust Company in accordance with the wire instructions set forth on <u>Schedule 2.2</u>, which will be held and distributed in accordance with the terms of this Agreement and the Bidding Procedures Order.  The Deposit shall not be subject to any lien, attachment, trustee process or any other judicial process of any creditor of any Seller or Purchaser and shall be applied against payment of the Purchase Price on the Closing Date).  For the avoidance of doubt, the Deposit shall not be considered property of any Seller's estate under section 541 of the Bankruptcy Code.

(b)    If this Agreement is terminated by the Sellers pursuant to <u>Section 8.1(e)</u> or <u>8.1(g)</u> (or by Purchaser pursuant to <u>Section 8.1(b)</u>, <u>8.1(c)</u> or <u>8.1(d)</u>, in each case, in circumstances where the Sellers would be entitled to terminate this Agreement pursuant to <u>Section 8.1(e)</u> or <u>8.1(g)</u>), then the Sellers shall retain the Deposit.

(c)    If this Agreement is terminated by any Party, other than as contemplated by <u>Section 2.2(b)</u>, then the Deposit shall be returned to Purchaser within five (5) Business Days after such termination.

(d)    In the event the Deposit becomes payable to Purchaser or the Sellers pursuant to <u>Section 2.2(b)</u> or <u>2.2(c)</u>, the Parties agree to cause Escrow Agent to disburse the Deposit to Purchaser or the Sellers, as applicable, by wire transfer of immediately available funds to an account designated by Purchaser or the Sellers, as applicable.  The Parties agree that the Sellers' right to retain the Deposit, as set forth herein, is not a penalty, but rather is liquidated damages in a reasonable amount that will compensate Sellers for their respective efforts and resources expended and the opportunities forgone while negotiating this Agreement and in reliance on this Agreement and the Transaction Documents and on the expectation of the consummation of the transactions contemplated hereby and thereby, which amount would otherwise be impossible to calculate with precision.

2.3    <u>Closing</u>

13

The closing of the purchase and sale of the Acquired Assets, the delivery of the Purchase Price and the assumption of the Assumed Liabilities (the "Closing") will take place by telephone conference and electronic exchange of documents at 9:00 a.m. Eastern Time on the second (2nd) Business Day following full satisfaction or due waiver (by the Party entitled to the benefit of such condition) of the closing conditions set forth in Article VII (other than conditions that by their terms or nature are to be satisfied at the Closing at the Closing, but subject to the satisfaction or waiver of such conditions), or at such other place and time as the Parties may agree.  The date the Closing occurs is referred to as the "Closing Date."

2.4    Closing Deliveries by Sellers

At or prior to the Closing, Sellers shall deliver to Purchaser:

(a)    a bill of sale substantially in the form of Exhibit A (the "Bill of Sale") duly executed by Sellers;

(b)    an assignment and assumption agreement substantially in the form of Exhibit B (the "Assignment and Assumption Agreement") duly executed by Sellers;

(c)    the Transition Services Agreement, in the form of Exhibit C (the "Transition Services Agreement"), duly executed by GBG USA, Inc.;

(d)    a copy of the Sale Order, as entered by the Bankruptcy Court;

(e)    email confirmation of Seller's bankruptcy counsel that the Sale Order has been duly entered by the Bankruptcy Court, that the Sale Order has not been stayed, suspended, modified, amended, vacated, or reversed by an appellate court, and that the Sale Order is enforceable in accordance with its terms;

(f)    an officer's certificate, dated as of the Closing Date, executed by a duly authorized officer of the Company certifying that the conditions set forth in Sections 7.2(a) and 7.2(b) have been satisfied;

(g)    a complete and duly executed IRS Form W-9 for each Seller;

(h)    the Escrow Agreement, duly executed by Sellers or an affiliate thereof and the Escrow Agent; and

(i)    all other documents, instruments and writings reasonably requested by Purchaser to be delivered by Sellers at or prior to the Closing pursuant to this Agreement.

2.5    Closing Deliveries by Purchaser

At the Closing, Purchaser shall deliver to (or at the express written direction of) the Sellers:

(a)    the Closing Date Payment;

(b)    the Bill of Sale, duly executed by Purchaser;

14

(c)     the Assignment and Assumption Agreement, duly executed by Purchaser;

(d)     the Transition Services Agreement, duly executed by Purchaser;

(e)     an officer's certificate, dated as of the Closing Date, executed by a duly authorized officer of Purchaser certifying that the conditions set forth in Sections 7.3(a) and 7.3(b) have been satisfied; and

(f)     all other documents, instruments and writings reasonably requested by Sellers to be delivered by Purchaser at or prior to the Closing pursuant to this Agreement.

## ARTICLE III

## REPRESENTATIONS AND WARRANTIES OF SELLERS

Except as set forth in the Schedules delivered by the Sellers concurrently herewith and Section 10.10, Sellers, jointly and severally, represent and warrant to Purchaser as follows.

3.1     Organization and Qualification

Each of the Sellers (a) is an entity duly incorporated or organized and validly existing under the Laws of its jurisdiction of incorporation or organization, as applicable, (b) has all requisite corporate or limited liability company power and authority to own and operate its properties and to carry on its businesses as now conducted, subject to the provisions of the Bankruptcy Code, and (c) is qualified to do business and is in good standing (or its equivalent) under the Laws of its jurisdiction of incorporation or organization, as applicable, and in every jurisdiction in which its ownership of property or the conduct of its business as now conducted requires it to qualify, except where the failure to be so qualified would not reasonably be expected to have a Material Adverse Effect.

3.2     Authorization of Agreement

The execution, delivery and performance of this Agreement by each Seller and each Transaction Document to which such Seller is a party, and the consummation by such Seller of the transactions contemplated hereby and thereby, subject to requisite Bankruptcy Court approvals, have been duly and validly authorized by all requisite corporate or similar organizational action, and no other corporate or similar organizational proceedings on its part are necessary to authorize the execution, delivery or performance of this Agreement by such Seller. Subject to requisite Bankruptcy Court approvals, this Agreement has been, and each Transaction Document to which such Seller is a party has been or will be as of the Closing, duly and validly executed and delivered by such Seller, and, assuming this Agreement is a valid and binding obligation of Purchaser and Guarantor, this Agreement constitutes a valid and binding obligation of such Seller, enforceable against such Seller in accordance with its terms, except as limited by the application of bankruptcy, insolvency, reorganization, fraudulent conveyance, moratorium or other Laws relating to or affecting creditors' rights or general principles of equity (whether considered in a proceeding in equity or at law) (the "Enforceability Exceptions"). Assuming each Transaction Document to which such Seller is or will be a party is or will be, as of the Closing, a valid and binding obligation of Purchaser, such Transaction Document constitutes or will constitute, as of the Closing, a valid

15

and binding obligation of such Seller, enforceable against such Seller in accordance with its terms, except as limited by the Enforceability Exceptions.

3.3    Conflicts; Consents

(a)    Except as set forth on Schedule 3.3(a) and assuming that (x) requisite Bankruptcy Court approvals are obtained and (y) the notices, authorizations, approvals, Orders, permits or consents set forth on Schedule 3.3(b) are made, given or obtained, as applicable, the execution, delivery and performance by Sellers of this Agreement and the Transaction Documents and the consummation by Sellers of the transactions contemplated hereby and thereby, do not: (i) violate the certificate of incorporation or formation, bylaws or limited liability company agreement or equivalent organizational documents of any of the Sellers; (ii) violate any Order or Law applicable to the Acquired Business, to any of the Acquired Assets or by which the Acquired Assets are bound; or (iii) result in any breach of, acceleration, or constitute a default (or an event that, with notice or lapse of time or both, would become a default) under, create in any party thereto the right to terminate or cancel, or require any consent under, or result in the creation or imposition of any Encumbrance (other than a Permitted Encumbrance) on any Assigned Contract or Assigned Permit, except, in each case, for any such violations, breaches, defaults or other occurrences that are not material to the Acquired Assets and Assumed Liabilities taken as a whole.

(b)    Except as set forth on Schedule 3.3(b) and assuming that requisite Bankruptcy Court approvals are obtained, Sellers are not required to file, seek or obtain any notice, authorization, approval, Order, permit or consent of or with any Governmental Body in connection with the execution, delivery and performance by Sellers of this Agreement or the consummation by Sellers of the transactions contemplated hereby, except (i) requisite Bankruptcy Court approvals, (ii) where failure to obtain such consent, approval, authorization or action, or to make such filing or notification, would not reasonably be expected to be material to the Acquired Assets and Assumed Liabilities taken as a whole or (iii) as may be necessary as a result of any facts or circumstances relating to Purchaser or any of its Affiliates.

3.4    Condition and Sufficiency of Assets

(a)    Each item of Tangible Personal Property is (i) structurally sound, in good operating condition and repair, and adequate for the uses to which they are being put, except in each case as would not be material to the Acquired Business taken as a whole, (ii) not in need of maintenance other than ordinary, routine maintenance in the Ordinary Course, and (iii) in compliance with all requirements under any Laws and any licenses which govern the use and operation thereof, except where the failure to be in such compliance would not be material to the Acquired Business taken as a whole.  The Acquired Assets and the Assumed Liabilities to be transferred to Purchaser at the Closing, together with the services and rights provided for in the Transaction Documents, constitute (i) in the case of the Company, all of the assets and liabilities of the Company that are related to the Acquired Business, (ii) in the case of Pacific Alliance, all of the assets and liabilities of Pacific Alliance that are primarily related to the Acquired Business and (iii) in the case of any Affiliate of either Seller, all of the assets and liabilities of such Affiliate that are primarily related to the Acquired Business.

16

(b)    Subject to requisite Bankruptcy Court approvals, and subject to assumption by Purchaser of the Assigned Contracts, the Acquired Assets, together with the services and rights provided for in the Transaction Documents, are sufficient for the continued conduct of the Acquired Business after the Closing in substantially the same manner as conducted prior to the Closing and constitute all of the rights, property, and assets necessary to conduct the Acquired Business as currently conducted.

3.5    Title to Acquired Assets.

(a)    One of the Sellers is the lawful owner of, and has good title to, or a valid leasehold interest in, all of the Acquired Assets, free and clear of Encumbrances.

3.6    Assigned Contracts.

(a)    Each Assigned Contract is valid and binding on the applicable Seller in accordance with its terms and is in full force and effect. Neither the Sellers (other than as to the payment of Cure Costs), nor, to the Knowledge of Sellers, any other party thereto are in breach of, violation of or default under (or is alleged to be in breach of, violation of or default under), or has provided or received any notice of any intention to suspend or terminate, any Assigned Contract. No event or circumstance has occurred that would constitute an event of default under any Assigned Contract or result in a termination thereof. Complete and correct copies of each Assigned Contract (including all modifications, amendments, and supplements thereto and waivers thereunder) have been made available to Purchaser There are no disputes pending or, to the Knowledge of Sellers, threatened under any Assigned Contract. Subject to payment of the Cure Costs, Sellers have paid all amounts due and payable by Sellers pursuant to the Assigned Contracts.

3.7    Inventory.

(a)    All Inventory consists of a quality and quantity usable and, with respect to finished goods, salable in the ordinary course of business consistent with past practice, except for obsolete, below-standard quality, damaged, defective, or slow-moving items that have been written off or written down to fair market value. No Inventory is held on a consignment basis, and following the Closing all Inventory will be owned by Purchaser free and clear of all Encumbrances and any successor liability. All Inventory is free from defects in materials and workmanship (normal wear and tear expected), except as would not be material to the Acquired Business taken as a whole.  Schedule 3.7 sets forth a true and complete aging schedule for the Inventory, as of the date of this Agreement.

3.8    Material Customers and Suppliers.

(a)    Schedule 3.8(a) sets forth with respect to the Acquired Business (i) each customer who has paid aggregate consideration for goods or services rendered in an amount greater than or equal to $100,000 for the most recent fiscal year (collectively, the "Material Customers"); and (ii) the amount of consideration paid by each Material Customer during such periods. No Seller has received any notice that any of the Material Customers has ceased, or intends to cease after the

Closing, to use the goods or services of the Acquired Business or to otherwise terminate or materially reduce its relationship with the Acquired Business.

(b)      Schedule 3.8(b) sets forth with respect to the Business (i) each supplier and/or vendor to whom a Seller has paid aggregate consideration for goods or services rendered in an amount greater than or equal to $100,000 for the most recent fiscal year (collectively, the "Material Suppliers"); and (ii) the amount of purchases from each Material Supplier during such periods. No Seller has received any notice that any of the Material Suppliers has ceased, or intends to cease, to supply goods or services to the Acquired Business or to otherwise terminate or materially reduce its relationship with the Acquired Business.

3.9      Legal Proceedings; Government Orders

(a)      Except as set forth on Schedule 3.9:

(a)      There are no claims, actions, causes of action, demands, lawsuits, arbitrations, inquiries, audits, notices of violation, proceedings, litigation, citations, summons, subpoenas, or investigations of any nature, whether at Law or in equity (collectively, "Actions") pending or, to the Knowledge of Sellers, threatened against or by (i) either Seller relating to or affecting the Acquired Business, the Acquired Assets, or the Assumed Liabilities or (ii) either Seller, the Company or any of its Affiliates that would materially affect either Seller's ability to consummate the transactions contemplated hereby.

(b)      There are no outstanding orders, writs, judgments, injunctions, decrees, stipulations, determinations, penalties, or awards entered by or with any Governmental Body against, relating to, or affecting the Acquired Business or the Acquired Assets.

3.10      Compliance with Laws.

(a)      Sellers are in material compliance with all Laws applicable to the conduct of the Acquired Business as currently conducted or the ownership and use of the Acquired Assets.

3.11      Employee Matters.

(a)      Schedule 3.11(a)(i) sets forth, in all material respects, a complete and accurate list of all employees of GBG USA or any of its Affiliates whose primary responsibility is the provision of services to the Company or the Business (the "GBG Business Employees") as of the date of this Agreement, along with the position, status as full-time or part-time, date of hire, base compensation or contract fee, any other incentive-based compensation (such as bonuses or commissions), status as exempt or non-exempt for purposes of federal and state overtime pay requirements, status as active or on leave, accrued but unused sick time or vacation leave or paid time off and a description of the fringe benefits provided to each such individual as of the date hereof.  Schedule 3.11(a)(ii) sets forth a complete and accurate list of each individual engaged to provide services to GBG USA or any of its Affiliates with respect to the Acquired Business as a consultant or other independent contractor ("GBG Business Contractors")  and, for each such individual, Sellers have made available to Purchaser any agreement between such GBG Business Contractor and such Seller.  The Company does not and has never employed any employees..

18

(b)    Schedule 3.11(b) sets forth each "multiemployer plan" within the meaning of Section 3(37) or Section 4001(a)(3) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), that is subject to Title IV of ERISA, to which such Seller or any Affiliate thereof contributes or has an obligation to contribute or in respect of which such Seller or any Affiliate thereof has any actual or contingent Liability, in each case with respect to the GBG Business Employees or the Acquired Assets.

(c)    Except as set forth on Schedule 3.11(c), no Seller has ordered or implemented any plant closing, mass layoff, group termination or similar event with respect to Employees that requires the issuance of notice under the WARN Act or any similar Law, and no such action is planned or contemplated prior to Closing.

3.12    Intellectual Property Matters; Data Privacy.

(a)    Schedule 3.12(a) lists all (i) Intellectual Property of any Seller that is the subject of a patent, registration, or pending application, including domain name and social media account registrations ("Registered IP") and (ii) material unregistered Intellectual Property of the Sellers, in each case that is related to the Acquired Business, and, specifying as to each such item, as applicable, the owner(s) of record (and, in the case of domain names, the registrant, and in the case of social media accounts, the account holder), jurisdiction of application and/or registration and the application and/or registration number.  To the Knowledge of Sellers, all Registered IP is in full force and otherwise in good standing.  To the Knowledge of Sellers, all Registered IP identified on Schedule 3.12(a) is valid, subsisting, and enforceable.  Subject to entry of the Sale Order, a Seller exclusively owns all right, title (including, with respect to all Registered IP, record title) and interest in and to the Transferred Intellectual Property free and clear of all Encumbrances (except for Permitted Encumbrances).

(b)    Neither the Transferred Intellectual Property nor the operation or conduct of the Acquired Business, including the manufacture, marketing, license, sale or use of any products or services anywhere in the world in connection with the Acquired Business, has (i) to the Knowledge of the Sellers, infringed, misappropriated, or otherwise violated, or is infringing, misappropriating, or otherwise violating any Intellectual Property of any other Person, or (ii) violated any license or agreement with any third party to which a Seller is bound.  None of the Sellers have received any written claim, demand or notice, and no Action is pending or threatened against any of the Sellers: (i) alleging any infringement, misappropriation, or other violation of any Transferred Intellectual Property of any other Person; or (ii) challenging the validity, registrability, enforceability or ownership of, or the right of the Sellers and their respective Subsidiaries to use, any Transferred Intellectual Property.  To the Knowledge of Sellers, no other Person is infringing, misappropriating or otherwise violating any Transferred Intellectual Property. Except as set forth on Schedule 3.12(b), none of the Intellectual Property included in the Acquired Assets is subject to any outstanding judgment, decree or order of any Governmental Body.  None of the Registered IP has been or is now involved in any interference, reissue, inter-partes review, reexamination, cancellation, revocation, opposition or other proceeding in the United States Patent and Trademark Office or any other Governmental Body.

(c)    The Transferred Intellectual Property, together with any Licensed Intellectual Property covered by the Transition Services Agreement, if any, constitutes all

19

Intellectual Property owned or purported to be owned by Sellers, or licensed to the Sellers, and used or held for use by Sellers in each case in connection with the Acquired Business.

(d)    The Transferred Intellectual Property is sufficient to operate the business of the Company as presently operated.

(e)    The Sellers' practices with regard to the collection, dissemination and use of Personal Data in connection with the Acquired Business are and have been at all times in conformance in all material respects with all (i) Laws relating to data protection or personal information, and (ii) contractual commitments of the Sellers. For the thirty six (36) months immediately preceding the date of this Agreement and the Closing Date, (i) the Sellers have not received any written notification or allegation from any competent authority (including any information or enforcement notice, or any transfer prohibition notice) alleging that any of the Sellers has not complied in any respect with Laws relating to data protection or personal information and (ii) to the Knowledge of Sellers, there has been no loss of, or unauthorized access, use, disclosure or modification of any Personal Data.

3.13    Brokers

(a)    Except for Ducera Partners LLC, whose fees and expenses will be borne solely by Sellers, there is no investment banker, broker, finder or other intermediary which has been retained by or is authorized to act on behalf of Sellers that might be entitled to any fee or commission in connection with the transactions contemplated by this Agreement.

3.14    Taxes

Except as set forth in Schedule 3.14:

(a)    Sellers have timely filed or caused to be filed with the appropriate federal, state, local, or foreign Governmental Body all Tax Returns required to be filed in respect of the Acquired Assets or of the Acquired Business and have timely paid in full or caused to be paid in full all material Taxes required to be paid (whether or not shown on any Tax Return), and all such Tax Returns are true, correct and complete in all material respects;

(b)    there are no liens or encumbrances for Taxes upon the Acquired Assets except Permitted Encumbrances;

(c)    Sellers have withheld or collected and paid (or set aside for payment when due) all Taxes required to be withheld or collected and paid with respect to the Acquired Assets or the Acquired Business, have timely filed all Tax Returns that are required to be filed in respect of any such Tax withholding (including IRS Forms 1099 and W-2), and have accurately reported all information required to be included on such Tax Returns;

(d)    Sellers have not consented to extend or granted any waiver of any statute of limitations with respect to, or any extension of a period for the assessment of, any Taxes with respect to the Acquired Assets, Acquired Business, or Assumed Liabilities;

(e)    there is no action, suit, proceeding, investigation, audit, claim, assessment or judgment currently ongoing, pending, or threatened in writing, for or relating to any Liability for Taxes with respect to the Acquired Assets, Acquired Business, or Assumed Liabilities by any Governmental Body; and

(f)    no Acquired Asset is (i) tax-exempt use property within the meaning of Section 168(h) of the Code, (ii) an equity interest in any Person, or (iii) a "United States real property interest" within the meaning of Section 897(c) of the Code.

3.15    <u>Financial Information</u>.  The Sellers have maintained the books of account and financial records of the Acquired Business in the usual, regular, and ordinary manner.  Attached hereto as <u>Schedule 3.15</u> is a true and accurate copy of the unaudited interim balance sheet  for the nine months ended September 30, 2021 (the "<u>Balance Sheet Date</u>"), with respect to the Acquired Business (such balance sheet, the "<u>Financial Statements</u>").  Except as set forth in the Financial Statements, there are no material Liabilities with respect to the Acquired Business, contingent or otherwise, other than (i) Liabilities incurred in the ordinary course of business subsequent to the Balance Sheet Date; and (ii) Liabilities which, individually and in the aggregate, would not be material to Acquired Business, as a whole.

3.16    <u>Accounts Receivable</u>. The accounts receivable of the Company have arisen from bona fide transactions entered into by the Company in the ordinary course of business. The Company has not at any time in the past twelve (12) months accelerated the payment terms with respect to any such accounts receivable that would otherwise be due and payable after the Closing Date in the ordinary course of business to become payable prior to the Closing.

3.17    <u>Absence of Certain Developments</u>.  Since the Balance Sheet Date through the date of this Agreement, (a) the Company has, in all material respects, conducted its business and operated its properties in the ordinary course of business consistent with past practice and (b) the Company has not taken any action which, if taken after the date hereof, would require the consent of the Purchaser pursuant to <u>Section 7.1</u>.  Since the Balance Sheet Date, there has not been any Material Adverse Effect and no circumstances have arisen, which, individually or in the aggregate, would reasonably be expected to have a Material Adverse Effect.

3.18    <u>Related Party Transactions</u>.  Except as set forth in <u>Schedule 3.18</u>, the Company is not party to any transactions, Contracts, arrangements, or understandings with any other Seller or any Affiliate thereof.

3.19    <u>No Other Representations or Warranties.</u>

(a)    Except for the representations and warranties expressly made by Sellers to Purchaser in this Article III (as qualified by the Schedules and in accordance with the express terms and conditions (including limitations and exclusions) of this Agreement) (the "<u>Express Representations</u>") (it being understood that Purchaser and the Purchaser Group have relied only on such Express Representations), Purchaser acknowledges and agrees, on its own behalf and on behalf of the Purchaser Group, that neither any Seller nor any other Person on behalf of any Seller makes, and neither Purchaser nor any member of the Purchaser Group has relied on, the accuracy or completeness of any express or implied representation or warranty with respect to the Sellers,

21

the Acquired Assets or the Assumed Liabilities or with respect to any statement or information of any nature made or provided by any Person, any information, statements, disclosures, documents, projections, forecasts or other material made available to Purchaser or any of its Affiliates or Advisors by electronic mail or in that certain datasite administered by DataSite (the "Dataroom") or elsewhere, or Projections on behalf of any Seller or any of its Affiliates or Advisors to Purchaser or any of its Affiliates or Advisors. Without limiting the foregoing, neither any Seller nor any other Person will have or be subject to any Liability whatsoever to Purchaser, or any other Person, resulting from the distribution to Purchaser or any of its Affiliates or Advisors, or Purchaser's or any of its Affiliates' or Advisors' use of or reliance on, any such information, including any information, statements, disclosures, documents, projections, forecasts or other material made available to Purchaser or any of its Affiliates or Advisors in the Dataroom or elsewhere, Projections or otherwise in expectation of the transactions contemplated by this Agreement or any Transaction Document or any discussions with respect to any of the foregoing information. Notwithstanding anything contained herein to the contrary, the Parties acknowledge that the disclaimer set forth in this Section 3.19 is not intended to and does not limit or waive any Party's Liability for Fraud.

## ARTICLE IV

## REPRESENTATIONS AND WARRANTIES OF PURCHASER

Purchaser represents and warrants to the Sellers as follows as of the date hereof and as of the Closing Date.

### 4.1    Organization and Qualification

Purchaser (a) is an entity duly incorporated or organized, validly existing and in good standing under the Laws of the jurisdiction of its incorporation or organization, as applicable, (b) has all requisite power and authority to own and operate its properties and to carry on its businesses as now conducted and (c) is qualified to do business and is in good standing (or its equivalent) in every jurisdiction in which its ownership of property or the conduct of its business as now conducted requires it to qualify, except where the failure to be so qualified would not reasonably be expected to have, individually or in the aggregate, a material adverse effect on Purchaser's ability to consummate the transactions contemplated under this Agreement and the other Transaction Documents. Guarantor is an entity duly incorporated or organized, validly existing and in good standing under the Laws of the jurisdiction of its incorporation or organization, as applicable.

### 4.2    Authorization of Agreement

The execution, delivery and performance of this Agreement and the other Transaction Documents by Purchaser, and the consummation by Purchaser of the transactions contemplated hereby and thereby, have been duly and validly authorized by all requisite corporate or similar organizational action, and no other corporate or similar organizational proceedings on its part are necessary to authorize the execution, delivery or performance hereunder and thereunder by Purchaser.  This Agreement and the Transaction Documents have been duly and validly executed and delivered by Purchaser, and, assuming this Agreement and the Transaction Documents are valid and binding obligations of Sellers, this Agreement and the Transaction Documents constitute

valid and binding obligations of Purchaser, enforceable against Purchaser in accordance with their terms, except as limited by the Enforceability Exceptions. The execution, delivery and performance of this Agreement and the other Transaction Documents to which Guarantor is a party, if any, by Guarantor, and the consummation by Guarantor of the transactions contemplated hereby and thereby, have been duly and validly authorized by all requisite corporate or similar organizational action, and no other corporate or similar organizational proceedings on its part are necessary to authorize the execution, delivery or performance hereunder and thereunder by Guarantor. This Agreement and the other Transaction Documents to which Guarantor is a party, if any, have been duly and validly executed and delivered by Guarantor, and, assuming this Agreement and the Transaction Documents are valid and binding obligations of Sellers, this Agreement and the Transaction Documents constitute valid and binding obligations of Guarantor, enforceable against Guarantor in accordance with their terms, except as limited by the Enforceability Exceptions.

4.3    <u>Conflicts; Consents</u>

(a)    The execution, delivery and performance by Purchaser of this Agreement and the Transaction Documents and the consummation by Purchaser of the transactions contemplated hereby and thereby, do not: (i) violate the certificate of formation, limited liability company agreement or equivalent organizational documents of Purchaser; (ii) violate any applicable Law applicable to Purchaser or by which any property or asset of Purchaser is bound; or (iii) result in any breach of, constitute a default (or an event that, with notice or lapse of time or both, would become a default) under, create in any party thereto the right to terminate or cancel, or require any consent under, or result in the creation or imposition of any Encumbrance on any property or asset of Purchaser under, any lease or Contract; except, in each case, for any such violations, breaches, defaults or other occurrences that would not, individually or in the aggregate, reasonably be expected to prevent or materially delay the ability of Purchaser to consummate the transactions contemplated hereby and thereby.

(b)    Purchaser is not required to file, seek or obtain any notice, authorization, approval, Order, permit or consent of or with any Governmental Body in connection with the execution, delivery and performance by Purchaser of this Agreement, the Transaction Documents, or the consummation by Purchaser of the transactions contemplated hereby and thereby, except from the Bankruptcy Court or where failure to obtain such consent, approval, authorization or action, or to make such filing or notification, would not, individually or in the aggregate, reasonably be expected to prevent or materially delay the ability of Purchaser to consummate the transactions contemplated hereby and thereby.

4.4    <u>Financing</u>

Purchaser has access to, and will have at the Closing, sufficient immediately available funds in an aggregate amount necessary to pay the Purchase Price and all fees and expenses of Purchaser related to the transactions contemplated by this Agreement or any Transaction Document, to perform the Assumed Liabilities as they become due in accordance with their terms and to consummate all of the other transactions contemplated by this Agreement or any Transaction Document.

23

4.5    Brokers

There is no investment banker, broker, finder or other intermediary which has been retained by or is authorized to act on behalf of Purchaser that might be entitled to any fee or commission in connection with the transactions contemplated by this Agreement or any Transaction Document to which Purchaser is a party.

4.6    No Litigation

There are no Actions pending or, to Purchaser's knowledge, threatened against or affecting Purchaser that will adversely affect Purchaser's performance under this Agreement or the consummation of the transactions contemplated by this Agreement or any Transaction Document.

4.7    Guarantor Financial Capabilities.

As of the date hereof and as of the Closing, Guarantor has and will have the resources, financial or otherwise, to perform its obligations hereunder, and has and will have the capabilities to carry out its financial and other obligations under this Agreement, including Guarantor's obligations with respect to  the Purchaser Obligations pursuant to Section 10.20. Guarantor is not insolvent. No insolvency proceedings of any nature, including bankruptcy, receivership, reorganization, composition, arrangement with creditors, voluntary or involuntary, affecting the Guarantor are pending, and Guarantor has not made an assignment for the benefit of creditors, nor, to its knowledge, has any person taken any action with a view to the institution of any insolvency proceedings.  Guarantor has not, as of the date hereof, and will not have as of the Closing, incurred any obligation, commitment, restriction or Liability of any kind that would reasonably be expected to materially impair or adversely affect such aforementioned resources or capabilities.

4.8    No Outside Reliance

Notwithstanding anything contained in this Article IV or any other provision of this Agreement to the contrary, Purchaser acknowledges and agrees, on its own behalf and on behalf of the Purchaser Group, that the Express Representations are the sole and exclusive representations, warranties and statements of any kind made to Purchaser or any member of the Purchaser Group and on which Purchaser and the Purchaser Group may rely in connection with the transactions contemplated by this Agreement or any Transaction Document.  Purchaser acknowledges and agrees, on its own behalf and on behalf of the Purchaser Group, that all other representations, warranties and statements of any kind or nature expressed or implied, whether in written, electronic or oral form, including (a) the completeness or accuracy of, or any omission to state or to disclose, any information (other than solely to the extent expressly set forth in the Express Representations) including in the Dataroom, any Projections, meetings, calls or correspondence with management of the Sellers, or any other Person on behalf of the Sellers, their Subsidiaries or any of their respective Affiliates or Advisors and (b) any other statement relating to the historical, current or future business, financial condition, results of operations, assets, Liabilities, properties, Contracts and prospects of the Acquired Business, or the quality, quantity or condition of the Sellers' or their Subsidiaries' assets (including the Acquired Assets), are, in each case specifically disclaimed by Sellers and that neither Purchaser nor any member of the Purchaser Group has relied on any such representations, warranties or statements.  Purchaser is

24

knowledgeable about the industries in which the Sellers operate and is capable of evaluating the merits and risks of the transactions contemplated by this Agreement or any Transaction Document and is able to bear the substantial economic risk of such investment for an indefinite period of time.  Purchaser has been afforded access to the books and records, facilities and personnel relating to the Acquired Assets or Assumed Liabilities for purposes of conducting a due diligence investigation and has conducted a full due diligence investigation of the Acquired Assets and Assumed Liabilities.  Purchaser acknowledges, on its own behalf and on behalf of the Purchaser Group, that it has conducted to its full satisfaction an independent investigation and verification of the business, financial condition, results of operations, assets, Liabilities, properties, Contracts and prospects of the Sellers and the Acquired Assets and Assumed Liabilities, and, in making its determination to proceed with the transactions contemplated by this Agreement and any Transaction Document, Purchaser has relied solely on the results of the Purchaser Group's own independent investigation and verification, and has not relied on, is not relying on, and will not rely on, any Seller, any Subsidiary, any information, statements, disclosures, documents, projections, forecasts or other material made available to Purchaser or any of its Affiliates or Advisors in the Dataroom or otherwise, Projections or any information, statements, disclosures or materials, in each case, whether written or oral, made or provided by, or as part of, any of the foregoing or the Sellers, their Subsidiaries or any of their respective Affiliates or Advisors, or any failure of any of the foregoing to disclose or contain any information, except for the Express Representations (it being understood that Purchaser and the Purchaser Group have relied only on the Express Representations). Notwithstanding anything contained herein to the contrary, the parties acknowledge that the disclaimer set forth in this Section 4.8 is not intended to and does not limit or waive any Party's Liability for Fraud.

## ARTICLE V

## BANKRUPTCY COURT MATTERS

5.1     Bid Protections and Auction Matters

(a)     If this Agreement is terminated pursuant to (i) Section 8.1 (other than (A) Section 8.1(a), 8.1(e) or 8.1(g) or (B) by Purchaser pursuant to Section 8.1(b), 8.1(c) or 8.1(d), in each case of this clause (B), in circumstances where the Sellers would be entitled to terminate this Agreement pursuant to Section 8.1(e) or 8.1(g)), Purchaser shall be entitled to the reimbursement of, and the Sellers shall promptly reimburse Purchaser in immediately available funds for, the actual, reasonable and documented out-of-pocket fees and expenses incurred by Purchaser (including reasonable and documented professional's fees and expenses) and its Advisors in connection with the diligence, preparation, execution and negotiation of this Agreement, in the maximum amount of $33,000 (the "Expense Reimbursement"), and (ii) Section 8.1(h), 8.1(i) or 8.1(j), Purchaser shall be entitled to the payment of a break-up fee in an amount equal to $99,000 of the Cash Payment less the amount of any Expense Reimbursement payable pursuant to the foregoing clause (i) (the "Break-Up Fee", and together with the Expense Reimbursement, the "Bid Protections"); provided that payment of any Bid Protections shall be made out of the proceeds of, and only upon consummation of, an Alternative Transaction. Purchaser's entitlement to the Bid Protections shall not be relinquished or forfeited by Purchaser's participation in any Auction required by the Bidding Procedures Order.

(b)    The obligations of the Sellers to pay the Bid Protections are subject to approval by the Bankruptcy Court and shall survive the termination of this Agreement in accordance with <u>Section 8.2</u>.  Notwithstanding anything herein to the contrary, in no event shall the Bid Protections required to be paid by Sellers pursuant to this Agreement exceed $99,000.  Other than as provided in <u>Section 10.12</u>, the sole and exclusive remedy of Purchaser and its Related Parties or any other Person against the Sellers and their Related Parties and any other Person for any and all Liabilities of any kind, character or description suffered or incurred in connection with this Agreement, the Transaction Documents and the transactions contemplated hereby and thereby, prior to the termination of this Agreement, shall be the payment of the Break-Up Fee and the Expense Reimbursement; <u>provided</u> that in no event (except Fraud) will Purchaser be entitled to amounts in excess of the payment of the Break-Up Fee and Expense Reimbursement.

(c)    The Parties acknowledge and agree that, in the event that the payment of the Break-Up Fee and/or the Expense Reimbursement becomes due and payable, and such amounts are actually paid to the Purchaser, such amounts are not a penalty, but rather are liquidated damages in reasonable amounts that will compensate Purchaser for its efforts and resources expended and the opportunities forgone while negotiating this Agreement and in reliance on this Agreement and the Transaction Documents and on the expectation of the consummation of the transactions contemplated hereby and thereby, which amount would otherwise be impossible to calculate with precision.  The Parties acknowledge and agree that (i) the agreements contained in <u>Section 5.1(a)</u> are an integral part of this Agreement and the transactions contemplated by this Agreement and are a material and necessary inducement to the Purchaser to enter into this Agreement and to consummate the transactions contemplated by this Agreement.  Sellers acknowledge and agree that the entry into this Agreement provides value to the Sellers' chapter 11 estates by, among other things, inducing other Persons to submit higher or better offers for the Acquired Assets and serving as the Backup Bidder pursuant to the terms herein, the Bidding Procedures Order and the Sale Order.

(d)    As required by the Bidding Procedures Order, if an Auction is conducted and Purchaser is not the prevailing party at the conclusion of such Auction (such prevailing party, the "<u>Successful Bidder</u>") but is the next highest bidder at the Auction, Purchaser hereby irrevocably agrees to serve as the back-up bidder (the "<u>Backup Bidder</u>") and to keep Purchaser's bid to consummate the transactions contemplated by this Agreement on the terms and conditions set forth in this Agreement (as the same may be revised in the Auction) open and irrevocable until this Agreement is otherwise terminated.  If the Successful Bidder fails to consummate the applicable Alternative Transaction as a result of a breach or failure to perform on the part of such Successful Bidder, the Backup Bidder will be deemed to have the new prevailing bid, and the Sellers may consummate the transactions contemplated by this Agreement on the terms and conditions set forth in this Agreement (as the same may have been improved upon in the Auction).  Notwithstanding the foregoing or anything else herein, Purchaser shall not be required to purchase or serve as Backup Bidder for less than all of the Acquired Assets.  In the event that Purchaser is not Successful Bidder, but fails to serve as the Backup Bidder in breach of this <u>Section 5.1(d)</u>, then Purchaser hereby forfeits any and all right, title and interest in and to any and all Bid Protections, and such Bid Protections shall not be payable in accordance herewith.

5.2    <u>Cure Costs</u>

Subject to entry of the Sale Order, Purchaser shall, subject to the terms of the Escrow Agreement, pay or cause to  be paid the Closing Cure Costs Amount such that the Assigned Contracts may be assumed by the applicable Seller and assigned to Purchaser (subject to payment by Purchaser of the Closing Cure Costs Amount and provision by Purchaser of adequate assurance of future performance) in accordance with the provisions of Section 365 of the Bankruptcy Code, the Bidding Procedures Order, the Sale Order and this Agreement.  The Sellers agree that they will promptly take such commercially reasonable actions as are necessary to obtain a Final Order of the Bankruptcy Court (which order may be the Sale Order) providing for the assumption and assignment of such Assigned Contracts.

## ARTICLE VI

## COVENANTS AND AGREEMENTS

6.1    Conduct of Business of Sellers

Until the earlier of the termination of this Agreement and the Closing, except (i) for any limitations on operations imposed by, and subject to any Orders entered or approvals or authorizations granted or required by or under, the Bankruptcy Court or the Bankruptcy Code (including in connection with the Bankruptcy Case), (ii) as required by applicable Law, (iii) as required or recommended under any directive, pronouncement, guideline or recommendation issued by any Governmental Body, including the Centers for Disease Control and Prevention and the World Health Organization, in each case, providing for or contemplating business closures or other reductions, changes to business operations, worker safety matters, "sheltering-in-place," quarantines, "stay-at-home," curfews, workforce reduction, social distancing, or any other remedial measures relating to, or arising out of, COVID-19 or SARS-CoV-2 virus and any mutations, variations or evolutions thereof or related or associated epidemics, pandemics or disease outbreaks, (iv)  to the extent related to the Excluded Assets, Excluded Liabilities and/or Retained Business, (v) as otherwise required by or reasonably necessary to carry out the terms of this Agreement or as set forth on Schedule 6.1 or (vi) with the prior written consent of Purchaser (which consent shall not be unreasonably withheld, conditioned or delayed), Sellers shall use commercially reasonable efforts to (A) conduct the Acquired Business in all material respects in the Ordinary Course (including using commercially reasonable efforts to maintain the Acquired Assets in the same condition as they were on the date of this Agreement, subject to reasonable wear and tear, if applicable); (B) maintain the Documents in accordance with past practice; and (C) comply in all material respects with all Laws applicable to the ownership and use of the Acquired Assets, and shall not:

(a)    terminate (other than by expiration), or amend or modify (other than by automatic extension or renewal) in any material respect any Assigned Contract;

(b)    sell, assign, license, transfer, convey, lease, surrender, relinquish or otherwise dispose of any material portion of the Acquired Assets, other than (i) sales of Inventory in the Ordinary Course or (ii) pursuant to existing Contracts;

(c)      sell, assign, license, transfer, convey, lease, surrender, relinquish or otherwise dispose of any Inventory other than in the Ordinary Course (including by means of volume or pricing discounts);

(d)      subject any material portion of the Acquired Assets to any Encumbrance, except for Permitted Encumbrances;

(e)      (i) increase the compensation or employee benefits payable or to be provided to any GBG Business Employee, (ii) adopt or amend any Seller Plan, except to the extent that any such adoption or amendment will not increase the cost of the Purchaser's obligations under Section 6.3(b) or (iii) permit the Company to employ any employee thereof;

(f)      make, rescind or change any material tax election with respect to the Acquired Assets or Assumed Liabilities;

(g)      undertake any liquidation or going-out-of-business sale to dispose of any Inventory or other assets of the Acquired Business; or

(h)      agree or commit to do any of the foregoing.

Nothing contained in this Agreement is intended to give Purchaser or its Affiliates, directly or indirectly, the right to control or direct the business of Sellers prior to the Closing.

6.2    Access to Information

(a)      From the date hereof until the Closing (or the earlier termination of this Agreement pursuant to Article VIII), the Sellers shall provide Purchaser and its authorized Advisors with reasonable access and upon reasonable advance notice and during regular business hours to the properties, offices, plants and other facilities, and books and records of the Sellers related to the Acquired Business (excluding, for the avoidance of doubt, all confidentiality agreements with prospective purchasers of the Acquired Assets or any portion thereof, and all bids and expressions of interest received from third parties with respect thereto), in order for Purchaser and its authorized Advisors to access such information regarding the Acquired Business as Purchaser reasonably deems necessary in connection with effectuating the transactions contemplated by this Agreement, and shall furnish Purchaser with such financial, operating and other data and information in connection with the Acquired Business and the Acquired Assets as Purchaser may reasonably request; provided that (i) such access does not unreasonably interfere with the normal operations of the Sellers, (ii) such access will occur in such a manner as the Sellers reasonably determine to be appropriate to protect the confidentiality of the transactions contemplated by this Agreement and the Transaction Documents, (iii) all requests for access will be directed to Ducera Partners LLC or such other Person(s) as the Sellers may designate in writing from time to time and (iv) nothing herein will require the Sellers to provide access to, or to disclose any information to, Purchaser if such access or disclosure (A) would cause significant competitive harm to the Sellers if the transactions contemplated by this Agreement and the Transaction Documents are not consummated, (B) would require the Sellers to disclose any financial or proprietary information of or regarding the Affiliates of the Sellers or otherwise disclose information regarding the Affiliates of the Sellers that the Sellers deem to be commercially sensitive, (C) would waive any legal privilege or (D) would be in violation of applicable Laws or

28

the provisions of any agreement to which the Sellers are a party; provided that, in the event that the Sellers withhold access or information in reliance on the foregoing clause (C) or (D), the Sellers shall provide (to the extent possible without waiving or violating the applicable legal privilege or Law) notice to Purchaser that such access or information is being so withheld and shall use commercially reasonable efforts to provide such access or information in a way that would not risk waiver of such legal privilege or applicable Law.

(b)     The information provided pursuant to this Section 6.2 will be used solely for the purpose of effecting the transactions contemplated hereby, and will be governed by the terms and conditions of the Confidentiality Agreement. Purchaser will, and will cause its Advisors to, abide by the terms of the Confidentiality Agreement with respect to such access and any information furnished to Purchaser or any of its Advisors; provided that the Confidentiality Agreement shall terminate automatically, without any action by any party, upon the Closing. Neither Seller makes any representation or warranty as to the accuracy of any information, if any, provided pursuant to this Section 6.2, and Purchaser may not rely on the accuracy of any such information, in each case, other than the Express Representations.

(c)     From and after the Closing for a period of seven (7) years following the Closing Date (or, if later, the closing of the Bankruptcy Case), upon the reasonable request of any Seller or Purchaser, the non-requesting Party will provide the requesting Party and its Advisors with reasonable access, during normal business hours, and upon reasonable advance notice, to the books and records, including work papers, schedules, memoranda, Tax Returns, Tax schedules, Tax rulings, and other documents (for the purpose of examining and copying) primarily relating to the Acquired Assets or the Assumed Liabilities with respect to periods or occurrences prior to the Closing Date and reasonable access, during normal business hours, and upon reasonable advance notice, to employees, officers, advisors, accountants, offices and properties (including for the purpose of better understanding such books and records) of the non-requesting Party. Unless otherwise consented to in writing by the Sellers, Purchaser will not, for a period of seven (7) years following the Closing Date (or, if later, the closing of the Bankruptcy Case), destroy, alter or otherwise dispose of any of the books and records relating to the Acquired Assets or the Assumed Liabilities with respect to periods or occurrences prior to the Closing Date without first offering to surrender to the Sellers such books and records or any portion thereof that Purchaser may intend to destroy, alter or dispose of. Unless otherwise consented to in writing by Purchaser, no Seller will, for a period of seven (7) years following the Closing Date, destroy, alter or otherwise dispose of any of the books and records primarily relating to the Acquired Assets or the Assumed Liabilities with respect to periods or occurrences prior to the Closing Date without first offering to surrender to Purchaser such books and records or any portion thereof that such Seller may intend to destroy, alter or dispose of. Nothing in this Section 6.2(c) will require any Party to provide access to, or to disclose any information to, the other Party if such access or disclosure (A) would waive any legal privilege or (B) would be in violation of applicable Law; provided that, in the event that the non-requesting Party withholds access or information in reliance on the foregoing clause (A) or (B), the non-requesting Party shall provide (to the extent possible without waiving or violating the applicable legal privilege or Law) notice to the requesting Party that such access or information is being so withheld and shall use commercially reasonable efforts to provide such access or information in a way that would not risk waiver of such legal privilege or applicable Law.

(d)     Purchaser will not, and will not permit any member of the Purchaser Group to, contact any officer, manager, director, employee, customer, supplier, lessee, lessor, lender, noteholder or other material business relation of the Sellers prior to the Closing with respect to the Acquired Business or the transactions contemplated by this Agreement and the Transaction Documents without the prior consent of the Sellers for each such contact.

6.3     <u>Employee Matters</u>. For the avoidance of doubt, the Sellers shall be responsible for, and Purchaser shall not have any obligations whatsoever for, any compensation or other amounts payable to, or any other liability related to, any GBG Business Employee, GBG Business Consultant or any other current or former employee, officer, director, independent contractor or consultant of the Acquired Business, including hourly pay, commission, bonus, salary, accrued vacation, fringe, pension or profit sharing benefits or severance pay relating to any services at any time prior to the Closing Date.

6.4     <u>Reasonable Best Efforts; Cooperation</u>

(a)     Subject to the other terms of this Agreement, each Party shall, and shall cause its Advisors to, use its reasonable best efforts to perform its obligations hereunder and to take, or cause to be taken, and do, or cause to be done, all things necessary, proper or advisable under applicable Law to cause the transactions contemplated herein to be effected as soon as practicable, but in any event on or prior to the Outside Date, in accordance with the terms hereof and to cooperate with each other Party and its Advisors in connection with any step required to be taken as a part of its obligations hereunder. The "reasonable best efforts" of a Party will not require a Party or any of their Subsidiaries, Affiliates or Advisors to expend any money to remedy any breach of any representation or warranty, to commence any Action, to waive or surrender any right, to modify any Contract, to commence or threaten to commence litigation, to agree to any restrictions on the business of such Party or any of its respective Affiliates or to waive or forego any right, remedy or condition hereunder.

(b)     The obligations of the Sellers pursuant to this Agreement, including this <u>Section</u> , shall be subject to any Orders entered, or approvals or authorizations granted or required, by or under the Bankruptcy Court or the Bankruptcy Code (including in connection with the Bankruptcy Case) and each Seller's obligations as a debtor-in-possession to comply with any order of the Bankruptcy Court (including the Bidding Procedures Order and the Sale Order) and Sellers' duty to seek and obtain the highest or otherwise best price for the Acquired Assets as required by the Bankruptcy Code.

6.5     <u>Further Assurances</u>

(a)     From time to time after the Closing, as and when requested by any Party and at such requesting Party's expense, any other Party will execute and deliver, or cause to be executed and delivered, all such documents and instruments and will take, or cause to be taken, all such further or other actions as such requesting party may reasonably deem necessary or desirable to evidence and effectuate the transactions contemplated by this Agreement.

(b)     If, following the Closing, either Seller or any of their respective Affiliates receives or becomes aware that it holds any Liability, asset, property or right which constitutes an

30

Assumed Liability or Acquired Asset (including if it receives any payment in respect of any services performed, or products shipped, by Purchaser or the Company from and after the Closing Date), then such Seller shall, or cause the applicable Affiliate to, transfer such Liability, asset, property or right to Purchaser (including the execution and delivery of all appropriate transfer documents) as promptly as practicable for no additional consideration.

(c)    If, following the Closing, Purchaser receives or becomes aware that it holds any Liability, asset, property or right which constitutes an Excluded Liability or an Excluded Asset, then Purchaser shall transfer such Liability, asset, property or right to Sellers (including the execution and delivery of all appropriate transfer documents) as promptly as practicable for no additional consideration.

6.6    <u>Acknowledgment by Purchaser</u>

(a)    Purchaser acknowledges and agrees, on its own behalf and on behalf of the Purchaser Group, that it has conducted to its full satisfaction an independent investigation and verification of the business, financial condition, results of operations, assets, Liabilities, properties, Contracts and prospects of the Sellers and the Acquired Business and the Assumed Liabilities, and, in making its determination to proceed with the transactions contemplated by this Agreement and any Transaction Document, Purchaser and the Purchaser Group have relied solely on the results of the Purchaser Group's own independent investigation and verification and have not relied on, are not relying on, and will not rely on, any Seller, any Subsidiary, any information, statements, disclosures, documents, projections, forecasts or other material made available to Purchaser or any of its Affiliates or Advisors in the Dataroom, Projections or any information, statements, disclosures or materials, in each case, whether written or oral, made or provided by, or as part of, any of the foregoing or any other Seller Party, or any failure of any of the foregoing to disclose or contain any information, except for the Express Representations (it being understood that Purchaser and the Purchaser Group have relied only on the Express Representations). Purchaser acknowledges and agrees, on its own behalf and on behalf of the Purchaser Group, that (i) the Express Representations are the sole and exclusive representations, warranties and statements of any kind made to Purchaser or any member of the Purchaser Group and on which Purchaser or any member of the Purchaser Group may rely in connection with the transactions contemplated by this Agreement and any Transaction Document; and (ii) all other representations, warranties and statements of any kind or nature expressed or implied, whether in written, electronic or oral form, including (1) the completeness or accuracy of, or any omission to state or to disclose, any information (other than solely to the extent expressly set forth in the Express Representations) including in the Dataroom, Projections, meetings, calls or correspondence with management of the Sellers, any of the Seller Parties or any other Person on behalf of the Sellers or any of the Seller Parties or any of their respective Affiliates or Advisors and (2) any other statement relating to the historical, current or future business, financial condition, results of operations, assets (including the Acquired Assets), Liabilities (including the Assumed Liabilities), properties, Contracts, and prospects of the Sellers, or the quality, quantity or condition of the Sellers' assets), are, in each case, specifically disclaimed by each of the Sellers, on each of their behalf and on behalf of the other Seller Parties. Purchaser, on its own behalf and on behalf of the Purchaser Group: (x) disclaims reliance on the items in clause (ii) in the immediately preceding sentence and (y) acknowledges and agrees that it has relied on, is relying on and will rely on only the items in clause (i) in the immediately preceding sentence. Without limiting the generality of the foregoing,

31

Purchaser acknowledges and agrees, on its own behalf and on behalf of the Purchaser Group, that neither the Sellers, nor any other Person (including the Seller Parties), has made, is making or is authorized to make, and Purchaser, on its own behalf and on behalf of the Purchaser Group, hereby waive, all rights and claims it or they may have against any Seller Party with respect to the accuracy of, any omission or concealment of, or any misstatement with respect to, (A) any potentially material information regarding the Sellers or any of their respective assets (including the Acquired Assets), Liabilities (including the Assumed Liabilities) or operations and (B) any warranty or representation (whether in written, electronic or oral form), express or implied, as to the quality, merchantability, fitness for a particular purpose, or condition of the Sellers' business (including the Acquired Business), operations, assets (including the Acquired Assets), Liabilities (including the Assumed Liabilities), prospects or any portion thereof, except, in each case, solely to the extent expressly set forth in the Express Representations.  Except as expressly set forth herein (and without limiting any of the representation and warranties set forth in Article III), Purchaser is acquiring the Acquired Assets and assuming the Assumed Liabilities on an "AS IS, WHERE IS" basis.

(b)    Without limiting the generality of the foregoing, in connection with the investigation by the Purchaser Group of the Acquired Business, Purchaser and the members of the Purchaser Group, and the Advisors of each of the foregoing, have received or may receive, from or on behalf of the Sellers, certain projections, forward-looking statements and other forecasts (whether in written, electronic or oral form, and including in the Dataroom, management meetings, etc.) (collectively, "Projections").  Purchaser acknowledges and agrees, on its own behalf and on behalf of the Purchaser Group, that (i) such Projections are being provided solely for the convenience of Purchaser to facilitate its own independent investigation of the Acquired Business, (ii) there are uncertainties inherent in attempting to make such Projections, (iii) Purchaser is familiar with such uncertainties, and (iv) Purchaser is taking full responsibility for making their own evaluation of the adequacy and accuracy of all Projections (including the reasonableness of the assumptions underlying such Projections).

(c)    Purchaser acknowledges and agrees, on its own behalf and on behalf of the Purchaser Group, that, absent Fraud, it will not assert, institute or maintain, and will cause each member of the Purchaser Group not to assert, institute or maintain, any Action that makes any claim contrary to the agreements and covenants set forth in this Section 6.6, including any such Action with respect to the distribution to Purchaser or any member of the Purchaser Group, or Purchaser's or any member of the Purchaser Group's use, of the Dataroom, Projections or any other information, statements, disclosures or materials, in each case whether written or oral, provided by any Seller Party or any failure of any of the foregoing to disclose any information.

(d)    Purchaser acknowledges and agrees, on its own behalf and on behalf of the Purchaser Group, that the covenants and agreements contained in this Section 6.6 (i) require performance after the Closing to the maximum extent permitted by applicable Law and will survive the Closing for the maximum period permitted by applicable Law; and (ii) are an integral part of the transactions contemplated by this Agreement and the Transaction Documents and that, without these agreements set forth in this Section 6.6, Sellers would not enter into this Agreement.

6.7    Confidentiality. Subject to the requirements of the Bankruptcy Code or as may be imposed by the Bankruptcy Court or as otherwise required by Law or as may be necessary to

prosecute the Chapter 11 Cases, from and after the Closing: (i) Sellers shall not, and shall direct their respective Affiliates, officers, directors, employees, agents and representatives not to, directly or indirectly, use, disclose, reveal, divulge, furnish or make accessible to anyone who is not otherwise authorized to be in possession of the same, any confidential information of the Acquired Business; (ii) in the event a Seller or an Affiliate or representative thereof shall be legally compelled to disclose any such information, such Seller or Affiliate shall provide Purchaser with prompt written notice of such requirement (to the extent such notice is legally permitted) so that Purchaser may seek a protective order or other remedy (at Purchaser's sole cost and expense); and (iii) in the event that such protective order or other remedy is not obtained, such Seller or its Affiliates or representatives shall furnish only such information as is legally required to be provided. Confidential information shall not include information that is or becomes publicly available without breach of this <u>Section 6.7</u>.

6.8     <u>Escrow Agreement</u>.  Without the prior written consent of Purchaser (which consent shall not be unreasonably withheld, conditioned or delayed), the Company shall not, and shall cause GBG USA Inc. not to, (i) terminate (other than by expiration), or amend or modify the Escrow Agreement or (ii) direct the Escrow Agent to make any disbursement from the escrow account established under the Escrow Agreement; provided that Purchaser's consent shall not be required to the extent that the Company has obtained a final non-appealable decision, order, judgment or decree of a court of competent jurisdiction.

## ARTICLE VII

## CONDITIONS TO CLOSING

7.1     <u>Conditions Precedent to the Obligations of Purchaser and Sellers</u>

The respective obligations of each Party to this Agreement to consummate the Closing are subject to the satisfaction (or to the extent permitted by Law, written waiver by each Seller and Purchaser, each in their sole discretion) on or prior to the Closing Date, of each of the following conditions:

(a)     no court or other Governmental Body has issued, enacted, entered, promulgated or enforced any Law or Order (that is final and non-appealable and that has not been vacated, withdrawn or overturned) restraining, enjoining or otherwise prohibiting the transactions contemplated by this Agreement;

(b)     Purchaser shall be the successful bidder at the auction in accordance with the Bidding Procedures Order; and

(c)     the Bankruptcy Court shall have entered the Sale Order and such Order shall be a Final Order.

7.2     <u>Conditions Precedent to the Obligations of Purchaser</u>

The obligations of Purchaser to consummate the Closing are subject to the satisfaction (or to the extent permitted by Law, written waiver by Purchaser in its sole discretion), on or prior to the Closing Date, of each of the following conditions:

33

(a)    the representations and warranties made by Sellers in <u>Article III</u> shall be true and correct as of the Closing Date (disregarding all qualifications or limitations as to "materiality" or "Material Adverse Effect" and words of similar import set forth therein), as though such representations and warranties had been made on and as of the Closing Date (except that representations and warranties that are made as of a specified other date need to be true and correct only as of such other date), except where the failure of such representations and warranties to be true and correct has not had, and would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect; provided that the representations set forth in <u>Sections 3.1</u>, <u>3.2</u> and <u>3.3(a)(i)</u> will be true and correct in all respects;

(b)    Sellers shall have performed in all material respects the covenants and agreements required to be performed by them under this Agreement at or prior to the Closing; and

(c)    Sellers shall have delivered all items and satisfied all obligations pursuant to <u>Section 2.4</u>.

7.3    <u>Conditions Precedent to the Obligations of the Sellers</u>

The obligations of Sellers to consummate the transactions contemplated by this Agreement are subject to the satisfaction (or to the extent permitted by Law, written waiver by Sellers in their sole discretion), on or prior to the Closing Date, of each of the following conditions:

(a)    the representations and warranties made by Purchaser in <u>Article IV</u> shall be true and correct in all material respects (without giving effect to any materiality or similar qualification contained therein), in each case as of the date hereof and as of the Closing Date, with the same force and effect as though all such representations and warranties had been made as of the Closing Date (other than representations and warranties that by their terms address matters only as of another specified date, which shall be so true and correct only as of such other specified date), except where the failure of such representations or warranties to be so true and correct has not had, and would not reasonably be expected to have, individually or in the aggregate, a material adverse effect on Purchaser's ability to consummate the transactions contemplated hereby; provided that the representations set forth in <u>Sections 4.1</u>, <u>4.2</u> and <u>4.3(a)(i)</u> will be true and correct in all respects;

(b)    Purchaser shall have performed in all material respects all of the covenants and agreements required to be performed by it under this Agreement at or prior to the Closing;

(c)    Purchaser shall have delivered all items and satisfied all obligations pursuant to <u>Section 2.5</u>;

(d)    Purchaser shall have paid all Cure Costs for all Assigned Contracts for which Cure Costs have been consensually agreed with the Contract counterparty or fixed by an order of the Bankruptcy Court as of the Closing Date; and

(e)    The Class B Member Written Consent shall remain in full force and effect as of the Closing Date.

7.4    <u>Waiver of Conditions</u>

34

Upon the occurrence of the Closing, any condition set forth in this <u>Article VII</u> that was not satisfied as of the Closing will be deemed to have been waived for all purposes by the Party having the benefit of such condition as of and after the Closing.  None of Purchaser or Sellers may rely on the failure of any condition set forth in this <u>Article VII</u>, as applicable, to be satisfied if such failure was caused by such Party's failure to use, as required by this Agreement, its reasonable best efforts to consummate the transactions contemplated hereby.

## ARTICLE VIII

## TERMINATION

8.1    <u>Termination of Agreement</u>

This Agreement may be terminated only in accordance with this <u>Section 8.1</u>.  This Agreement may be terminated at any time prior to the Closing:

(a)    by the mutual written consent of the Sellers and the Purchaser;

(b)    by written notice of either Purchaser or the Sellers, upon the issuance by any Governmental Body of an Order restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated by this Agreement or declaring unlawful the transactions contemplated by this Agreement, and such Order having become final, binding and non-appealable; <u>provided</u> that no termination may be made by a Party under this <u>Section 8.1(b)</u> if the issuance of such Order was caused by the breach or action or inaction of such Party;

(c)    by written notice of either Purchaser or the Sellers, if the Closing shall not have occurred on or before December 31, 2021 (the "<u>Outside Date</u>"); <u>provided</u> that a Party shall not be permitted to terminate this Agreement pursuant to this <u>Section 8.1(c)</u> if the failure of the Closing to have occurred by the Outside Date was caused by the breach or action or inaction of such Party;

(d)    by written notice of either Purchaser or the Sellers, if the Bankruptcy Case is dismissed or converted to a case or cases under Chapter 7 of the Bankruptcy Code, or if a trustee or examiner with expanded powers to operate or manage the financial affairs or reorganization of the Sellers is appointed in the Bankruptcy Case;

(e)    by written notice from the Sellers to Purchaser, upon a breach of any covenant or agreement on the part of Purchaser, or if any representation or warranty of Purchaser will have become untrue, in each case, such that the conditions set forth in <u>Section 7.3(a)</u> or <u>7.3(b)</u> would not be satisfied, including a breach of Purchaser's obligation to consummate the Closing; <u>provided</u> that (i) if such breach is curable by Purchaser then the Sellers may not terminate this Agreement under this <u>Section 8.1(e)</u> unless such breach has not been cured by the date which is the earlier of (A) two (2) Business Days prior to the Outside Date and (B) ten (10) Business Days after the Sellers notify Purchaser of such breach and (ii) the right to terminate this Agreement pursuant to this <u>Section 8.1(e)</u> will not be available to the Sellers at any time that any Seller is in material breach of any covenant, representation or warranty hereunder;

35

(f)    by written notice from Purchaser to the Sellers, upon a breach of any covenant or agreement on the part of any Seller, or if any representation or warranty of any Seller will have become untrue, in each case, such that the conditions set forth in Section 7.2(a) or 7.2(b) would not be satisfied; provided that (i) if such breach is curable by such Seller then Purchaser may not terminate this Agreement under this Section 8.1(f) unless such breach has not been cured by the date which is the earlier of (A) two (2) Business Days prior to the Outside Date and (B) ten (10) Business Days after Purchaser notifies the Sellers of such breach and (ii) the right to terminate this Agreement pursuant to this Section 8.1(f) will not be available to Purchaser at any time that Purchaser is in material breach of any covenant, representation or warranty hereunder;

(g)    by written notice from the Sellers to Purchaser, if all of the conditions set forth in Sections 7.1 and 7.2 have been satisfied (other than conditions that by their nature are to be satisfied at the Closing, but subject to the satisfaction or waiver of such conditions at the Closing) or waived and Purchaser fails to complete the Closing at the time required by Section 2.3;

(h)    by written notice from the Sellers to Purchaser, if any Seller or the board of directors, board of managers, or similar governing body of any Seller determines in good faith, on advice in the opinion of outside legal counsel, that proceeding with the transactions contemplated by this Agreement or failing to terminate this Agreement would violate applicable Law or its or breach such Person's or body's fiduciary obligations under applicable Law;

(i)    by written notice of either Purchaser or the Sellers, if (i) any Seller enters into (or provides written notice to Purchaser of its intent to enter into) one or more Alternative Transactions with one or more Persons other than Purchaser or the Successful Bidder or the Backup Bidder at the Auction or (ii) the Bankruptcy Court approves an Alternative Transaction other than with the Successful Bidder or the Backup Bidder;

(j)    by written notice from Purchaser to the Sellers, if Purchaser is not the Successful Bidder or the Backup Bidder at the Auction; provided that Purchaser shall not be permitted to terminate this Agreement pursuant to this Section 8.1(j) until after the twenty-fifth (25th) day following entry by the Bankruptcy Court of an Order authorizing and approving an Alternative Transaction with the Successful Bidder at the Auction (and, notwithstanding Purchaser not having been the Successful Bidder or the Backup Bidder at the Auction, until such time (if any) as Purchaser terminates this Agreement pursuant to this Section 8.1(j), the obligations of Purchaser to consummate the transactions contemplated by this Agreement and any Transaction Document shall remain unaffected by Purchaser's right to terminate this Agreement pursuant to this Section 8.1(j)); or

(k)    by written notice of either Purchaser or Sellers if the Bankruptcy Court shall have stated unconditionally that it will not enter the Sale Order approving the sale to the Purchaser.

8.2    Effect of Termination

In the event of termination of this Agreement pursuant to Section 8.1, this Agreement shall become null and void and there shall be no Liability on the part of any Party or any of its partners, members, officers, directors or shareholders; provided that Section 2.2, Section 5.1(a), this Section 8.2 and Article X shall survive any such termination; provided further that no termination

36

will relieve a Party from any Liability for damages (including damages based on the loss of the economic benefits of the transactions contemplated by this Agreement or any Transaction Document, including the Cash Payment, to Sellers), losses, costs or expenses (including reasonable legal fees and expenses) to any non-breaching Party resulting from any willful breach by such first Party of this Agreement prior to the date of such termination (which, for the avoidance of doubt, will be deemed to include any failure by a Party to consummate the Closing if and when it is obligated to do so hereunder) or Fraud.

## ARTICLE IX

## TAXES

### 9.1    Transfer Taxes

Any sales, use, value-added, goods and services, registration, conveyancing, purchase, transfer, franchise, deed, fixed asset, stamp, documentary, use or similar Taxes and recording charges which may be payable by reason of the sale of the Acquired Assets or the assumption of the Assumed Liabilities under this Agreement or the transactions contemplated hereby (the "Transfer Taxes") shall be borne and timely paid by Sellers, but only to the extent not exempt under the Bankruptcy Code, as applicable to the transfer of the Acquired Assets pursuant to this Agreement.   Sellers shall timely file any Tax Returns as may be required to comply with the provisions of applicable Law in connection with the payment of such Transfer Taxes.

### 9.2    Allocation of Purchase Price

Purchaser shall prepare an allocation of the Purchase Price and the Assumed Liabilities (plus other relevant items) among the Acquired Assets for all Tax purposes (the "Purchase Price Allocation") in accordance with the principles of Section 1060 of the Code (and any similar provision of state, local, or non-U.S. law, as appropriate) and the methodologies set forth on a schedule delivered by Purchaser to Seller prior to the Closing (the "Allocation Methodology Schedule").  Purchaser shall deliver such allocation to the Company within thirty days following the Closing Date for the Company's review, comment and approval.  Purchaser and the Company shall work together to jointly agree to the final allocation.  If Purchaser and the Company agree on the allocations, such allocations will become the Purchase Price Allocation and in such case (i) Purchaser and the Sellers will report, act and file Tax Returns (including, but not limited to Internal Revenue Service Form 8594) in all respects and for all purposes consistent with the Purchase Price Allocation and (ii) the parties will not take any position (whether in audits, on any Tax Returns or otherwise) that is inconsistent with the Purchase Price Allocation unless required to do so by a "determination" as defined in Section 1313 of the Code. If Purchaser and the Company do not reach an agreement each of Purchaser and the Company shall be permitted to file, and shall permit its Affiliates to file, federal and applicable state income Tax Returns (including IRS Form 8594 or other applicable form) in any manner that it chooses regarding the allocation of the Purchase Price, applicable Assumed Liabilities and other relevant items. The Sellers shall provide Purchaser and Purchaser shall provide the Sellers with a copy of any information required to be furnished to the Secretary of the Treasury under Code Section 1060.

### 9.3    Cooperation

Purchaser and Sellers shall cooperate fully, as and to the extent reasonably requested by the other Party, in connection with the filing of Tax Returns and any audit, litigation or other proceeding with respect to Taxes. Purchaser and Sellers further agree, upon request in writing from either party, to use their commercially reasonable efforts to obtain any certificate or other document (including any resale exemption certification) from any Governmental Body or any other Person as may be necessary to mitigate, reduce or eliminate any Tax that could be imposed (including, but not limited to, with respect to the transactions contemplated hereby); provided that the requesting party shall reimburse the other party for its reasonable out-of-pocket costs incurred in satisfying the request.

9.4    Straddle Period

. In the case of any taxable period that includes (but does not end on) the Closing Date (a "Straddle Period"), the amount of any property, ad valorem or other Taxes not based on income or gross receipts for a Straddle Period that relates to the Pre-Closing Tax Period shall be deemed to be the amount of such Tax for the entire taxable period multiplied by a fraction the numerator of which is the number of days in the taxable period ending on and including the Closing Date and the denominator of which is the number of days in such Straddle Period. The amount of any Taxes based on income or gross receipts for a Straddle Period shall be determined by an interim closing of the books. To the extent the actual amount of a Tax is not known at the time a determination is to be made with respect to a Tax, no later than two Business Days prior to the date of such determination, the Parties shall utilize the most recent information available in estimating in good faith the amount of such Tax for purposes of such determination.

## ARTICLE X

## MISCELLANEOUS

10.1    Non-Survival of Representations and Warranties and Certain Covenants

Each of the representations and warranties and the covenants and agreements (to the extent such covenant or agreement contemplates or requires performance by such party prior to or at the Closing) of the Parties set forth in this Agreement or in any Transaction Document, or in any certificate delivered hereunder or thereunder, will terminate effective immediately as of the Closing such that, other than in the case of Fraud, no claim for breach of any such representation, warranty, covenant or agreement, detrimental reliance or other right or remedy (whether in contract, in tort or at law or in equity) may be brought with respect thereto after the Closing. Each covenant and agreement that explicitly contemplates performance after the Closing, will, in each case and to such extent, expressly survive the Closing in accordance with its terms, and if no term is specified, until fully performed.

10.2    Expenses

Whether or not the Closing takes place, except as otherwise provided herein (including, for the avoidance of doubt, Section 8.2), all fees, costs and expenses (including fees, costs and expenses of Advisors) incurred in connection with the negotiation of this Agreement and the other agreements contemplated hereby, the performance of this Agreement and the Transaction

Documents and the consummation of the transactions contemplated hereby and thereby will be paid by the Party incurring such fees, costs and expenses; it being acknowledged and agreed that all Transfer Taxes will be allocated pursuant to Section 9.1.

10.3    Notices

Except as otherwise expressly provided herein, all notices, demands and other communications to be given or delivered under or by reason of the provisions of this Agreement will be in writing and will be deemed to have been given (a) when personally delivered, (b) when transmitted via facsimile device or by electronic mail (provided with respect to electronic mail that no "bounce back" or similar message of non-delivery is received with respect thereto) (unless if transmitted after 5:00 P.M. Central time or other than on a Business Day, then on the next Business Day), (c) the day following the day on which the same has been delivered prepaid to a reputable national overnight air courier service or (d) the third (3rd) Business Day following the day on which the same is sent by certified or registered mail, postage prepaid, in each case, to the respective party at the number, electronic mail address or street address, as applicable, set forth below, or at such other number, electronic mail address or street address as such party may specify by written notice to the other Party.

Notices to Purchaser or Guarantor:

c/o CE Op Co, LLC
9200 Sunset Blvd., Suite 300
West Hollywood, CA 90069
Attention:       Tarik Brooks
Email:            tbrooks@combsenterprises.com

with a copies (which shall not constitute notice) to:

Becker, Glynn, Muffly, Chassin & Hosinski LLP
299 Park Avenue
New York, New York 10171
Attention:       Alec P. Ostrow
Facsimile:       212-888-0255
Email:            aostrow@beckerglynn.com

and to:

Jonathan D. Davis, P.C.
10 Rockefeller Plaza, Suite 1015
New York, New York 10020
Attention:       Jonathan D. Davis

Facsimile:    (212) 697-2521
Email:     jdd@jddavispc.com

and to:

Grubman Shire Meiselas & Sacks, P.C.
152 West 57th Street
New York, New York 10019
Attention:    Eric Sacks, Esq.
             Branch Furtado, Esq.
Facsimile:    (212) 554-0444
Email:     ESacks@gispc.com
             BFurtado@gispc.com

<u>Notices to Sellers</u>:

GBG Sean John LLC and Pacific Alliance USA Inc.
Empire State Building
350 5th Ave, 8th Floor
New York, New York 10118
Attention:    Robert Smits, EVP and Secretary
Email:     robertsmits@globalbrandsgroup.com

with a copy (which shall not constitute notice) to:

Willkie Farr & Gallagher LLP
787 Seventh Ave
New York, New York 10019
Attention:    Rachel C. Strickland
             Andrew S. Mordkoff
             Melainie Mansfield
Facsimile:    (212) 728-8111
Email:     rstrickland@willkie.com
             amordkoff@willkie.com
             mmanfield@willkie.com

    10.4    <u>Binding Effect; Assignment</u>

        This Agreement shall be binding upon Purchaser and, subject to entry of the Sale Order, Sellers and inure to the benefit of the Parties and their respective successors and permitted assigns, including any trustee or estate representative appointed in the Bankruptcy Case or any successor Chapter 7 case; <u>provided</u> that this Agreement and any of the rights or obligations hereunder may be assigned or delegated, without the prior written consent of the Sellers, to Affiliates of the Purchaser so long as the Purchaser remains liable hereunder.

    10.5    <u>Amendment and Waiver</u>

Any provision of this Agreement or the Schedules or Exhibits hereto may be (a) amended only in a writing signed by Purchaser and the Sellers or (b) waived only in a writing executed by the Person against which enforcement of such waiver is sought.  No waiver of any provision hereunder or any breach or default thereof will extend to or affect in any way any other provision or prior or subsequent breach or default.

10.6    Third Party Beneficiaries

Except as otherwise expressly provided herein, nothing expressed or referred to in this Agreement will be construed to give any Person other than the Parties any legal or equitable right, remedy, or claim under or with respect to this Agreement or any provision of this Agreement.

10.7    Non-Recourse

This Agreement may only be enforced against, and any Action based upon, arising out of or related to this Agreement may only be brought against, the Persons that are expressly named as parties to this Agreement.  Except to the extent named as a party to this Agreement, and then only to the extent of the specific obligations of such parties set forth in this Agreement, no past, present or future shareholder, member, partner, manager, director, officer, employee, Affiliate, agent or Advisor of any party to this Agreement will have any Liability (whether in contract, tort, equity or otherwise) for any of the representations, warranties, covenants, agreements or other obligations or Liabilities of any of the parties to this Agreement or for any Action based upon, arising out of or related to this Agreement.

10.8    Severability

Whenever possible, each provision of this Agreement will be interpreted in such manner as to be effective and valid under applicable Law, but if any provision of this Agreement is held to be prohibited by or invalid under applicable Law in any jurisdiction, such provision will be ineffective only to the extent of such prohibition or invalidity in such jurisdiction, without invalidating the remainder of such provision or the remaining provisions of this Agreement or in any other jurisdiction.

10.9    Construction

The language used in this Agreement will be deemed to be the language chosen by the Parties to express their mutual intent, and no rule of strict construction will be applied against any Person.  The headings of the sections and paragraphs of this Agreement have been inserted for convenience of reference only and will in no way restrict or otherwise modify any of the terms or provisions hereof.

10.10   Schedules

The disclosure schedules to this Agreement (the "Schedules") have been arranged for purposes of convenience in separately numbered sections corresponding to the sections of this Agreement; provided that each section of the Schedules will be deemed to incorporate by reference all information disclosed in any other section of the Schedules to the extent that the relevance of such disclosure to such other actions is reasonably apparent on its face.  Capitalized terms used in

the Schedules and not otherwise defined therein have the meanings given to them in this Agreement. The specification of any dollar amount or the inclusion of any item in the representations and warranties contained in this Agreement, the Schedules or the attached Exhibits is not intended to imply that the amounts are or are not material or are within or outside of the Ordinary Course, and no party will use the fact of the setting of the amounts or the fact of the inclusion of any item in the representations and warranties contained in this Agreement, the Schedules or Exhibits in any dispute or controversy between the Parties as to whether the amount or items are material or are within or outside of the Ordinary Course. In addition, matters reflected in the Schedules are not necessarily limited to matters required by this Agreement to be reflected in the Schedules. Such additional matters are set forth for informational purposes only and do not necessarily include other matters of a similar nature. No information set forth in the Schedules will be deemed to broaden in any way the scope of the parties' representations and warranties. Any description of any agreement, document, instrument, plan, arrangement or other item set forth on any Schedule is a summary only and is qualified in its entirety by the terms of such agreement, document, instrument, plan, arrangement or item which terms will be deemed disclosed for all purposes of this Agreement. The information contained in this Agreement, in the Schedules and Exhibits hereto is disclosed solely for purposes of this Agreement, and no information contained herein or therein will be deemed to be an admission by any Party to any third party of any matter whatsoever, including any violation of Law or breach of contract.

    10.11    Complete Agreement

    This Agreement, together with the Confidentiality Agreement, the Transaction Documents, and any other agreements expressly referred to herein, contains the entire agreement of the parties respecting the sale and purchase of the Acquired Assets and the Assumed Liabilities and the transactions contemplated by this Agreement and supersedes all prior understandings or agreements among the Parties (whether written or oral) respecting the sale and purchase of the Acquired Assets and the Assumed Liabilities and the transactions contemplated by this Agreement. In the event an ambiguity or question of intent or interpretation arises with respect to this Agreement, the terms and provisions of the execution version of this Agreement will control and prior drafts of this Agreement and the documents referenced herein will not be considered or analyzed for any purpose (including in support of parol evidence proffered by any Person in connection with this Agreement), will be deemed not to provide any evidence as to the meaning of the provisions hereof or the intent of the Parties with respect hereto and will be deemed joint work product of the Parties.

    10.12    Specific Performance

    The Parties agree that irreparable damage, for which monetary relief, even if available, would not be an adequate remedy, would occur in the event that any provision of this Agreement is not performed in accordance with its specific terms or is otherwise breached, including if any Party fails to take any action required of it hereunder to consummate the transactions contemplated by this Agreement. It is accordingly agreed that (a) the Parties will be entitled to an injunction or injunctions, specific performance or other equitable relief to prevent breaches of this Agreement and to enforce specifically the terms and provisions hereof in the courts described in Section 10.13 without proof of damages or otherwise, this being in addition to any other remedy to which they are entitled under this Agreement, and (b) the right of specific performance and other equitable

42

relief is an integral part of the transactions contemplated by this Agreement and without that right, neither Sellers nor Purchaser would have entered into this Agreement.  The Parties acknowledge and agree that any Party pursuing an injunction or injunctions or other Order to prevent breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement in accordance with this <u>Section 10.12</u> will not be required to provide any bond or other security in connection with any such Order.  The remedies available to Sellers pursuant to this <u>Section 10.12</u> will be in addition to any other remedy to which they were entitled at law or in equity, and the election to pursue an injunction or specific performance will not restrict, impair or otherwise limit any Seller from seeking to collect or collecting damages.  If, prior to the Outside Date, any Party brings any action, in each case in accordance with this <u>Section 10.12</u>, to enforce specifically the performance of the terms and provisions hereof by any other party, the Outside Date will automatically be extended (y) for the period during which such action is pending, <u>plus</u> ten (10) Business Days or (z) by such other time period established by the court presiding over such action, as the case may be.  In no event will this <u>Section 10.12</u> be used, alone or together with any other provision of this Agreement, to require any Seller or Purchaser, as applicable, to remedy any breach of any representation or warranty of any Seller or Purchaser, as applicable, made herein.

10.13    <u>Jurisdiction and Exclusive Venue</u>

Each of the Parties irrevocably agrees that any Action that may be based upon, arising out of or related to this Agreement or the negotiation, execution or performance of this Agreement and the transactions contemplated hereby brought by any other Party or its successors or assigns will be brought and determined only in (a) the Bankruptcy Court and any federal court to which an appeal from the Bankruptcy Court may be validly taken or (b) in the event the Bankruptcy Case is closed, or if the Bankruptcy Court is unwilling or unable to hear such Action, in any state or federal court sitting in the State of New York ((a) and (b), the "<u>Chosen Courts</u>"), and each of the Parties hereby irrevocably submits to the exclusive jurisdiction of the Chosen Courts for itself and with respect to its property, generally and unconditionally, with regard to any such Action arising out of or relating to this Agreement and the transactions contemplated hereby.  Each of the parties agrees not to commence any Action relating thereto except in the Chosen Courts, other than Actions in any court of competent jurisdiction to enforce any judgment, decree or award rendered by any Chosen Court, and no party will file a motion to dismiss any Action filed in a Chosen Court on any jurisdictional or venue-related grounds, including the doctrine of *forum non-conveniens*. The Parties irrevocably agree that venue would be proper in any of the Chosen Courts, and hereby irrevocably waive any objection that any such court is an improper or inconvenient forum for the resolution of such Action.  Each of the Parties further irrevocably and unconditionally consents to service of process in the manner provided for notices in <u>Section 10.3</u>.  Nothing in this Agreement will affect the right of any Party to this agreement to serve process in any other manner permitted by Law.

10.14    <u>Governing Law; Waiver of Jury Trial</u>

(a)    Except to the extent the mandatory provisions of the Bankruptcy Code apply, this Agreement, and any Action that may be based upon, arise out of or relate to this Agreement or the negotiation, execution or performance of this Agreement or the Transaction Documents will be governed by and construed in accordance with the internal Laws of the State of New York applicable to agreements executed and performed entirely within such State without

regards to conflicts of law principles of the State of New York or any other jurisdiction that would cause the Laws of any jurisdiction other than the State of New York to apply.

(b)     EACH PARTY ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY THAT MAY ARISE UNDER THIS AGREEMENT, THE DOCUMENTS AND AGREEMENTS CONTEMPLATED HEREBY AND THE TRANSACTIONS CONTEMPLATED HEREBY AND THEREBY IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES AND THEREFORE HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY ACTION BASED ON, ARISING OUT OF OR RELATED TO THIS AGREEMENT, ANY DOCUMENT OR AGREEMENT CONTEMPLATED HEREBY OR THE TRANSACTIONS CONTEMPLATED HEREBY AND THEREBY. EACH OF THE PARTIES AGREES AND CONSENTS THAT ANY SUCH ACTION WILL BE DECIDED BY COURT TRIAL WITHOUT A JURY AND THAT THE PARTIES THIS AGREEMENT MAY FILE AN ORIGINAL COUNTERPART OF A COPY OF THIS AGREEMENT WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF THE PARTIES TO THE IRREVOCABLE WAIVER OF THEIR RIGHT TO TRIAL BY JURY. EACH PARTY (I) CERTIFIES THAT NO ADVISOR OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (II) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

10.15   No Right of Set-Off.

(a)     Purchaser, on its own behalf and on behalf of the Purchaser Group and its and their respective successors and permitted assigns, hereby waives any rights of set-off, netting, offset, recoupment, or similar rights that Purchaser, any member of the Purchaser Group or any of its or their respective successors and permitted assigns has or may have with respect to the payment of the Purchase Price or any other payments to be made by Purchaser pursuant to this Agreement or the Transition Services Agreement.

(b)     Each Seller, on its own behalf and on behalf of the Seller Parties, hereby waives any rights of set-off, netting, offset, recoupment, or similar rights that Seller, any Seller Party has or may have with respect to any payments to be made by any Seller pursuant to this Agreement or the Transition Services Agreement.

10.16   Counterparts and PDF.

This Agreement and any other agreements referred to herein or therein, and any amendments hereto or thereto, may be executed in multiple counterparts, any one of which need not contain the signature of more than one party, but all such counterparts taken together will constitute one and the same instrument. Any counterpart, to the extent signed and delivered by means of a facsimile machine, .PDF or other electronic transmission, will be treated in all manner and respects as an original contract and will be considered to have the same binding legal effects as if it were the original signed version thereof delivered in person. Minor variations in the form

of the signature page to this Agreement or any agreement or instrument contemplated hereby, including footers from earlier versions of this Agreement or any such other document, will be disregarded in determining the effectiveness of such signature.  At the request of any party hereto or to any such contract, each other party hereto or thereto will re-execute original forms thereof and deliver them to all other parties.  No party hereto or to any such contract will raise the use of a facsimile machine, .PDF or other electronic transmission to deliver a signature or the fact that any signature or contract was transmitted or communicated through the use of facsimile machine, .PDF or other electronic transmission as a defense to the formation of a contract and each such party forever waives any such defense.

10.17   Publicity

Neither the Sellers nor Purchaser shall issue any press release or public announcement concerning this Agreement or the transactions contemplated hereby without obtaining the prior written approval of the other Party, which approval will not be unreasonably withheld or delayed, unless, in the reasonable judgment of Purchaser or the Company, disclosure is otherwise required by applicable Law or by the Bankruptcy Court with respect to filings to be made with the Bankruptcy Court in connection with this Agreement.

10.18   Bulk Sales Laws

The Parties intend that pursuant to Section 363(f) of the Bankruptcy Code, the transfer of the Acquired Assets shall be free and clear of any security interests in the Acquired Assets, including any liens or claims arising out of the bulk transfer laws, and the Parties shall take such steps as may be necessary or appropriate to so provide in the Sale Order.  In furtherance of the foregoing, each Party hereby waives compliance by the Parties with the "bulk sales," "bulk transfers" or similar Laws and all other similar Laws in all applicable jurisdictions in respect of the transactions contemplated by this Agreement.

10.19   Waiver of Conflicts.

(a)     Sellers have engaged Willkie Farr & Gallagher LLP as its legal counsel in connection with the transactions contemplated hereby. In the event that such counsel now or in the future represents Purchaser in connection with matters unrelated to the transactions contemplated hereby, Purchaser hereby (a)  consents to the continued representation of the Sellers or any other Seller Party by such counsel in connection with the transactions contemplated hereby, and (b) waives any actual, potential or alleged conflict of interest that exists or may arise from such counsel's representation of any Seller Party in connection with the transactions contemplated hereby, and any Actions or other dispute resolution proceedings of any kind in respect of the foregoing. Nothing contained herein shall be deemed to be a waiver of any privilege or consent to the disclosure of any privileged information. Purchaser hereby acknowledges that Purchaser has obtained independent legal advice in connection with the foregoing consent and waiver.

10.20   Guarantee.

(a)     Guarantor hereby irrevocably, absolutely and unconditionally guarantees (as the primary obligor and not merely as surety) to Sellers the prompt and full performance, discharge and payment by Purchaser of each of Purchaser's covenants, agreements, obligations

45

and liabilities under this Agreement and any Transaction Document (including, without limitation, the making of any payments required by <u>Section 2.1</u> hereof) (collectively, the "<u>Purchaser Obligations</u>", and Guarantor's guarantee thereof, the "<u>Guaranty</u>"). The foregoing sentence is an absolute, unconditional and continuing guarantee of the full and punctual discharge and performance of the Guaranteed Obligations. The Guarantor acknowledges and agrees that, with respect to all the Purchaser Obligations to pay money pursuant to this Agreement, such guarantee shall be a guarantee of payment and performance and not of collection and shall not be conditioned or contingent upon the pursuit of any remedies against Purchaser.

(b)    Guarantor hereby waives diligence, presentment, demand of performance, filing of any claim, any right to require any Action first against Purchaser, protest, notice and all demands whatsoever in connection with the performance of its obligations set forth in this <u>Section 10.20</u>.

(c)    Guarantor agrees that the Guaranty is a continuing guarantee, and that its obligations under the Guaranty shall not be released or discharged, in whole or in part, or otherwise affected by:

(i)    any change in the corporate existence, structure or ownership of Purchaser or the Sellers;

(ii)    any insolvency, bankruptcy, reorganization or other similar proceeding affecting Purchaser;

(iii)    any change in the time, place, or manner of payment of the Purchaser Obligations, or any rescission, waiver, compromise, or other amendment or modification of any of the terms or provisions of this Agreement, the Transaction Documents or any other agreement or instrument relating thereto made in accordance with the terms thereof or any other agreement evidencing, securing or otherwise executed in connection with the Purchaser Obligations;

(iv)    the addition, substitution or release of any Person now or hereafter liable for the Purchaser Obligations; or

(v)    any other act or omission which may in any manner otherwise operate as a release or discharge of a surety.

(vi)    This Guaranty may not be revoked or terminated and shall remain in full force and effect and shall be binding on Guarantor and its successors until the Purchaser Obligations have been indefeasibly paid in full in cash and performed in full.

# ARTICLE XI

## ADDITIONAL DEFINITIONS AND INTERPRETIVE MATTERS

11.1    <u>Certain Definitions</u>

(a)    "<u>Action</u>" means any action, claim (including a counterclaim, cross-claim, or defense), complaint, grievance, summons, suit, litigation, arbitration, mediation, proceeding (including any civil, criminal, administrative, investigative or appellate proceeding), prosecution, contest, hearing, inquiry, inquest, audit, examination or investigation, of any kind whatsoever, regardless of the legal theory under which such Liability or obligation may be sought to be imposed, whether sounding in contract or tort, or whether at law or in equity, or otherwise under any legal or equitable theory, commenced, brought, conducted or heard by or before, or otherwise involving, any Governmental Body.

(b)    "<u>Acquired Business</u>" means the Sellers' global wholesale, e-commerce and retail business operated under the "Sean John" and "Enyce" brands, including the trademarks SEAN JOHN and ENYCE and the exploitation and licensing thereof.

(c)    "<u>Advisors</u>" means, with respect to any Person, the accountants, attorneys, consultants, advisors, investment bankers, or other representatives of such Person.

(d)    "<u>Affiliate</u>" means, with respect to any Person, any other Person that, directly or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such Person, and the term "<u>control</u>" (including the terms "<u>controlled by</u>" and "<u>under common control with</u>") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities, by Contract or otherwise.

(e)    "<u>Alternative Transaction</u>" means any transaction (or series of transactions), whether direct or indirect, concerning a sale, merger, acquisition, liquidation or disposition of all or any material portion of the Acquired Assets (in any form of transaction, whether by merger, sale of assets or equity or otherwise).

(f)    "<u>Assumed Taxes</u>" means any Liability for Taxes arising from the ownership or operation of the Acquired Business, the Acquired Assets or the Assumed Liabilities for a Post-Closing Tax Period.

(g)    "<u>Auction</u>" has the meaning set forth in the Bidding Procedures Order.

(h)    "<u>Bidding Procedures Order</u>" means that certain order, entered on August 31, 2021, Docket No. 141, approving bidding procedures, *inter alia*,, (a) establishing the Bidding Procedures (as defined in the Bidding Procedures Order), (b) approving payment of the Bid Protections, (c) providing that the Bid Protections shall constitute administrative expenses of the Debtors, (d) approving procedures for the assumption and assignment of contracts, and (e) setting sale milestones and scheduling related hearings.

(i)    "Business Day" means any day other than a Saturday, Sunday or other day on which banks in New York City, New York are authorized or required by Law to be closed.

(j)    "Class B Members" means Christian Casey LLC, a Delaware limited liability company, and Jessie and D Lila LLC, a Delaware limited liability company, in each case, in their capacity as Class B Members (as such term is defined in the Company Operating Agreement).

(k)    "Code" means the United States Internal Revenue Code of 1986, as amended, and the regulations promulgated thereunder, as the same may be in effect from time to time.

(l)    "Company Operating Agreement" means that certain Operating Agreement, dated as of November 4, 2016, by and among GBG USA, the Class B Members and the Company.

(m)    "Confidentiality Agreement" means the Confidentiality Agreement, dated as of July 8, 2021, by and between GBG USA Inc. and Purchaser.

(n)    "Consent" means any approval, consent, ratification, permission, waiver or authorization, or an Order of the Bankruptcy Court that deems or renders unnecessary the same.

(o)    "Contract" means any contract, indenture, note, bond, lease, sublease, license or other agreement that is binding upon a Person or its property.

(p)    "Documents" means all of the Sellers' written files, documents, instruments, papers, books, reports, records, tapes, microfilms, photographs, letters, budgets, forecasts, plans, operating records, safety and environmental reports, data, studies and documents, ledgers, journals, title policies, customer lists, regulatory filings, operating data and plans, research material, technical documentation (design specifications, engineering information, test results, maintenance schedules, functional requirements, operating instructions, logic manuals, processes, flow charts, etc.), user documentation (installation guides, user manuals, training materials, release notes, working papers, etc.), marketing documentation (sales brochures, flyers, pamphlets, web pages, etc.) and other similar materials, in each case whether or not in electronic form.

(q)    "Encumbrance" means any lien (as defined in Section 101(37) of the Bankruptcy Code), encumbrance, claim (as defined in Section 101(5) of the Bankruptcy Code), charge, mortgage, deed of trust, option, pledge, security interest or similar interests, title defects, hypothecations, easements, rights of way, encroachments, judgments, conditional sale or other title retention agreements and other similar impositions, imperfections or defects of title or restrictions on transfer or use.

(r)    "Equipment" means any and all equipment, computers, furniture, furnishings, fixtures, office supplies, supply inventory, vehicles and all other fixed assets.

(s)    "Escrow Agreement" means an escrow agreement among Sellers (or any Affiliate thereof) and the Escrow Agent, pursuant to which Purchaser shall deposit an amount equal to the aggregate amount of the Cure Costs that have been consensually agreed with the Assigned Contract counterparty or fixed by an order of the Bankruptcy Court as of the Closing

48

Date (the "<u>Closing Cure Costs Amount</u>"), which will be held and distributed to the applicable Assigned Contract counterparties in accordance with the terms of this Agreement and the Escrow Agreement.

(t)    "<u>Final Order</u>" means an order or judgment of the Bankruptcy Court or any other court of competent jurisdiction entered by the clerk of the Bankruptcy Court or such other court on the docket in Sellers' Bankruptcy Case or the docket of such other court, which has not been modified, amended, reversed, vacated or stayed and as to which (a) the time to appeal, petition for certiorari, or move for a new trial, reargument or rehearing has expired and as to which no appeal, petition for certiorari or motion for new trial, reargument or rehearing shall then be pending or (b) if an appeal, writ of certiorari new trial, reargument or rehearing thereof has been sought, such order or judgment of the Bankruptcy Court or other court of competent jurisdiction shall have been affirmed by the highest court to which such order was appealed, or certiorari shall have been denied, or a new trial, reargument or rehearing shall have been denied or resulted in no modification of such order, and the time to take any further appeal, petition for certiorari or move for a new trial, reargument or rehearing shall have expired, as a result of which such order shall have become final in accordance with Rule 8002 of the Federal Rules of Bankruptcy Procedure; <u>provided</u> that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be filed relating to such order, shall not cause such order not to be a Final Order.

(u)    "<u>Fraud</u>" means, with respect to any Party, actual common law fraud (and not constructive fraud, negligent misrepresentation or negligent omission, or any form of fraud premised on recklessness or negligence) under the Laws of the State of New York, which shall only be deemed to exist if such party makes a representation or warranty (as qualified by the Schedules) in <u>Article III</u> (with respect to the Sellers) or <u>Article IV</u> (with respect to Purchaser), as applicable, with actual knowledge that such representation or warranty was false at the time such representation or warranty was made.

(v)    "<u>GAAP</u>" means United States generally accepted accounting principles as in effect from time to time.

(w)    "<u>GBG USA</u>" means GBG USA Inc. a Delaware corporation.

(x)    "<u>Governmental Authorization</u>" means any permit, license, certificate, approval, consent, permission, clearance, designation, qualification or authorization issued, granted, given or otherwise made available by or under the authority of any Governmental Body or pursuant to any Law.

(y)    "<u>Governmental Body</u>" means any government, quasi governmental entity, or other governmental or regulatory body, agency or political subdivision thereof of any nature, whether foreign, federal, state or local, or any agency, branch, department, official, entity, instrumentality or authority thereof, or any court or arbitrator (public or private) of applicable jurisdiction.

(z)    "<u>Intellectual Property</u>" means all of the following: (i) patents, patent applications and patent disclosures; (ii) trademarks, service marks, trade dress, corporate names

and Internet domain names, together with all goodwill associated with each of the foregoing; (iii) copyrights; (iv) registrations and applications for any of the foregoing; (v) trade secrets and know-how; and (vi) all other intellectual property.

(aa)    "Knowledge of Sellers" or words of similar effect, regardless of case, means the actual knowledge of Robert Smits or Alain LaFontant.

(bb)    "Law" means any federal, state, provincial, local, municipal, foreign or international, multinational or other law, statute, legislation, constitution, principle of common law, resolution, ordinance, code, edict, decree, proclamation, treaty, convention, rule, regulation, ruling, directive, pronouncement, determination, decision, opinion or requirement issued, enacted, adopted, promulgated, implemented or otherwise put into effect by or under the authority of any Governmental Body.

(cc)    "Liability" means, as to any Person, any debt, adverse claim, liability (including any liability that results from, relates to or arises out of tort or any other product liability claim), duty, responsibility, obligation, commitment, assessment, cost, expense, loss, expenditure, charge, fee, penalty, fine, contribution or premium of any kind or nature whatsoever, whether known or unknown, asserted or unasserted, absolute or contingent, direct or indirect, accrued or unaccrued, liquidated or unliquidated, or due or to become due, and regardless of when sustained, incurred or asserted or when the relevant events occurred or circumstances existed.

(dd)    "Licensed Intellectual Property" means any and all Intellectual Property licensed by (i) the Company from any other Person and used in, held for use in, or otherwise related to the Acquired Business or (ii) Pacific Alliance or GBG USA from any other Person and primarily used in, held for use primarily in, or otherwise primarily related to the Acquired Business.

(ee)    "Material Adverse Effect" means any event, change, occurrence or effect (each, an "Effect") that, individually or in the aggregate with all other Effects, has had, or would reasonably be expected to have, a material adverse effect on the business, operations, Liabilities, properties, assets or condition (financial or otherwise) the Acquired Assets and Assumed Liabilities, taken as whole; provided that none of the following shall constitute, or be taken into account in determining whether or not there has been, a Material Adverse Effect: (i) Effects in, arising from or relating to general business or economic conditions generally affecting the industry in which the Sellers operate as primarily related to the Acquired Assets, (ii) Effects in, arising from or relating to national or international political or social conditions, including the engagement by the United States in hostilities or the escalation thereof, whether or not pursuant to the declaration of a national emergency or war, or the occurrence or the escalation of any military, cyber or terrorist attack upon the United States, or any of its territories, possessions, or diplomatic or consular offices or upon any military installation, asset, equipment or personnel of the United States, (iii) Effects in, arising from or relating to financial, banking, or securities markets (including (A) any disruption of any of the foregoing markets, (B) any change in currency exchange rates, (C) any decline or rise in the price of any security, commodity, contract or index and (D) any increased cost, or decreased availability, of capital or pricing or terms related to any financing for the transactions contemplated by this Agreement, (iv) Effects in, arising from or relating to changes in, GAAP, (v) Effects in, arising from or relating to changes in, Laws or other binding directives or determinations issued or made by any Governmental Body, (vi) Effects in,

50

arising from or relating to (A) the taking of any action expressly required by this Agreement or at the request of Purchaser or its Affiliates (other than the Seller's obligation to conduct the Business in the Ordinary Course in accordance with Section 7.1), (B) the failure to take any action if such action is prohibited by this Agreement, (C) Purchaser's failure to consent to any of the actions restricted in Section 6.1 or (D) the negotiation, announcement or pendency of this Agreement or the transactions contemplated hereby or the identity, nature or ownership of Purchaser, including the impact thereof on the relationships, contractual or otherwise, of the business of the Sellers or any of their Subsidiaries with employees, customers, lessors, suppliers, vendors or other commercial partners, (vii) Effects that arise from any seasonal fluctuations in the business, (viii) any failure, in and of itself, to achieve any budgets, projections, forecasts, estimates, plans, predictions, performance metrics or operating statistics or the inputs into such items (whether or not shared with Purchaser or its Affiliates or Advisors) (but, for the avoidance of doubt, not the underlying causes of any such failure to the extent such underlying cause is not otherwise excluded from the definition of Material Adverse Effect), (ix) Effects of any action taken by the Purchaser or its Affiliates with respect to the transactions completed by this Agreement or the financing thereof, (x) any pandemics or epidemics, including COVID-19, or any other similar event or any change, escalation or worsening thereof after the date hereof or (xi) (A) the commencement or pendency of the Bankruptcy Case; (B) any objections in the Bankruptcy Court to (1) this Agreement or any of the transactions contemplated hereby or thereby, (2) the reorganization of Sellers and any related plan of reorganization or disclosure statement, (3) the Bidding Procedures Motion or (4) the assumption or rejection of any Assigned Contract; (C) any Order of the Bankruptcy Court or any actions or omissions of Sellers or their Subsidiaries in compliance therewith; except in the case of the clauses (i), (ii), (iii), (v), or (x), to the extent such Effects have a materially disproportionate impact on the Acquired Assets and Assumed Liabilities taken as a whole, as compared to other participants engaged in the industries and geographies in which Sellers operate.

(ff)    "Order" means any order, injunction, judgment, decree, ruling, writ, assessment or arbitration award of a Governmental Body, including any Order entered by the Bankruptcy Court in the Bankruptcy Case (including the Sale Order).

(gg)    "Ordinary Course" means the ordinary and usual course of operations of the business of the Acquired Business, consistent with past practice, taking into account the commencement and pendency of the Bankruptcy Case.

(hh)    "Permitted Encumbrances" means (i) Encumbrances for utilities and Taxes not yet due and payable or being contested in good faith, (ii) easements, rights of way, restrictive covenants, encroachments and similar non-monetary encumbrances or non-monetary impediments against any of the Acquired Assets which do not, individually or in the aggregate, adversely affect the operation of the Acquired Assets, (iii) materialmans', mechanics', artisans', shippers', warehousemans' or other similar common law or statutory liens incurred in the Ordinary Course for amounts not yet due and payable and that are not resulting from a breach, default or violation by any Seller of any Contract or applicable Law, (iv) licenses granted on a non-exclusive basis pursuant to Assigned Contracts, (v) such other Encumbrances or title exceptions as Purchaser may approve in writing in its sole discretion and (vi) any Encumbrances that will be removed or released by operation of the Sale Order.

51

(ii)    "Person" means an individual, corporation, partnership, limited liability company, joint venture, association, trust, unincorporated organization, labor union, estate, Governmental Body or other entity or group.

(jj)    "Personal Data" means any information relating to an identified or identifiable natural person including (i) a natural person's name, street address, telephone number, email address, photograph, passport number, credit card number, bank information, or account number, and (ii) any other piece of non-publicly available information that allows the identification of such natural person or is otherwise considered personally identifiable information or personal information under Law.

(kk)    "Pre-Closing Tax Period" means all taxable periods ending on or prior to the Closing Date and the portion ending on the Closing Date of any taxable period that includes but does not end on the Closing Date.

(ll)    "Purchaser Group" means Purchaser, any Affiliate of Purchaser and each of their respective former, current or future Affiliates, officers, directors, employees, partners, members, managers, agents, Advisors, successors or permitted assigns.

(mm)    "Retained Business" means any business that is not the Acquired Business.

(nn)    "Sale Order" means a Final Order of the Bankruptcy Court, in form and substance reasonably acceptable to the Purchaser, approving the sale of the Acquired Assets consistent with the terms of this Agreement and the Bidding Procedures Order.

(oo)    "Seller Parties" means Sellers and each of their respective former, current, or future Affiliates, officers, directors, employees, partners, members, equityholders, controlling or controlled persons, managers, agents, Advisors, successors or permitted assigns.

(pp)    "Seller Plans" means (i) nonqualified deferred compensation or retirement plans, (ii) qualified "defined contribution plans" (as such term is defined under Section 3(34) of ERISA), (iii) qualified "defined benefit plans" (as such term is defined under Section 3(35) of ERISA), (iv) "welfare benefit plans" (as such term is defined under Section 3(1) of ERISA) or (v) severance, incentive or bonus, stock purchase, stock option or equity incentive or any other material employee benefit plans, policy, programs or arrangements.

(qq)    "Subsidiary" means, with respect to any Person, any corporation of which a majority of the total voting power of shares of stock entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers or trustees thereof is at the time owned or controlled, directly or indirectly, by such Person or one or more of the other Subsidiaries of such Person or a combination thereof or any partnership, association or other business entity of which a majority of the partnership or other similar ownership interest is at the time owned or controlled, directly or indirectly, by such Person or one or more Subsidiaries of such Person or a combination thereof.

(rr)    "Tax" means any federal, state, local, non-U.S. or other income, gross receipts, capital stock, franchise, profits, withholding, social security, unemployment, disability, real property, escheat, unclaimed property, ad valorem/personal property, stamp, excise,

52

occupation, sales, use, transfer, value added, import, export, alternative minimum or estimated tax, including any interest, penalty or addition thereto.

(ss)    "Tax Return" means any return (including any information return), report, statement, declaration, estimate, schedule, notice, notification, form, election, certificate or other document or information (including any amendments thereto) that is, has been or may in the future be filed with or submitted to, or required to be filed with or submitted to, any Governmental Body in connection with the determination, assessment, collection or payment of any Tax or in connection with the administration, implementation or enforcement of or compliance with any Law relating to any Tax.

(tt)    "Transaction Documents" means (i) the Bill of Sale, (ii) the Assignment and Assumption Agreement, (iii) the Transition Services Agreement, if any, (iv) the Class B Member Consent and (v) the other agreements, instruments, and documents required to be delivered in connection with this Agreement.

11.2    Index of Defined Terms

Acquired Assets ........................................... 5
Agreement .................................................. 4
Assignment and Assumption Agreement .. 14
Assumed Liabilities ...................................... 9
Backup Bidder ........................................... 26
Bankruptcy Case ............................. 4, 57, 61
Bankruptcy Code ............................. 4, 57, 61
Bankruptcy Court ................................. 4, 57, 61
Bankruptcy Rules ........................................ 5
Bid Protections .......................................... 26
Bidding Procedures Order ......................... 47
Bill of Sale ................................................ 14
Break-Up Fee ............................................ 25
Cash Payment ............................................ 12
Chosen Courts ........................................... 43
Closing ...................................................... 14
Closing Date .............................................. 14
Closing Date Payment ............................... 12
Cure Costs ................................................... 9
D&O Insurance Policies ............................. 7
D&O Related Insurance Policies ............... 8
Dataroom ................................................... 22
Deposit ...................................................... 13
E&O Insurance Policies ............................. 7
Enforceability Exceptions ......................... 16
EPLI Insurance Policies ............................. 7

ERISA ....................................................... 19
Escrow Agreement ..................................... 48
Excluded Assets ........................................... 7
Excluded Liabilities .................................... 9
Expense Reimbursement ............................ 25
Express Representations ............................ 21
Inventory ..................................................... 6
Licensed Intellectual Property ................. 50
Outside Date .............................................. 35
Parties ......................................................... 4
Party ........................................................... 4
Personal Data ............................................ 52
Projections ................................................. 32
Purchase Agreement .................................. 57
Purchase Price ........................................... 12
Purchase Price Allocation ......................... 37
Purchaser ......................................... 4, 57, 61
Registered IP ............................................. 19
Schedules ................................................... 41
Seller .................................................... 4, 57
Sellers ............................................... 4, 57, 61
Straddle Period .......................................... 38
Successful Bidder ...................................... 26
Tangible Personal Property ......................... 5
Transfer Taxes .......................................... 37

11.3    Rules of Interpretation

Unless otherwise expressly provided in this Agreement, the following will apply to this Agreement, the Schedules, the Transaction Documents and any other certificate, instrument, agreement or other document contemplated hereby or delivered hereunder.

(a)     Accounting terms which are not otherwise defined in this Agreement have the meanings given to them under GAAP consistently applied.  To the extent that the definition of an accounting term defined in this Agreement is inconsistent with the meaning of such term under GAAP, the definition set forth in this Agreement will control.

(b)     The terms "hereof," "herein" and "hereunder" and terms of similar import are references to this Agreement as a whole and not to any particular provision of this Agreement. Section, clause, Schedule and Exhibit references contained in this Agreement are references to sections, clauses, Schedules and Exhibits in or to this Agreement, unless otherwise specified.  All Exhibits and Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein.  Any capitalized terms used in any Schedule or Exhibit but not otherwise defined therein shall be defined as set forth in this Agreement.

(c)     Whenever the words "include," "includes" or "including" are used in this Agreement, they will be deemed to be followed by the words "without limitation." Where the context permits, the use of the term "or" will be equivalent to the use of the term "and/or."

(d)     The words "to the extent" shall mean "the degree by which" and not "if."

(e)     When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period will be excluded.  If the last day of such period is a day other than a Business Day, the period in question will end on the next succeeding Business Day.

(f)     Words denoting any gender will include all genders, including the neutral gender.  Where a word is defined herein, references to the singular will include references to the plural and vice versa.

(g)     The word "will" will be construed to have the same meaning and effect as the word "shall".  The words "shall," "will," or "agree(s)" are mandatory, and "may" is permissive.

(h)     All references to "$" and dollars will be deemed to refer to United States currency unless otherwise specifically provided.

(i)     All references to a day or days will be deemed to refer to a calendar day or calendar days, as applicable, unless otherwise specifically provided.

(j)     Any document or item will be deemed "delivered", "provided" or "made available" by the Sellers, within the meaning of this Agreement if such document or item (a) is included in the Dataroom, (b) actually delivered or provided to Purchaser or any of Purchaser's attorneys, in each case no later than twenty-four (24) hours prior to the date of this Agreement.

(k)     Any reference to any agreement or contract will be a reference to such agreement or contract, as amended, modified, supplemented or waived.

(l)       Any reference to any particular Code section or any Law will be interpreted to include any amendment to, revision of or successor to that section or Law regardless of how it is numbered or classified; <u>provided</u> that, for the purposes of the representations and warranties set forth herein, with respect to any violation of or non-compliance with, or alleged violation of or non-compliance, with any Code section or Law, the reference to such Code section or Law means such Code section or Law as in effect at the time of such violation or non-compliance or alleged violation or non-compliance.

(m)       All references to a day or days shall be deemed to refer to a calendar day or calendar days, as applicable, unless otherwise specifically provided.

<p align="center">[<em>Signature page(s) follow</em>.]</p>

**IN WITNESS WHEREOF**, the Parties have caused this Agreement to be executed by their respective duly authorized officers as of the date first above written.

<div align="center">

**<u>PURCHASER</u>**

</div>

**SLC FASHION, LLC**

By: _____

Name:  Tarik Brooks

Title:   President

<div align="center">

**<u>GUARANTOR</u>**

</div>

**CEOPCO, LLC**

By: _____

Name:  Tarik Brooks

Title:   President

**<u>SELLERS</u>**

**GBG SEAN JOHN LLC**

By: _Robert k. Smits_

Name:  Robert Smits
Title:   EVP and Secretary

**PACIFIC ALLIANCE USA, INC.**

By: _Robert k. Smits_

Name:  Robert Smits
Title:   EVP and Secretary

*Signature Page to Asset Purchase Agreement*

<u>**EXHIBIT A**</u>
**FORM OF BILL OF SALE**

This BILL OF SALE (this "<u>Agreement</u>") is executed effective as of [●], 2021, by and among SLC FASHION, LLC, a Delaware limited liability company ("<u>Purchaser</u>"), GBG SEAN JOHN LLC, a Delaware limited liability company ("<u>SJ LLC</u>") and PACIFIC ALLIANCE USA INC., a Delaware corporation ("<u>Pacific Alliance</u>", and together with the SJ LLC, each a "<u>Seller</u>" and collectively "<u>Sellers</u>").   Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Purchase Agreement (as defined below).

WHEREAS, Pacific Alliance, together with certain of its affiliates including GBG USA Inc. a Delaware corporation (collectively, the "<u>Initial Debtors</u>") filed voluntary petitions for relief on July 29, 2021 under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "<u>Bankruptcy Code</u>") in the United States Bankruptcy Court for the Southern District of New York (the "<u>Bankruptcy Court</u>"), which cases are being jointly administered for procedural purposes only (collectively, the "<u>Bankruptcy Case</u>");

WHEREAS, SJ LLC (collectively with the Initial Debtors, the "<u>Debtors</u>") filed voluntary petitions for relief on [  ], 2021 under Chapter 11 of the Bankruptcy Code as an additional Debtor in the Bankruptcy Case;

WHEREAS, in connection with the Bankruptcy Case, Sellers and Purchaser have entered into that certain Asset Purchase Agreement, dated as of [●], 2021 (the "<u>Purchase Agreement</u>");

WHEREAS, Sellers desire to sell, convey, assign, transfer, and deliver to Purchaser, and Purchaser desires to purchase, acquire and accept from Sellers, all of Sellers' rights, titles, and interests in, to and under the Acquired Assets; and

WHEREAS, pursuant to the Purchase Agreement, Sellers and Purchaser have agreed to enter into this Agreement pursuant to which the Acquired Assets will be conveyed to Purchaser.

NOW, THEREFORE, for and in consideration of the payment by Purchaser of the Purchase Price pursuant to and in accordance with the terms of the Purchase Agreement and other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound hereby, agree as follows:

1.      <u>Sale; Assignment; Transfer; Conveyance and Delivery</u>.  Sellers hereby irrevocably SELL, CONVEY, ASSIGN, TRANSFER, and DELIVER to Purchaser (or its affiliated designee) and its successors and assigns for its and their own use forever, as provided in the Purchase Agreement, all of the rights, titles and interests of Sellers as of the Closing in and to all of the Acquired Assets, and Purchaser hereby PURCHASES, ACQUIRES and ACCEPTS from Sellers all of Sellers' rights, titles and interests in and to all of the Acquired Assets, free and clear of any Encumbrances and any successor liability.

2.      <u>Priority</u>.  Notwithstanding anything in this Agreement to the contrary, nothing contained herein shall in any way supersede, modify, alter, replace, amend, change, diminish, rescind, waive, exceed, expand, enlarge or in any way affect the provisions, including the warranties, covenants, agreements, conditions, representations or, in general, any of the rights and

remedies or any of the obligations (including for indemnification) of Sellers or Purchaser set forth in the Purchase Agreement. This Agreement is intended only to effect the sale, assignment, transfer, conveyance and delivery to Purchaser of Sellers' rights, titles and interests in the Acquired Assets free and clear of any Encumbrances and any successor liability pursuant to the Purchase Agreement and shall be governed entirely in accordance with the terms and conditions of the Purchase Agreement, which shall in all respects survive the execution and delivery of this Agreement in accordance with its terms. To the extent that any provision of this Agreement conflicts or is inconsistent with the terms of the Purchase Agreement, the provisions of the Purchase Agreement shall govern.

3.    <u>Successors and Assigns</u>. This Agreement shall be binding upon Purchaser and, subject to entry of the Bidding Procedures Order (with respect to the matters covered thereby) and the Sale Order, Sellers, and shall inure to the benefit of the parties hereto and their respective successors and permitted assigns, including any trustee or estate representative appointed in the Bankruptcy Case or any successor Chapter 7 case, and nothing in this Agreement, express or implied, is intended to or shall confer upon any other Person any rights, benefits or remedies of any nature whatsoever under or by reason of this Agreement. Neither party may assign its rights or obligations hereunder without the prior written consent of the other party, which consent shall not be unreasonably withheld or delayed. Any purported assignment in violation of this Section shall be null and void. No assignment shall relieve the assigning party of any of its obligations hereunder.

4.    <u>No Assumption of Liabilities</u>. Except as otherwise set forth in the Purchase Agreement, nothing expressed or implied in this Agreement shall be deemed to be an assumption by Purchaser of any Excluded Liabilities of Sellers.

5.    <u>Governing Law</u>. Except to the extent the mandatory provisions of the Bankruptcy Code apply, this Agreement, and any Action that may be based upon, arise out of or relate to this Agreement or the negotiation, execution or performance of this Agreement or the transactions contemplated hereby will be governed by and construed in accordance with the internal laws of the State of New York without giving effect to any choice or conflict of law provision or rule (whether of the State of New York or any other jurisdiction). Any Action arising out of or related to this Agreement may be instituted in (a) the Bankruptcy Court and any federal court to which an appeal from the Bankruptcy Court may be validly taken or (b) in the event the Bankruptcy Case is closed, or if the Bankruptcy Court is unwilling or unable to hear such Action, in any state or federal court sitting in the State of New York), and each party irrevocably submits to the exclusive jurisdiction of such courts in any such suit, action, proceeding, or dispute.

6.    <u>Counterparts</u>. This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. A signed copy of this Agreement delivered by facsimile, email, or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement. A signed digital copy of this Agreement shall be treated as an original.

7.    <u>Descriptive Headings</u>. The section and paragraph headings in this Agreement are for reference purposes only and shall not affect the meaning or interpretation of this Agreement.

8.    <u>Severability</u>.  In the event that any part of this Agreement is declared by any court or other judicial or administrative body to be null, void or unenforceable, said provision shall survive to the extent it is not so declared, and all of the other provisions of this Agreement shall remain in full force and effect.

9.    <u>Entire Agreement</u>.    This Agreement, the Purchase Agreement and the other Transaction Documents constitute the entire agreement of the parties hereto relating to the purchase of the rights, titles and interests in and to the Acquired Assets, and supersedes all prior agreements and understandings, both written and oral, between the parties with respect to the subject matter hereof, subject to the terms and conditions listed in <u>Section 3</u> hereof.

10.    <u>Amendments</u>. This Agreement may be amended, supplemented or changed only by a writing signed by all parties hereto.

[Signature page follows]

IN WITNESS WHEREOF, the parties have executed this Agreement effective as of the date first above written.

**PURCHASER**

**SLC FASHION, LLC**

By: _____
Name:
Title:

**SELLERS**

**GBG SEAN JOHN LLC**

By: _____
Name:
Title:

**PACIFIC ALLIANCE USA INC.**

By: _____
Name:
Title:

*Signature Page to Bill of Sale*

## EXHIBIT B
## FORM OF ASSIGNMENT AND ASSUMPTION AGREEMENT

This ASSIGNMENT AND ASSUMPTION AGREEMENT (this "Agreement"), dated as of [●], 2021, by and among SLC FASHION, LLC, a Delaware limited liability company ("Assignee"), GBG SEAN JOHN LLC, a Delaware limited liability company ("SJ LLC") and PACIFIC ALLIANCE USA, INC., a Delaware corporation ("Pacific Alliance", and together with the SJ LLC, "Assignors").  Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Purchase Agreement (as defined below).

**WHEREAS**, Pacific Alliance, together with certain of its affiliates including GBG USA Inc. a Delaware corporation (collectively, the "Initial Debtors") filed voluntary petitions for relief on July 29, 2021 under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"), which cases are being jointly administered for procedural purposes only (collectively, the "Bankruptcy Case");

**WHEREAS**, SJ LLC (collectively with the Initial Debtors, the "Debtors") filed voluntary petitions for relief on [  ], 2021 under Chapter 11 of the Bankruptcy Code as an additional Debtor in the Bankruptcy Case;

**WHEREAS**, in connection with the Bankruptcy Case, Assignors and Assignee have entered into the Purchase Agreement (the terms of which, including all Schedules and Exhibits thereto, are incorporated herein by this reference), pursuant to which Assignee is acquiring the Acquired Assets from Assignors as described therein;

**WHEREAS**, the assignment, transfer and conveyance of such Acquired Assets to Assignee includes, as a condition thereof, the assumption by Assignee of all Assumed Liabilities; and

**WHEREAS**, Assignee and Assignors now desire to evidence and effectuate the assignment, transfer and conveyance by Assignors to Assignee of the Acquired Assets and the assumption by Assignee of the Assumed Liabilities.

**NOW**, **THEREFORE**, in consideration of the mutual covenants set forth in the Purchase Agreement and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Assignee and Assignors hereby covenant and agree as follows:

1.    Assignors agree to, and hereby do, sell, convey, assign, transfer, and deliver Assignee (or its affiliated designee) and its successors and assigns for its and their own use forever, as provided in the Purchase Agreement, all of the rights, titles and interests of Assignors as of the Closing in and to all of the Acquired Assets, and Assignee agrees to, and hereby does purchase, acquire and accept from Assignors all of Assignors' rights, titles and interests in and to all of the Acquired Assets, free and clear of any Encumbrances and any successor liability.

2.    Assignors agree to, and hereby do, assign to Assignee, and Assignee agrees to, and hereby does, accept and assume, and agrees to pay, honor, perform and discharge when due, the Assumed Liabilities in accordance with the terms set forth in the Purchase Agreement and any and

all Transaction Documents. Upon the consummation of the transactions contemplated hereby, Assignors shall not have any liability or obligation, direct or indirect, absolute or contingent, related to any of the Assumed Liabilities (except as set forth in the indemnification provisions of the Purchase Agreement). For the avoidance of doubt, Assignee shall not assume, succeed to or have any liability or obligation, direct or indirect, absolute or contingent, related to any of the Excluded Liabilities, all of which Assignors hereby agree to retain, remain solely liable for and to pay and satisfy when due.

3.      This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. A signed copy of this Agreement delivered by facsimile, email, or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement. A signed digital copy of this Agreement shall be treated as an original.

4.      The Purchase Agreement, this Agreement and the other Transaction Documents embody the entire agreement and understanding of the parties hereto in respect of the subject matter contained herein and supersede all other prior agreements and understandings among the parties hereto with respect to such subject matter. Notwithstanding anything in this Agreement to the contrary, nothing contained herein shall in any way supersede, modify, alter, replace, amend, change, diminish, rescind, waive, exceed, expand, enlarge or in any way affect the provisions, including the warranties, covenants, agreements, conditions, representations or, in general, any of the rights and remedies or any of the obligations (including for indemnification) of Assignors or Assignee set forth in the Purchase Agreement. To the extent that any provision of this Agreement conflicts or is inconsistent with the terms of the Purchase Agreement, the provisions of the Purchase Agreement shall govern.

5.      This Agreement shall be binding upon and inure solely to the benefit of each party and its successors and permitted assigns and nothing in this Agreement, express or implied, is intended to or shall confer upon any other Person any rights, benefits or remedies of any nature whatsoever under or by reason of this Agreement.

6.      Except to the extent the mandatory provisions of the Bankruptcy Code apply, this Agreement, and any Action that may be based upon, arise out of or relate to this Agreement or the negotiation, execution or performance of this Agreement or the transactions contemplated hereby will be governed by and construed in accordance with the internal laws of the State of New York without giving effect to any choice or conflict of law provision or rule (whether of the State of New York or any other jurisdiction). Any Action arising out of or related to this Agreement may be instituted in (a) the Bankruptcy Court and any federal court to which an appeal from the Bankruptcy Court may be validly taken or (b) in the event the Bankruptcy Case is closed, or if the Bankruptcy Court is unwilling or unable to hear such Action, in any state or federal court sitting in the State of New York), and each party irrevocably submits to the exclusive jurisdiction of such courts in any such suit, action, proceeding, or dispute.

7.      This Agreement can be amended, supplemented or changed only by a writing signed by the parties hereto.

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be duly executed as of the day and year first above written.

**ASSIGNORS:**

**GBG SEAN JOHN LLC**

By: _____
Name:
Title:

**PACIFIC ALLIANCE USA INC.**

By: _____
Name:
Title:

**ASSIGNEE:**

**SLC FASHION, LLC**

By: _____
Name:
Title:

**EXHIBIT C**

**FORM OF TRANSITION SERVICES AGREEMENT**

See attached.

## TRANSITION SERVICES AGREEMENT

This Transition Services Agreement, dated as of [●], 2021 (this **"Agreement"**), is entered into between GBG SEAN JOHN LLC, a Delaware corporation (the "**Company**"), and the affiliates of the Company that are indicated on the signature pages attached hereto (together with the Company, each a "**Seller**" and collectively "**Sellers**"), and SLC FASHION, LLC, a Delaware limited liability company ("Purchaser") (**"Purchaser"**).

## RECITALS

WHEREAS, Purchaser and Sellers entered into that certain Asset Purchase Agreement, dated as of December 1, 2021 (the **"Purchase Agreement"**), pursuant to which Sellers agreed to sell and assign to Purchaser, and Purchaser has agreed to purchase and assume from Sellers, certain Acquired Assets, and certain Assumed Liabilities, of the Acquired Business (as such capitalized terms are defined in the Purchase Agreement), all as more fully described therein;

WHEREAS, in order to ensure an orderly transition of the Acquired Business to Purchaser and as a condition to consummating the transactions contemplated by the Purchase Agreement, Purchaser and Sellers have agreed to enter into this Agreement, pursuant to which Sellers will provide, and/or cause their respective Affiliates to provide, Purchaser with certain services, in each case on a transitional basis and subject to the terms and conditions set forth herein; and

WHEREAS, capitalized terms used herein and not otherwise defined shall have the meaning ascribed to such terms in the Purchase Agreement.

NOW, THEREFORE, in consideration of the mutual agreements and covenants hereinafter set forth, Purchaser and Sellers hereby agree as follows:

## ARTICLE I
### SERVICES

**Section 1.01   Provision of Services.**

(a)      Sellers agree to provide, and/or to cause their respective Affiliates or designated third party service providers to provide, the services (the **"Services"**) set forth on the exhibits attached hereto (as such exhibits may be amended or supplemented pursuant to the terms of this Agreement, collectively, the **"Service Exhibits"**) to Purchaser for the respective periods and on the other terms and conditions set forth in this Agreement and in the respective Service Exhibits.

(b)      Subject to Section 2.03 and Section 2.04, the obligations of Sellers under this Agreement to provide Services shall terminate with respect to each Service on the end

date specified in the applicable Service Exhibit (the "**End Date**"). Notwithstanding the foregoing, the parties acknowledge and agree that Purchaser may determine from time to time that it does not require all the Services set out on one or more of the Service Exhibits or that it does not require such Services for the entire period up to the applicable End Date. Accordingly, Purchaser may terminate any Service, in whole and not in part, upon no less than ten (10) days written notice to Sellers in writing of any such determination.

**Section 1.02   IP License Agreements.**

(a)      Sellers hereby grant, and agree to cause CAA-GBG USA, LLC ("CAA-GBG") to grant, to Purchaser the right, but not the obligation, solely from the date hereof until the six-month anniversary hereof, to engage CAA-GBG's brand management services team to assist with communications, negotiations and business planning as between the Purchaser and the counterparties under any and all of the intellectual property that is licensed pursuant to the agreements listed on Exhibit A hereto (the "Sean John Licenses"), regarding the runoff and/or termination of the Sean John Licenses and potential rebranding of the Acquired Business, in each case, as directed by Purchaser (the "Brand Management Services"). To the extent Brand Management Services are requested, all such Brand Management Services shall be provided by Sellers, or Sellers shall cause CAA-GBG to provide such Brand Management Services; provided that (i) Sellers' full consideration for provision of any Services by the Sellers' personnel set forth on the Service Exhibit shall be the rates set forth on the Service Exhibit, and (ii) the costs of any Brand Management Services to be provided by CAA-GBG shall be at the cost set forth on the applicable Service Exhibit (the "Brand Management Fees"). For the avoidance of doubt, except as otherwise agreed by Purchase and CAA-GBG, Purchaser shall have the right to opt out of the Brand Management Services on no less than thirty (30) days written notice to Sellers in accordance with Section 1.1(b).

(b)      During the period in which CAA-GBG provides Brand Management Services to Purchaser, if any, Purchaser hereby grants to CAA-GBG, a non-exclusive, non-transferable, sublicensable (to the extent set forth in this paragraph), worldwide license and right respective to all of the intellectual property covered by the Sean John Licenses, to the extent of Purchaser's interest therein, exercisable without payment of royalty or other compensation such that CAA-GBG may, or may allow its and/or the Company's distributors, brand managers and customers (the "Sean John Customers") to, use, market, repossess, possess, store, process, sell, transfer, distribute, and dispose of any tangible inventory utilizing any of the Sean John Licenses, in each case, at the direction of Purchaser and solely in connection with the Brand Management Services. For the avoidance of doubt and to the extent engaged by Purchaser as set forth in this clause, CAA-GBG will be entitled to the Brand Management Fees.

**Section 1.03   Standard of Service.** Sellers represent, warrant and agree that the Services shall be provided in good faith, in accordance with Law and, except as specifically provided in the Service Exhibits, in a manner generally consistent with the historical

2

provision of the Services and with the same standard of care as provided in the six (6) months prior to the date hereof. Subject to Section 1.04**4**, Sellers agree to assign sufficient resources and qualified personnel as are reasonably required to perform the Services in accordance with the standards set forth in the preceding sentence.

**Section 1.04   Third-Party Service Providers.** Sellers may retain and use one or more third party service providers to provide some of the Services to Purchaser, provided that Sellers shall in all cases retain responsibility for the provision to Purchaser of Services to be performed by any third-party service provider or subcontractor or by any of Sellers' Affiliates.

## ARTICLE II
### COMPENSATION

**Section 2.01   Responsibility for Wages and Fees.** For such time as any employees of Sellers or any of their respective Affiliates are providing the Services to Purchaser under this Agreement, (a) such employees will remain employees of Sellers or such Affiliate, as applicable, and shall not be deemed to be employees of Purchaser for any purpose, and (b) Sellers or such Affiliate, as applicable, shall be solely responsible for the payment and provision of all wages, bonuses and commissions, employee benefits, including severance and worker's compensation, and the withholding and payment of applicable Taxes relating to such employment.

**Section 2.02   Terms of Payment and Related Matters.**

(a)      As consideration for provision of the Services, Purchaser shall pay Sellers the amount specified for each Service on such Service's respective Service Exhibit.

(b)      As more fully provided in the Service Exhibits and subject to the terms and conditions therein:

(i)      Sellers shall provide Purchaser, in accordance with Section 6.01 of this Agreement, with monthly invoices ("**Invoices**"), which shall set forth in reasonable detail, with such supporting documentation as Purchaser may reasonably request with respect to amounts payable under this Agreement; and

(ii)      payments pursuant to this Agreement shall be made within thirty (30) days after the date of receipt of an Invoice by Purchaser from Sellers.

(c)      It is the intent of the parties that the compensation set forth in the respective Service Exhibits reasonably approximate the out-of-pocket cost of providing the Services, without any intent to cause Sellers to receive profit or incur loss. If at any time Sellers believe that the payments contemplated by a specific Service Exhibit are materially insufficient to compensate it for the cost of providing the Services it is obligated to provide hereunder, or Purchaser believes that the payments contemplated by a specific Service

Exhibit materially overcompensate Sellers for such Services, such party shall notify the other party as soon as possible, and the parties hereto will commence good faith negotiations toward an agreement in writing as to the appropriate course of action with respect to pricing of such Services for future periods.

**Section 2.03   Extension of Services.** The parties agree that Sellers shall not be obligated to perform any Service after the applicable End Date; *provided*, *however*, that if Purchaser desires and Sellers agree to continue to perform any of the Services after the applicable End Date, the parties shall negotiate in good faith to determine an amount that compensates Sellers for all of its costs for such performance. The Services so performed by Sellers after the applicable End Date shall continue to constitute Services under this Agreement and be subject in all respects to the provisions of this Agreement for the duration of the agreed-upon extension period.

**Section 2.04   Terminated Services.** Upon termination or expiration of any or all Services pursuant to this Agreement, or upon the termination of this Agreement in its entirety, Sellers shall have no further obligation to provide the applicable terminated Services and Purchaser will have no obligation to pay any future compensation relating to such Services (other than for or in respect of Services already provided in accordance with the terms of this Agreement and received by Purchaser prior to such termination).

**Section 2.05   Taxes.** Sellers shall be responsible for all sales or use Taxes imposed or assessed as a result of the provision of Services by Sellers.

<div align="center">

**ARTICLE III**

**TERMINATION**

</div>

**Section 3.01   Termination of Agreement.** Subject to Section 3.04, this Agreement shall terminate in its entirety (i) on the date upon which Sellers shall have no continuing obligation to perform any Services as a result of each of their expiration or termination in accordance with Section 1.01(b), **1.02 or** Section 3.02 or (ii) in accordance with Section 3.03.

**Section 3.02   Breach.** Any party (the **"Non-Breaching Party"**) may terminate this Agreement with respect to any Service, in whole but not in part, at any time upon prior written notice to the other party (the **"Breaching Party"**) if the Breaching Party has failed to perform any of its material obligations under this Agreement relating to such Service, and such failure shall have continued without cure for a period of thirty (30) days after receipt by the Breaching Party of a written notice of such failure from the Non-Breaching party seeking to terminate such service.

**Section 3.03   Insolvency.** In the event that Sellers shall (i) become or are declared insolvent, (ii) make an assignment on behalf of all or substantially all of its creditors, or

(iii) take any corporate action for its winding up or dissolution, then Purchaser shall have the right to terminate this Agreement immediately by providing written notice to Sellers.

**Section 3.04   Effect of Termination.** Upon termination of this Agreement in its entirety pursuant to Section 3.01, all obligations of the parties hereto shall terminate, except for the provisions of Section 2.04, Section 2.05, Article IV, Article V and Article VI, which shall survive any termination or expiration of this Agreement.

## ARTICLE IV
### CONFIDENTIALITY

**Section 4.01            Confidentiality.**

(a)      During the term of this Agreement and thereafter, the parties hereto shall, and shall instruct their respective Representatives to, maintain in confidence and not disclose the other party's financial, technical, sales, marketing, development, personnel, and other information, records, or data, including, without limitation, customer lists, supplier lists, trade secrets, designs, product formulations, product specifications or any other proprietary or confidential information, however recorded or preserved, whether written or oral (any such information, "**Confidential Information**"). Each party hereto shall use the same degree of care, but no less than reasonable care, to protect the other party's Confidential Information as it uses to protect its own Confidential Information of like nature. Unless otherwise authorized in any other agreement between the parties, any party receiving any Confidential Information of the other party (the "**Receiving Party**") may use Confidential Information only for the purposes of fulfilling its obligations under this Agreement (the "**Permitted Purpose**"). Any Receiving Party may disclose such Confidential Information only to its Representatives who have a need to know such information for the Permitted Purpose and who have been advised of the terms of this Section 4.01 and the Receiving Party shall be liable for any breach of these confidentiality provisions by such Persons; *provided*, *however*, that any Receiving Party may disclose such Confidential Information to the extent such Confidential Information is required to be disclosed by a Governmental Order, in which case the Receiving Party shall promptly notify, to the extent possible, the disclosing party (the "**Disclosing Party**"), and take reasonable steps to assist in contesting such Governmental Order or in protecting the Disclosing Party's rights prior to disclosure, and in which case the Receiving Party shall only disclose such Confidential Information that it is advised by its counsel in writing that it is legally bound to disclose under such Governmental Order.

(b)      Notwithstanding the foregoing, "Confidential Information" shall not include any information that the Receiving Party can demonstrate: (i) was publicly known at the time of disclosure to it, or has become publicly known through no act of the Receiving Party or its Representatives in breach of this Section 4.01; (ii) was rightfully received from a third party without a duty of confidentiality; or (iii) was developed by it independently without any reliance on the Confidential Information.

(c)     Upon demand by the Disclosing Party at any time, or upon expiration or termination of this Agreement with respect to any Service, the Receiving Party agrees promptly to return or destroy, at the Disclosing Party's option, all Confidential Information. If such Confidential Information is destroyed, an authorized officer of the Receiving Party shall certify to such destruction in writing.

## ARTICLE V
### INDEMNIFICATION

**Section 5.01   Indemnification.** Subject to the limitations set forth herein, each Party shall indemnify, defend and hold harmless the other Party and its Affiliates and each of their respective Representatives (collectively, the **"Indemnified Parties"**) from and against any and all Losses of the Indemnified Parties relating to, arising out of or resulting from the material breach of this Agreement.

**Section 5.02   Indemnification Procedures** The indemnification procedures set forth in Section 6.04 of the Purchase Agreement shall be deemed incorporated into, and made a part of, this Agreement.

## ARTICLE VI
### MISCELLANEOUS

**Section 6.01   Notices.** All Invoices, notices, requests, consents, claims, demands, waivers and other communications hereunder shall be in writing and shall be deemed to have been given: (a) when delivered by hand (with written confirmation of receipt); (b) when received by the addressee if sent by a nationally recognized overnight courier (receipt requested); (c) on the date sent by facsimile or e-mail of a PDF document (with confirmation of transmission) if sent during normal business hours of the recipient, and on the next Business Day if sent after normal business hours of the recipient; or (d) on the fifth day after the date mailed, by certified or registered mail, return receipt requested, postage prepaid. Such communications must be sent to the respective parties at the addresses set forth in Section 10.3 of the Purchase Agreement.

**Section 6.02   Headings.** The headings in this Agreement are for reference only and shall not affect the interpretation of this Agreement.

**Section 6.03   Severability.** If any term or provision of this Agreement is invalid, illegal or unenforceable in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other term or provision of this Agreement or invalidate or render unenforceable such term or provision in any other jurisdiction. Upon such determination that any term or other provision is invalid, illegal or unenforceable, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in a mutually acceptable manner in order that the transactions

contemplated hereby be consummated as originally contemplated to the greatest extent possible.

Section 6.04    **Entire Agreement.** This Agreement, including all Service Exhibits and the Purchase Agreement, constitutes the sole and entire agreement of the parties to this Agreement with respect to the subject matter contained herein and supersedes all prior and contemporaneous understandings and agreements, both written and oral, with respect to such subject matter.

Section 6.05    **Successors and Assigns.** This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and permitted assigns. Subject to the following sentence, neither party may assign its rights or obligations hereunder without the prior written consent of the other party, which consent shall not be unreasonably withheld or delayed. Notwithstanding the foregoing sentence, Purchaser may, without the prior written consent of Sellers, assign all or any portion of its right to receive Services to any of its Affiliates that participate in the operation of the Acquired Business. No assignment shall relieve the assigning party of any of its obligations hereunder.

Section 6.06    **No Third-Party Beneficiaries.** This Agreement is for the sole benefit of the parties hereto and their respective successors and permitted assigns and nothing herein, express or implied, is intended to or shall confer upon any other Person any legal or equitable right, benefit or remedy of any nature whatsoever, under or by reason of this Agreement.

Section 6.07    **Amendment and Modification; Waiver.** This Agreement may only be amended, modified or supplemented by an agreement in writing signed by each party hereto. No waiver by any party of any of the provisions hereof shall be effective unless explicitly set forth in writing and signed by the party so waiving. No failure to exercise, or delay in exercising, any right, remedy, power or privilege arising from this Agreement shall operate or be construed as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.

Section 6.08    **Governing Law; Submission to Jurisdiction.** This Agreement shall be governed by and construed in accordance with the internal laws of the State of Delaware without giving effect to any choice or conflict of law provision or rule (whether of the State of Delaware or any other jurisdiction) that would cause the application of Laws of any jurisdiction other than those of the State of Delaware. Any legal suit, action or proceeding arising out of or based upon this agreement or the transactions contemplated hereby may be instituted in the federal courts of the United States of America or the courts of the State of Delaware, and each party irrevocably submits to the exclusive jurisdiction of such courts in any such suit, action or proceeding. Service of process, summons, notice or other document by mail to such party's address set forth herein shall be effective service

of process for any suit, action or other proceeding brought in any such court. The parties irrevocably and unconditionally waive any objection to the laying of venue of any suit, action or any proceeding in such courts and irrevocably waive and agree not to plead or claim in any such court that any such suit, action or proceeding brought in any such court has been brought in an inconvenient forum.

**Section 6.09    Waiver of Jury Trial.** Each party irrevocably and unconditionally waives any right it may have to a trial by jury in respect of any legal action arising out of or relating to this agreement or the transactions contemplated hereby. Each party to this agreement certifies and acknowledges that (a) no representative of any other party has represented, expressly or otherwise, that such other party would not seek to enforce the foregoing waiver in the event of a legal action, (b) such party has considered the implications of this waiver, (c) such party makes this waiver voluntarily, and (d) such party has been induced to enter into this agreement by, among other things, the mutual waivers and certifications in this Section 6.09.

**Section 6.10    Counterparts.** This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. A signed copy of this Agreement delivered by facsimile, e-mail or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement. An electronic copy of this Agreement shall be treated as an original.

[SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the date first written above by their respective officers thereunto duly authorized.

**SLC FASHION, LLC**

By: _____
Name:
Title:

**GBG SEAN JOHN LLC**

By: _____

Name:  Robert Smits

Title:   Secretary

Highly Confidential – Subject to Review
For Discussion & Illustrative Purposes Only
Subject to Material Change

# GBG – Sean John TSA Service Exhibits

**Reference Materials**

November 30, 2021





Highly Confidential – Subject to Review
For Discussion & Illustrative Purposes Only
Subject to Material Change

# One-Time TSA Services[1]

**The services below represent one-time services which will be provided at no cost.**

| Service | Service Description |
|---|---|
| **E-Commerce** | • Provide access to paid search provider and technology provider.<br>• Provide customer and/or loyalty database for all customers including purchase history, email, address, etc.<br>• Provide digital assets in a usable format, including, but not limited, to photographs, videos, copy, and graphical designs. |
| **Product Development** | • Deliver all tech packs for 2021/2022 line plus available historical tech packs.<br>• Deliver 2021/2022 full sample line of final TOP samples.<br>• Deliver any physical proto samples of 2022/2023 styles.<br>• Deliver all product files. |
| **Production / Sourcing** | • Provide key contacts with vendors, sourcing agents, QC network.<br>• Provide key contacts with freight forwarders in US and Europe. |
| **Human Resources Services** | • For employees hired from GBG, provide historical compensation data including compensation history, including performance/bonus compensation for last 3 years. |
| **Marketing Services** | • Deliver all current marketing assets including any current and future campaign assets.<br>• Deliver all Ecom, catalog and product marketing related digital assets.<br>• Deliver Social Media control (including all passwords/accounts). |

[1]Services will be provided to the extent the data is available; internal review ongoing.

2




Highly Confidential – Subject to FRE 408
For Discussion & Illustrative Purposes Only
Subject to Material Change

# Ongoing TSA Services: Personnel – Brand Level & Corporate Operations

**The below illustrates the direct brand level or operational personnel requested to support the transition of Sean John on part-time / temporary or full-time basis.**

## Brand Level

| Full Name | Title | Location | Annual Salary Base | Base Salary w / Taxes & Benefits[1] | Monthly Salary[1] | % Alloc. | Monthly TSA Cost | Term |
|---|---|---|---|---|---|---|---|---|
| **Alain Lafontant** | **VP, Sales Division Head** | New York, NY | $275,000 | $338,250 | $28,188 | 100% | $28,188 | 3 months, with option to contract directly beyond. |

## Corporate Operations

| Full Name | Title | Location | Annual Salary Base | Base Salary w / Taxes & Benefits[1] | Monthly Salary[1] | Hourly Rate[2,3] | Term |
|---|---|---|---|---|---|---|---|
| **Katherine (Ekaterini) Siomos** | **VP, Operations** *(Inventory Support)* | New York, NY | $155,000 | $190,650 | $15,888 | $100 | As needed, although likely one-time charge. |

[1]Assumes 23% taxes/benefits.
[2]Based on loaded monthly salary at 160 hours / month.
[3]Subject to increase if replaced with temporary labor.

3




For Discussion & Illustrative Purposes Only
Subject to Material Change

# Ongoing TSA Services: Personnel – Shared Resources

**The below reflects the illustrative monthly cost at illustrative headcount levels of shared resources available to support the transition of finance, accounting and tax functions through 12/31. Buyer would have to contract with individuals directly post-12/31.**

| Function | Headcount | Annual Cost | Monthly TSA Cost[1] | Description |
|---|---|---|---|---|
| **Accounts Receivable** | Three (3) | $52,500 | $4,370 | Credit, collections and compliance support |
| **Finance** | One (1) | $144,000 | $12,000 | Budgeting and general accounting support |
| **Total** | | **$196,500** | **$16,375** | |

[1]Monthly cost subject to increase as employees leave and are replaced with temporary labor.




Highly Confidential – Subject to Review
For Discussion & Illustrative Purposes Only
Subject to Material Change

# Ongoing TSA Services: Brand Management Services

**The below reflects the ongoing TSA services available to the Purchaser if requested in connection with the engagement of CAA-GBG's brand management services team.**

| Service | Service Description |
|---|---|
| **Brand Management Services**[1] | • Assist with communications, negotiations and business planning between the Purchaser and the counterparties under any and all of the intellectual property that is licensed pursuant to the agreements listed in Exhibit A of the TSA regarding the runoff and/or termination of the Sean John Licenses and potential rebranding of the Acquired Business.<br>• **Fee:** The Purchaser shall pay to CAA-GBG a commission fee equal to 20% of the revenue under each applicable license with respect to the period in which CAA-GBG is providing services (the "Brand Management Fee"). |

[1]The Brand Management Services and the commission rate associated with the Brand Management Fees are consistent with historical services and fees per the Sean John LLC Operating Agreement.



# Disclaimer

This presentation, together with all associated oral or written materials prepared or presented (the "Materials") have been prepared and provided in good faith exclusively by GBG USA Inc. ("GBG" or the "Company"), Ducera Partners LLC ("Ducera"), Ankura Consulting Group, LLC ("Ankura") and Willkie Farr & Gallagher LLP ("Willkie", and collectively with Ankura and Ducera, the "Company Advisors") on a confidential basis. Neither the Company nor its Company Advisors nor any of their respective affiliates, advisers, representatives, officers, agents or employees make any representation, warranty or undertaking, express or implied, with respect to the Materials, and no responsibility or liability is accepted by any of them as to the accuracy, completeness or reasonableness of the Materials. The information contained in the Materials is as of the date hereof, and the Company and the Company Advisors expressly disclaim any obligation to update the information herein presented or to correct any inaccuracies in the Materials that may become apparent. You should conduct your own investigation into any information contained in the Materials. Neither the Company nor the Company Advisors shall have any liability, whether direct or indirect, in contract or tort or otherwise, to any person in connection with the Materials.

Certain statements contained in the Materials constitute forward-looking statements. Such forward-looking statements involve known and unknown risks, assumptions, uncertainties and other factors, which may cause the actual results, performance or achievements contemplated to be materially different from any future results, performance or achievements, and you are cautioned not to place undue reliance on such forward-looking statements. Neither the Company nor the Company Advisors nor any other person assumes responsibility for the accuracy and completeness of such forward-looking statements or the reasonableness of the assumptions and projections therein.

The Materials do not constitute, and shall not be interpreted as an offer, the solicitation of an offer or sale, or as the basis of a contract, and should not be construed as financial, legal, tax, accounting, investment or other advice or a recommendation with respect to any investment. The Materials shall not be taken as any form of commitment on the part of the Company or any Company Advisors to proceed with any transaction and are not intended to be relied upon as the basis for an investment decision in any security. Securities may not be offered or sold in the United States absent registration with the Securities and Exchange Commission or an exemption from such registration.

You agree that you are not entitled to, and will not rely on, the accuracy or completeness of the Materials, and that you will only be entitled to rely on such representations and warranties as may be included in any definitive agreement with respect to a transaction, when, as, and if executed and delivered, and subject to such limitations and restrictions as may be contained therein.

Unless otherwise specified, estimated preliminary financial information included in the Materials reflects the Company's and the Company Advisors' current good faith estimates for such periods, and is based upon information available to the Company Advisors as of the date of these Materials and is not a comprehensive statement of GBG's financial position and has not been audited or reviewed by an independent registered public accounting firm.

The Materials are being provided to you for informational purposes only and based upon the express understanding that you will keep confidential the information contained herein or sent herewith, or made available in connection with further inquiries pursuant to the terms of the confidentiality obligations described herein.  The Materials and any other information supplied shall not be copied, reproduced or distributed to any other person at any time without the prior written consent of GBG (other than to your directors, officers, employees and professional advisers who need to know the confidential information and, even then, only provided that such parties are subject to the same confidentiality obligations as those set forth herein.

The Materials may contain material, non-public information within the meaning of the United States Federal Securities Laws with respect to the Company and its securities.

The above provisions apply in addition to those included in any non-disclosure agreement that the recipient of the Materials has executed with GBG prior to receipt hereof. Nothing contained herein shall supersede or limit the provisions of any non-disclosure agreement.



*Final Version*

DISCLOSURE SCHEDULES
to
ASSET PURCHASE AGREEMENT
DATED AS OF DECEMBER 1, 2021
BY AND AMONG
SLC FASHION, LLC, AS THE PURCHASER
CEOPCO, LLC, AS THE GUARANTOR
AND
GBG SEAN JOHN LLC
AND PACIFIC ALLIANCE USA INC., AS THE SELLERS

**Dated as of December 1, 2021**

These Disclosure Schedules (the "**Schedules**") are made and given pursuant to the Asset Purchase Agreement, dated as of December 1, 2021 by and among SLC FASHION, LLC, a Delaware limited liability company ("**Purchaser**"), CEOPCO, LLC , a Delaware limited liability company ("**Guarantor**"), GBG SEAN JOHN LLC, a Delaware limited liability company (the "**Company**" or "**SJ LLC**") and PACIFIC ALLIANCE USA INC., a Delaware corporation ("**Pacific Alliance**", and together with SJ LLC, each a "**Seller**" and collectively "**Sellers**") (the "**Agreement**"). Capitalized terms used in the Schedules and not otherwise defined therein have the meanings given to them in the Agreement. The specification of any dollar amount or the inclusion of any item in the representations and warranties contained in the Agreement, the Schedules or the attached Exhibits is not intended to imply that the amounts are or are not material or are within or outside of the Ordinary Course, and no party will use the fact of the setting of the amounts or the fact of the inclusion of any item in the representations and warranties contained in the Agreement, the Schedules or Exhibits in any dispute or controversy between the Parties as to whether the amount or items are material or are within or outside of the Ordinary Course. In addition, matters reflected in the Schedules are not necessarily limited to matters required by the Agreement to be reflected in the Schedules. Such additional matters are set forth for informational purposes only and do not necessarily include other matters of a similar nature. No information set forth in the Schedules will be deemed to broaden in any way the scope of the parties' representations and warranties. Any description of any agreement, document, instrument, plan, arrangement or other item set forth on any Schedule is a summary only and is qualified in its entirety by the terms of such agreement, document, instrument, plan, arrangement or item which terms will be deemed disclosed for all purposes of the Agreement.

# TABLE OF CONTENTS

Page

Schedule 1.1(a)
Assigned Contracts ..................................................................................................... 4

Schedule 1.1(e)
Trademarks and Trade Names ..................................................................................... 5

Schedule 1.4(i)
Open Purchase Orders.................................................................................................. 6

Schedule 3.3(a)
No Conflicts or Consents ............................................................................................ 7

Schedule 3.3(b)
Permits and Approvals ................................................................................................ 8

Schedule 3.7
Inventory ..................................................................................................................... 9

Schedule 3.8(a)
Material Customers ..................................................................................................... 10

Schedule 3.8(b)
Material Suppliers ....................................................................................................... 11

Schedule 3.9
Legal Proceedings ....................................................................................................... 12

Schedule 3.11(a)(i)
Employees.................................................................................................................... 13

Schedule 3.11(a)(ii)
Independent Contractors ............................................................................................. 14

Schedule 3.11(b)
Multiemployer Plan ..................................................................................................... 15

Schedule 3.11(c)
WARN Act ................................................................................................................... 16

Schedule 3.12(a)
Intellectual Property.................................................................................................... 17

Schedule 3.12(b)
Intellectual Property Proceedings ............................................................................... 18

Schedule 3.14
Taxes............................................................................................................................ 19

Schedule 3.15
Financial Information................................................................................................... 20

Schedule 3.16
Related Party Transactions .......................................................................................... 21

Schedule 6.1
Conduct of Business of the Company........................................................................... 22

Schedule 1.1(a)
Assigned Contracts

1.  License Agreement, dated as of August 16, 2017, by and between Allure Eyewear, LLC and the Company, as amended by a Renewal dated as of January 27, 2021.
2.  License Agreement, dated as of December 1, 2013, by and between the Company and S. Rothschild &Co., Inc., as amended by a Renewal dated as of June 2, 2016, as further amended by a Second Renewal dated as of October 13, 2020.
3.  License Agreement, dated as of July 1, 2018, by and between Sportlife Brands, LLC and the Company, as amended by an Amendment dated as of April 28, 2021.
4.  License Agreement, dated as of March 23, 2020, by and between Missguided Limited and the Company, as amended by that First Amendment dated as of July 1, 2021
5.  Binding Licensing Term Sheet, dated as of January 1, 2019, by and between PEM America, Inc. and the Company, as amended by that Termination and Mutual Release Agreement, dated as of July 1, 2021.
6.  License Agreement, dated as of June 1, 2004, by and between Peerless Clothing International, Inc. and the Company, as amended by a Second Renewal, dated as of June 2010, as further amended by a Third Renewal, dated as of November 9, 2016, as further amended by a Fourth Renewal, dated as April 2, 2014, as further amended by a Fifth Renewal, dated as of August 6, 2019, and as further amended by a Sixth Renewal, dated as of May 4, 2021.
7.  Agreement, dated as of November 22, 2013, by and between Jacavi Beauty Group, LLC and the Company, as amended by an Amendment dated as of May 31, 2017, and as further amended by a Second Amendment.
8.  License Agreement, dated as of August 24, 2020, by and between Snipes SE and the Company.
9.  Term Sheet, dated as June 8, 2021, by and between Arise Brands LLC and the Company.
10.  License Agreement, dated as of December 3, 2020, by and between Concepts in Time LLC and the Company.
11.  License Agreement, dated as of May 8, 2013, by and between Allura Imports, Inc. and the Company, as amended by a First Amendment, dated as of July 1, 2017, and as further amended by a Second Amendment, dated as of July 2020.
12.  Agreement with Google, Inc. regarding the Company's Google AdWords account.
13.  Proposal from StyleExpo, dated as of February 6, 2013, and all Amendments thereto.
14.  Shopify Plus Agreement, dated as of May 31, 2019, by and between GBG USA, Inc. and Shopify Inc.
15.  Returnly Sales Contract, dated as of July 25, 2019, by and  between GBG USA, Inc. and Shopify Inc.

Schedule 1.1(e)
<u>Trademarks and Trade Names</u>

Attached hereto as <u>Schedule 1.1(e)</u>.

## GBG TM (20200112)

| COUNTRY | APPLICATION NUMBER | DATE FILED | STATUS | REGISTRATION NUMBER | REGISTRATION DATE | MARK | IMAGE | CLASS | OWNER | BUSINESS DIVISION | RENEWAL DATE |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Argentina | 3348577 | | Registered | 2813513 | Jul 6, 2016 | SEAN JOHN | | 25 | Christian Casey LLC | GBG Sean John LLC | Jan 6, 2026 |
| Argentina | 3598594 | Apr 26, 2007 | Registered | 2918618 | Apr 26, 2007 | SEAN JOHN | | 03 | Christian Casey LLC | GBG Sean John LLC | Oct 26, 2026 |
| Argentina | 3663882 | | Registered | 2199168 | Nov 27, 2007 | UNFORGIVABLE SEAN JOHN | | 03 | GBG Sean John LLC | GBG Sean John LLC | May 27, 2027 |
| Aruba | IM04082618 | | Registered | 23156 | Nov 4, 2004 | ENYCE | | 03, 09, 14, 18, 25 | L.C. Licensing, Inc | GBG Sean John LLC | Aug 24, 2024 |
| Bahamas | 27264 | | Registered | 27264 | Sep 29, 2008 | ENYCE | | 10 | L.C. Licensing, Inc | GBG Sean John LLC | Dec 6, 2032 |
| Bahamas | 27265 | | Registered | 27265 | Sep 29, 2008 | ENYCE | | 14 | L.C. Licensing, Inc | GBG Sean John LLC | Dec 6, 2032 |
| Bahamas | 27266 | | Registered | 27266 | Sep 29, 2008 | ENYCE | | 18 | L.C. Licensing, Inc | GBG Sean John LLC | Dec 6, 2032 |
| Bahamas | 27267 | | Registered | 27267 | Sep 29, 2008 | ENYCE | | 38 | L.C. Licensing, Inc | GBG Sean John LLC | Dec 6, 2032 |
| Bahamas | 27268 | | Registered | 27268 | Sep 29, 2008 | ENYCE | | 48 | L.C. Licensing, Inc | GBG Sean John LLC | Dec 6, 2032 |
| Bahamas | 27269 | | Registered | 27269 | Aug 28, 2008 | ENYCE | | 50 | L.C. Licensing, Inc | GBG Sean John LLC | Dec 6, 2032 |
| Bahrain | 43215 | | Registered | 43215 | Jan 17, 2007 | ENYCE | | 25 | L.C. Licensing, Inc | GBG Sean John LLC | Jan 3, 2025 |
| Bangladesh | 191925 | | Registered | 191925 | Nov 8, 2015 | EE ENYCE DESIGN III | | 18 | JESSIE AND D LILA LLC | GBG Sean John LLC | Nov 8, 2022 |
| Bangladesh | 191926 | | Registered | 191926 | Nov 8, 2015 | EE ENYCE DESIGN III | | 25 | JESSIE AND D LILA LLC | GBG Sean John LLC | Nov 8, 2022 |
| Bangladesh | 191927 | | Registered | 191927 | Nov 8, 2015 | EE ENYCE DESIGN III DOTTED | | 18 | JESSIE AND D LILA LLC | GBG Sean John LLC | Nov 8, 2022 |
| Bangladesh | 191928 | | Registered | 191928 | Nov 8, 2015 | EE ENYCE DESIGN III DOTTED | | 25 | JESSIE AND D LILA LLC | GBG Sean John LLC | Nov 8, 2022 |
| Bangladesh | 72009 | | Registered | 72009 | Jul 27, 2014 | SEAN JOHN | | 25 | Christian Casey LLC | GBG Sean John LLC | Aug 22, 2028 |
| Belize | 302905 | | Registered | 302905 | Jul 18, 2005 | ENYCE | | 03, 09, 14, 18, 25 | L.C. Licensing, Inc | GBG Sean John LLC | Apr 11, 2025 |
| Bermuda | 41470 | | Registered | 41470 | Nov 10, 2005 | ENYCE | | 03 | L.C. Licensing, Inc | GBG Sean John LLC | Oct 14, 2025 |
| Bolivia | 37922004 | | Registered | 108747C | Jun 6, 2007 | ENYCE | | 03 | L.C. Licensing, Inc | GBG Sean John LLC | Jun 6, 2027 |
| Botswana | 200800627 | | Registered | BWM0800627 | Mar 26, 2010 | SEAN JOHN | | 03 | Christian Casey LLC | GBG Sean John LLC | Oct 15, 2028 |
| Brazil | 821147897 | Oct 21, 1998 | Registered | 821147897 | Apr 30, 2002 | EE ENYCE DESIGN II | | 25 | L.C. Licensing, Inc | GBG Sean John LLC | Apr 30, 2022 |
| Brazil | 822348357 | Jan 6, 2000 | Registered | 822348357 | Dec 27, 2005 | SEAN JOHN (STYLIZED SIGNATURE I) | | 25 | Christian Casey LLC | GBG Sean John LLC | Dec 27, 2025 |
| Brazil | 826550630 | May 24, 2004 | Registered | 826550630 | Aug 25, 2009 | SEAN JOHN | | 03 | Christian Casey LLC | GBG Sean John LLC | Aug 25, 2029 |
| Brazil | 827123280 | Jan 18, 2005 | Registered | 827123280 | Dec 4, 2007 | ENYCE | | 03 | L.C. Licensing, Inc | GBG Sean John LLC | Dec 4, 2027 |
| Brazil | 828066671 | Jan 6, 2006 | Registered | 828066671 | Jun 3, 2008 | UNFORGIVABLE | | 03 | Christian Casey LLC | GBG Sean John LLC | Jun 3, 2028 |
| Brazil | 829611932 | Feb 27, 2008 | Registered | 829611932 | Mar 24, 2015 | I AM KING SEAN JOHN | | 03 | Christian Casey LLC | GBG Sean John LLC | Mar 24, 2025 |
| Brazil | 907494145 | Mar 28, 2014 | Registered | 907494145 | Nov 1, 2016 | 3AM | | 03 | Christian Casey LLC | GBG Sean John LLC | Nov 1, 2026 |
| Bulgaria | 2011120955N | Sep 27, 2011 | Registered | 82598 | Nov 22, 2012 | ENYCE SPORT AND DESIGN | | 14, 18, 25 | JESSIE AND D LILA LLC | GBG Sean John LLC | Sep 27, 2021 |
| Canada | 1082566 | Nov 14, 2000 | Registered | TMA806500 | Sep 12, 2011 | SEAN JOHN | | 03, 09, 14, 16, 18 | Sean Combs | GBG Sean John LLC | Sep 12, 2026 |
| Canada | 1262985 | Jun 29, 2005 | Registered | TMA692836 | Jul 25, 2007 | UNFORGIVABLE | | 03 | Christian Casey LLC | GBG Sean John LLC | Jul 25, 2022 |
| Canada | 1380701 | Jan 25, 2008 | Registered | TMA748495 | Sep 23, 2009 | I AM KING SEAN JOHN | | 03 | Sean Combs | GBG Sean John LLC | Sep 23, 2024 |
| Canada | 1549253 | Oct 26, 2011 | Registered | TMA971113 | May 17, 2017 | ENYCE | | 25, 35 | GBG Sean John LLC | GBG Sean John LLC | May 17, 2032 |

| Country | App. No. | App. Date | Status | Reg. No. | Reg. Date | Mark | Class | Owner | Owner | Date |
|---|---|---|---|---|---|---|---|---|---|---|
| Canada | 1549254 | Oct 26, 2011 | Registered | TMA843384 | Feb 15, 2013 | EE ENYCE DESIGN II | 25 | GBG Sean John LLC | GBG Sean John LLC | Feb 15, 2028 |
| Canada | 1670065 | Mar 27, 2014 | Registered | TMA968510 | Apr 19, 2017 | 3AM | 03 | GBG Sean John LLC | GBG Sean John LLC | Apr 19, 2032 |
| Canada | 1753920 | Nov 9, 2015 | Registered | TMA1032704 | Jun 26, 2019 | EE ENYCE DESIGN III DOTTED | 18, 25 | GBG Sean John LLC | GBG Sean John LLC | Jun 26, 2029 |
| Canada | 1753921 | Nov 9, 2015 | Registered | TMA1032652 | Jun 26, 2019 | EE ENYCE DESIGN III | 18, 25 | GBG Sean John LLC | GBG Sean John LLC | Jun 26, 2029 |
| Canada | 870504 | Feb 26, 1998 | Registered | TMA540913 | Feb 7, 2001 | SEAN JOHN | 25 | Sean Combs | GBG Sean John LLC | Feb 7, 2031 |
| Chile | 1058545 | | Registered | 1057193 | May 9, 2013 | SEAN JOHN | 25 | Christian Casey LLC | GBG Sean John LLC | May 9, 2023 |
| Chile | 1132665 | | Registered | 1150618 | Nov 18, 2004 | SEAN JOHN | 03 | Christian Casey LLC | GBG Sean John LLC | Dec 30, 2014 |
| Chile | 1132665 | | Registered | 1150618 | Nov 18, 2004 | SEAN JOHN | 03 | Christian Casey LLC | GBG Sean John LLC | Nov 18, 2024 |
| Chile | 716762 | | Registered | 802863 | Dec 4, 2007 | UNFORGIVABLE SEAN JOHN (STYLIZED) | 03 | Christian Casey LLC | GBG Sean John LLC | Dec 4, 2027 |
| Chile | 805271 | | Registered | 835043 | Nov 27, 2008 | I AM KING SEAN JOHN | 03 | Christian Casey LLC | GBG Sean John LLC | Nov 27, 2028 |
| h | 04100173 | | Registered | 302806 | Jul 7, 2015 | ENYCE | 25 | JESSIE AND D LILA LLC | GBG Sean John LLC | Jul 7, 2025 |
| Colombia | 0447446 | | Registered | 289720 | Nov 25, 2014 | SEAN JOHN | 03 | Christian Casey LLC | GBG Sean John LLC | Nov 25, 2024 |
| Colombia | 06108643 | | Registered | 335197 | May 29, 2007 | UNFORGIVABLE SEAN JOHN | 03 | Christian Casey LLC | GBG Sean John LLC | May 29, 2027 |
| Colombia | 1201264 | Mar 13, 2014 | Registered | 1201264 | Mar 13, 2014 | 3AM | 03 | Christian Casey LLC | GBG Sean John LLC | Mar 13, 2024 |
| Colombia | 14094810 | | Registered | 512348 | Apr 15, 2015 | 3AM | 03 | Christian Casey LLC | GBG Sean John LLC | Apr 15, 2025 |
| Costa Rica | 20030003256 | | Registered | 143771 | Jan 26, 2004 | SEAN JOHN | 25 | Sean Combs | GBG Sean John LLC | Jan 26, 2024 |
| Costa Rica | 203799 | | Registered | 116154 | Sep 20, 1999 | EE ENYCE DESIGN II | 25 | ENYCE LLC | GBG Sean John LLC | Sep 20, 2029 |
| Croatia | Z20041371A | Sep 3, 2004 | Registered | Z20041371 | Sep 15, 2005 | ENYCE | 03, 09, 14, 18, 25 | JESSIE AND D LILA LLC | GBG Sean John LLC | Sep 3, 2024 |
| Cuba | 20050075 | | Registered | 20050075 | Feb 14, 2005 | ENYCE | 03, 09, 14, 18, 25 | L.C. Licensing, Inc | GBG Sean John LLC | Feb 14, 2020 |
| Cuba | 20050075 | | Registered | 20050075 | Feb 14, 2005 | ENYCE | 03, 09, 14, 18, 25 | L.C. Licensing, Inc | GBG Sean John LLC | Feb 14, 2025 |
| Dominican Republic | 0644805 | | Registered | 156256 | Sep 14, 2006 | SEAN JOHN | 25 | Christian Casey LLC | GBG Sean John LLC | Sep 14, 2011 |
| Dominican Republic | 0644805 | | Registered | 156256 | Sep 14, 2006 | SEAN JOHN | 25 | Christian Casey LLC | GBG Sean John LLC | Sep 14, 2026 |
| Dominican Republic | 200472426 | | Registered | 145079 | Nov 30, 2004 | ENYCE | 03, 25 | L.C. Licensing, Inc | GBG Sean John LLC | Nov 30, 2009 |
| Dominican Republic | 200472426 | | Registered | 145079 | Nov 30, 2004 | ENYCE | 03, 25 | L.C. Licensing, Inc | GBG Sean John LLC | Nov 30, 2024 |
| Ecuador | 116555 | | Registered | 1776002 | Aug 13, 2002 | SEAN JOHN | 25 | GBG Sean John LLC | GBG Sean John LLC | Aug 13, 2022 |
| Ecuador | 177848 | | Registered | 664107 | Sep 13, 2007 | UNFORGIVABLE SEAN JOHN | 03 | GBG Sean John LLC | GBG Sean John LLC | Sep 13, 2027 |
| Egypt | 1249425 | Apr 7, 2015 | Registered | 1249425 | Apr 7, 2015 | ENYCE | 03, 18, 25 | GBG Sean John LLC | GBG Sean John LLC | Apr 6, 2025 |
| Egypt | 1249425 | Apr 7, 2015 | Registered | 1249425 | Apr 7, 2015 | ENYCE | 03, 18, 25 | GBG Sean John LLC | GBG Sean John LLC | Apr 7, 2025 |
| Egypt | 170884 | | Registered | 170884 | Jun 26, 2007 | ENYCE | 25 | JESSIE AND D LILA LLC | GBG Sean John LLC | Nov 28, 2024 |
| Egypt | 370223 | | Unfiled | | | SEAN JOHN | 25 | GBG Sean John LLC | GBG Sean John LLC | |
| Eswatini | 1072015 | | Unfiled | | | ENYCE | 18, 25 | JESSIE AND D LILA LLC | GBG Sean John LLC | May 31, 2029 |
| European Union | 000786012 | Mar 31, 1998 | Registered | 000786012 | Aug 3, 1999 | ENYCE | 09, 14, 16, 18, 20, 25 | GBG Sean John LLC | GBG Sean John LLC | Mar 31, 2028 |
| European Union | 000802553 | Apr 17, 1998 | Registered | 000802553 | Aug 9, 1999 | enyce & device | 25 | GBG Sean John LLC | GBG Sean John LLC | Apr 17, 2028 |
| European Union | 000943662 | Sep 30, 1998 | Registered | 000943662 | Apr 19, 2001 | ENYCE (STYLIZED) II | 25 | GBG Sean John LLC | GBG Sean John LLC | Sep 30, 2028 |
| European Union | 003796067 | Apr 27, 2004 | Registered | 003796067 | Jul 28, 2005 | ENYCE | 03, 06, 35 | GBG Sean John LLC | GBG Sean John LLC | Apr 27, 2024 |
| European Union | 004461455 | Jun 23, 2005 | Registered | 004461455 | Jun 20, 2006 | SEAN JOHN UNFORGIVABLE | 03 | GBG Sean John LLC | GBG Sean John LLC | Jun 23, 2025 |
| European Union | 004484325 | Jul 7, 2005 | Registered | 004484325 | Jun 20, 2006 | SEAN JOHN UNFORGIVABLE | 03 | GBG Sean John LLC | GBG Sean John LLC | Jul 7, 2025 |
| European Union | 005620505 | Jan 17, 2007 | Registered | 005620505 | Oct 9, 2008 | SEAN JOHN (STYLIZED SIGNATURE II) | 03, 09, 14, 18, 25 | GBG Sean John LLC | GBG Sean John LLC | Jan 17, 2027 |

| Country | Number | Filing Date | Status | Reg. Number | Reg. Date | Mark | Class | Owner | Parent | Date |
|---|---|---|---|---|---|---|---|---|---|---|
| European Union | 010265445 | Sep 14, 2011 | Registered | 010265445 | Feb 17, 2012 | ENYCE SPORT AND DESIGN | 14, 18, 25 | GBG Sean John LLC | GBG Sean John LLC | Sep 14, 2021 |
| European Union | 017417635 | Oct 31, 2017 | Registered | 017417635 | Feb 25, 2018 | SEAN JOHN DENIM | 25 | GBG Sean John LLC | GBG Sean John LLC | Oct 31, 2027 |
| European Union | 1041156 | May 25, 2010 | Registered | 1041156 | May 25, 2010 | I AM KING OF MIAMI | 03 | Christian Casey LLC | GBG Sean John LLC | May 25, 2030 |
| European Union | 1201264 | Mar 13, 2014 | Registered | 1201264 | Mar 13, 2014 | 3AM | 03 | Christian Casey LLC | GBG Sean John LLC | Mar 13, 2024 |
| European Union | 6610984 | Jan 25, 2008 | Registered | 6610984 | Jan 20, 2009 | I AM KING SEAN JOHN | 03 | GBG Sean John LLC | GBG Sean John LLC | Jan 25, 2028 |
| European Union | 756544 | Feb 26, 1998 | Registered | 756544 | Aug 4, 2000 | SEAN JOHN | 03, 09, 14, 18, 25 | GBG Sean John LLC | GBG Sean John LLC | Feb 26, 2028 |
| Germany | 397245777 | May 28, 1997 | Registered | 39724577 | Oct 8, 1997 | EE ENYCE DESIGN II | 03, 05, 14, 25 | GBG Sean John LLC | GBG Sean John LLC | May 28, 2027 |
| Germany | 397245777 | May 28, 1997 | Registered | 39724577 | Oct 8, 1997 | EE ENYCE DESIGN II | 03, 05, 14, 25 | GBG Sean John LLC | GBG Sean John LLC | May 31, 2027 |
| Germany | 398094748 | Feb 16, 1998 | Registered | 39809474 | Mar 30, 1998 | ENYCE | 03, 05, 14, 25 | L.C. Licensing, Inc | GBG Sean John LLC | Feb 16, 2028 |
| Germany | 398094748 | Feb 16, 1998 | Registered | 39809474 | Mar 30, 1998 | ENYCE | 03, 05, 14, 25 | L.C. Licensing, Inc | GBG Sean John LLC | Feb 29, 2028 |
| Ghana | 0013782008 |  | Registered | 43309 | Jun 13, 2014 | SEAN JOHN | 03 | Christian Casey LLC | GBG Sean John LLC | Aug 25, 2028 |
| Guatemala | 199901091 |  | Registered | 99592 | Nov 17, 1999 | EE ENYCE DESIGN II | 25 | ENYCE INC | GBG Sean John LLC | Nov 16, 2029 |
| Guatemala | 200408640 |  | Registered | 137789 | Sep 5, 2005 | ENYCE | 25 | L.C. Licensing, Inc | GBG Sean John LLC | Sep 4, 2025 |
| Guatemala | 200408641 |  | Registered | 137238 | Aug 11, 2005 | ENYCE | 03 | L.C. Licensing, Inc | GBG Sean John LLC | Aug 10, 2025 |
| Guatemala | 201108148 |  | Registered | 201108148 | Sep 27, 2011 | ENYCE SPORT | 25 | JESSIE AND D LILA LLC | GBG Sean John LLC | Sep 26, 2021 |
| Guatemala | 201108149 |  | Registered | 201108149 | Sep 27, 2011 | ENYCE SPORT | 18 | JESSIE AND D LILA LLC | GBG Sean John LLC | Sep 26, 2021 |
| Guatemala | 201108150 |  | Registered | 201108150 | Sep 27, 2011 | ENYCE SPORT | 14 | JESSIE AND D LILA LLC | GBG Sean John LLC | Sep 26, 2021 |
| Haiti | 1314G |  | Unfiled |  |  | ENYCE SPORT | 14 | JESSIE AND D LILA LLC | GBG Sean John LLC |  |
| Haiti | 1315G |  | Unfiled |  |  | ENYCE SPORT | 18 | JESSIE AND D LILA LLC | GBG Sean John LLC |  |
| Haiti | 1316G |  | Unfiled |  |  | ENYCE SPORT | 25 | JESSIE AND D LILA LLC | GBG Sean John LLC |  |
| Honduras | 05012961 |  | Registered | 105099 | Jun 4, 2008 | ENYCE | 25 | L.C. Licensing, Inc | GBG Sean John LLC | Jun 4, 2028 |
| Honduras | 99001278 |  | Registered | 77403 | Jun 14, 2000 | ENYCE DESIGN | 25 | ENYCE INC | GBG Sean John LLC | Jun 14, 2030 |
| Iceland | V0106718 | Nov 3, 2017 | Registered | V0106718 | Nov 30, 2017 | SEAN JOHN DENIM | 18, 25 | GBG Sean John LLC | GBG Sean John LLC | Nov 30, 2027 |
| India | 1249425 | Apr 7, 2015 | Registered | 1249425 | Apr 7, 2015 |  | 03, 18, 25 | GBG Sean John LLC | GBG Sean John LLC | Apr 7, 2025 |
| India | 2621521 | Oct 30, 2013 | Pending |  |  | SEAN JOHN | 03, 25 | Christian Casey LLC | GBG Sean John LLC | Oct 30, 2023 |
| India | 2622265 | Oct 31, 2013 | Registered | 2622265 | Dec 5, 2018 | SEAN JOHN (STYLIZED SIGNATURE II) | 03, 25 | Christian Casey LLC | GBG Sean John LLC | Oct 31, 2023 |
| India | 2919826 | Mar 10, 2015 | Registered | 2919826 | Jul 26, 2019 | SEAN JOHN | 09, 14, 18, 24, 35 | Christian Casey LLC | GBG Sean John LLC | Mar 10, 2025 |
| India | 3051591 | Apr 7, 2015 | Pending |  |  | ENYCE | 25 | JESSIE AND D LILA LLC | GBG Sean John LLC | Apr 7, 2025 |
| India | 828140 | Nov 18, 1998 | Registered | 828140 | Mar 28, 2006 | EE ENYCE DESIGN II | 25 | ENYCE LLC | GBG Sean John LLC | Nov 18, 2028 |
| India | 888535 | Nov 26, 1999 | Registered | 888535 | Nov 26, 1999 | SEAN JOHN (STYLIZED SIGNATURE I) | 25 | Christian Casey LLC | GBG Sean John LLC | Nov 26, 2026 |
| International Bureau (WIPO) | 1041156 | May 25, 2010 | Registered | 1041156 | May 25, 2010 | I AM KING OF MIAMI | 03 | Christian Casey LLC | GBG Sean John LLC | May 25, 2030 |
| International Bureau (WIPO) | 1201264 | Mar 13, 2014 | Registered | 1201264 | Mar 13, 2014 | 3AM | 03 | Christian Casey LLC | GBG Sean John LLC | Mar 13, 2024 |
| International Bureau (WIPO) | 1249425 | Apr 7, 2015 | Registered | 1249425 | Apr 7, 2015 | ENYCE | 03, 18, 25 | GBG Sean John LLC | GBG Sean John LLC | Apr 7, 2025 |
| International Bureau (WIPO) | 1284191 | Nov 9, 2015 | Registered | 1284191 | Nov 9, 2015 | EE ENYCE DESIGN III DOTTED | 25 | GBG Sean John LLC | GBG Sean John LLC | Nov 9, 2025 |
| International Bureau (WIPO) | 1284192 | Nov 9, 2015 | Registered | 1284192 | Nov 9, 2015 | EE ENYCE DESIGN | 18, 25 | GBG Sean John LLC | GBG Sean John LLC | Nov 9, 2025 |

| Country | Number | App Date | Status | Reg Number | Reg Date | Mark | Class | Owner | Owner 2 | Expiry |
|---|---|---|---|---|---|---|---|---|---|---|
| Israel | 1249425 | Apr 7, 2015 | Registered | 1249425 | Apr 7, 2015 | ENYCE | 03, 18, 25 | GBG Sean John LLC | GBG Sean John LLC | Apr 7, 2025 |
| Israel | 172351 | May 23, 2004 | Registered | 172351 | Nov 7, 2005 | SEAN JOHN | 03 | Christian Casey LLC | GBG Sean John LLC | May 23, 2024 |
| Israel | 186447 | Jan 8, 2006 | Registered | 186447 | Aug 6, 2007 | UNFORGIVABLE SEAN JOHN (STYLIZED) | 03 | Christian Casey LLC | GBG Sean John LLC | Jan 8, 2026 |
| Japan | 1201264 | Mar 13, 2014 | Registered | 1201264 | Mar 13, 2014 | 3AM | 03 | Christian Casey LLC | | Mar 13, 2024 |
| Jordan | 77816 | | Registered | 77816 | Jun 28, 2005 | ENYCE | 25 | L.C. Licensing, Inc | GBG Sean John LLC | Dec 2, 2024 |
| Kenya | 2004056765 | | Registered | 56765 | May 17, 2005 | ENYCE | 25 | L.C. Licensing, Inc | GBG Sean John LLC | Nov 17, 2024 |
| Kenya | 2008063933 | | Registered | 63933 | Feb 21, 2010 | SEAN JOHN | 03 | Christian Casey LLC | GBG Sean John LLC | Aug 25, 2028 |
| Kuwait | 67731 | | Registered | 57927 | Apr 8, 2006 | ENYCE | 25 | L.C. Licensing, Inc | GBG Sean John LLC | Dec 12, 2024 |
| Lebanon | 99170 | | Registered | 99170 | Aug 23, 2004 | ENYCE | 25 | L.C. Licensing, Inc | GBG Sean John LLC | Aug 23, 2034 |
| Mauritius | MUM0301026 | | Unfiled | | | EE ENYCE DESIGN II | 25 | ENYCE LLC | GBG Sean John LLC | |
| Mauritius | MUM0808106 | | Registered | 077342009 | Jul 21, 2009 | SEAN JOHN | 03 | Christian Casey LLC | GBG Sean John LLC | Aug 25, 2028 |
| Mexico | 1201264 | Mar 13, 2014 | Registered | 1201264 | Mar 13, 2014 | 3AM | 03 | Christian Casey LLC | GBG Sean John LLC | Mar 13, 2024 |
| Mexico | 1249425 | Apr 7, 2015 | Registered | 1249425 | Apr 7, 2015 | ENYCE | 03, 18, 25 | GBG Sean John LLC | GBG Sean John LLC | Apr 7, 2025 |
| Mexico | 1284191 | Nov 9, 2015 | Registered | 1284191 | Nov 9, 2015 | EE ENYCE DESIGN III DOTTED | 25 | GBG Sean John LLC | GBG Sean John LLC | Nov 9, 2025 |
| Mexico | 1284192 | Nov 9, 2015 | Registered | 1284192 | Nov 9, 2015 | EE ENYCE DESIGN | 18, 25 | GBG Sean John LLC | GBG Sean John LLC | Nov 9, 2025 |
| Mexico | 1708678 | Nov 9, 2015 | Registered | 1838983 | Jan 8, 2018 | EE ENYCE AND DESIGN | 18 | GBG Sean John LLC | GBG Sean John LLC | Nov 9, 2025 |
| Mexico | 1708679 | Nov 9, 2015 | Registered | 1838984 | Jan 8, 2018 | EE ENYCE AND DESIGN | 25 | GBG Sean John LLC | GBG Sean John LLC | Nov 9, 2025 |
| Mexico | 405684 | Jan 7, 2000 | Registered | 641841 | Feb 21, 2000 | SEAN JOHN | 09 | Christian Casey LLC | GBG Sean John LLC | Jan 7, 2030 |
| Mexico | 405685 | Jan 7, 2000 | Registered | 641842 | Feb 21, 2000 | SEAN JOHN | 25 | Christian Casey LLC | GBG Sean John LLC | Jan 7, 2030 |
| Mexico | 405686 | Jan 7, 2000 | Registered | 641843 | Feb 21, 2000 | SEAN JOHN | 18 | Christian Casey LLC | GBG Sean John LLC | Jan 7, 2030 |
| Mexico | 405687 | Jan 7, 2000 | Registered | 642307 | Feb 22, 2000 | SEAN JOHN | 03 | Christian Casey LLC | GBG Sean John LLC | Jan 7, 2030 |
| Mexico | 405688 | Jan 7, 2000 | Registered | 642308 | Feb 22, 2000 | SEAN JOHN | 14 | Christian Casey LLC | GBG Sean John LLC | Jan 7, 2030 |
| Mexico | 715906 | May 4, 2005 | Registered | 897322 | Aug 26, 2005 | ENYCE | 09 | L.C. Licensing, Inc | GBG Sean John LLC | May 4, 2025 |
| Mexico | 715907 | May 4, 2005 | Registered | 927189 | Mar 30, 2006 | ENYCE | 03 | L.C. Licensing, Inc | GBG Sean John LLC | May 4, 2025 |
| Mexico | 715908 | May 4, 2005 | Registered | 891788 | Jul 26, 2005 | ENYCE | 14 | L.C. Licensing, Inc | GBG Sean John LLC | May 4, 2025 |
| Mexico | 715909 | May 4, 2005 | Registered | 926555 | Mar 29, 2006 | ENYCE | 18 | L.C. Licensing, Inc | GBG Sean John LLC | May 4, 2025 |
| Mexico | 715910 | May 4, 2005 | Registered | 896513 | Aug 24, 2005 | ENYCE | 25 | L.C. Licensing, Inc | GBG Sean John LLC | May 4, 2025 |
| Mexico | 757630 | Dec 20, 2005 | Registered | 930785 | Apr 25, 2006 | SEAN JOHN UNFORGIVABLE | 03 | Christian Casey LLC | GBG Sean John LLC | Dec 20, 2025 |
| Mexico | 910191 | Jan 29, 2008 | Registered | 1074563 | Nov 27, 2008 | I AM KING SEAN JOHN | 03 | Christian Casey LLC | GBG Sean John LLC | Jan 29, 2028 |
| Monaco | 20215 | | Registered | 9920082 | Nov 20, 2008 | EE ENYCE DESIGN II | 25 | L.C. Licensing, Inc | GBG Sean John LLC | Oct 1, 2028 |
| Mozambique | 141242008 | Oct 17, 2008 | Registered | 141242008 | Nov 12, 2014 | SEAN JOHN | 03 | Christian Casey LLC | GBG Sean John LLC | Oct 17, 2028 |
| New Zealand | 1249425 | Apr 7, 2015 | Registered | 1249425 | Apr 7, 2015 | ENYCE | 03, 18, 25 | GBG Sean John LLC | GBG Sean John LLC | Apr 7, 2025 |
| New Zealand | 301552 | Nov 19, 1998 | Registered | 301552 | Mar 16, 2000 | EE ENYCE DESIGN II | 25 | JESSIE AND D LILA LLC | GBG Sean John LLC | Nov 19, 2025 |
| New Zealand | 722654 | Dec 9, 2004 | Registered | 722654 | Jun 8, 2006 | ENYCE | 14, 18, 25 | JESSIE AND D LILA LLC | GBG Sean John LLC | Dec 9, 2024 |
| New Zealand | 746331 | Apr 12, 2006 | Registered | 746331 | Oct 12, 2006 | UNFORGIVABLE | 03 | GBG Sean John LLC | GBG Sean John LLC | Apr 12, 2026 |
| New Zealand | 783319 | Jan 28, 2008 | Registered | 783319 | Feb 12, 2009 | I AM KING SEAN JOHN | 03 | GBG Sean John LLC | GBG Sean John LLC | Jan 10, 2028 |

| Country | Number | App Date | Status | Reg Number | Reg Date | Mark | Class | Owner | Related | Expiry |
|---|---|---|---|---|---|---|---|---|---|---|
| New Zealand | 783319 | Jan 28, 2008 | Registered | 783319 | Feb 12, 2009 | I AM KING SEAN JOHN | 03 | GBG Sean John LLC | GBG Sean John LLC | Jan 28, 2028 |
| New Zealand | 809564 | Jul 16, 2009 | Registered | 809564 | Jan 21, 2010 | SHE IS KING SEAN JOHN | 03 | GBG Sean John LLC | GBG Sean John LLC | Jul 16, 2029 |
| North Macedonia | 2004618 | Sep 1, 2004 | Registered | 12416 | Dec 11, 2006 | ENYCE | 25 | L.C. Licensing, Inc | GBG Sean John LLC | Sep 1, 2024 |
| Norway | 200405521 | May 24, 2004 | Registered | 227221 | Jun 27, 2005 | SEAN JOHN | 03, 25 | GBG Sean John LLC | GBG Sean John LLC | Jun 27, 2025 |
| Norway | 200600320 | Jan 10, 2006 | Registered | 234366 | Aug 17, 2006 | UNFORGIVABLE SEAN JOHN (STYLIZED) | 03 | GBG Sean John LLC | GBG Sean John LLC | Aug 17, 2026 |
| Norway | 200801186 | Jan 29, 2008 | Registered | 245851 | May 13, 2008 | I AM KING SEAN JOHN | 03 | GBG Sean John LLC | GBG Sean John LLC | May 13, 2028 |
| Oman | 1249425 | Apr 7, 2015 | Registered | 1249425 | Apr 7, 2015 | ENYCE | 03, 18, 25 | GBG Sean John LLC | GBG Sean John LLC | Apr 7, 2025 |
| Pakistan | 203887 | | Registered | 203887 | Nov 8, 2013 | ENYCE | 25 | L.C. Licensing, Inc | GBG Sean John LLC | Dec 13, 2024 |
| Pakistan | 203888 | | Registered | 203888 | Dec 13, 2004 | ENYCE | 18 | L.C. Licensing, Inc | GBG Sean John LLC | Dec 13, 2024 |
| Pakistan | 231432 | | Registered | 231432 | Sep 8, 2010 | SEAN JOHN | 25 | Christian Casey LLC | GBG Sean John LLC | Jan 15, 2027 |
| Pakistan | 385559 | | Registered | 385559 | Apr 6, 2015 | ENYCE | 25 | JESSIE AND D LILA LLC | GBG Sean John LLC | Apr 6, 2025 |
| Panama | 116849 | | Registered | 116849 | Aug 29, 2001 | SEAN JOHN | 25 | Christian Casey LLC | GBG Sean John LLC | Aug 29, 2021 |
| Panama | 139023 | | Registered | 139023 | Nov 22, 2004 | ENYCE | 25 | L.C. Licensing, Inc | GBG Sean John LLC | Nov 22, 2024 |
| Panama | 143735 | | Registered | 143735 | Jul 13, 2005 | UNFORGIVABLE SEAN JOHN | 03 | Christian Casey LLC | GBG Sean John LLC | Jul 13, 2025 |
| Panama | 97395 | | Registered | 97395 | May 18, 2000 | EE ENYCE DESIGN II | 25 | L.C. Licensing, Inc | GBG Sean John LLC | Nov 19, 2028 |
| Paraguay | 1115636 | | Registered | 362452 | May 16, 2012 | EE ENYCE DESIGN II | 25 | L.C. Licensing, Inc | GBG Sean John LLC | May 16, 2022 |
| Paraguay | 16130 | | Unfiled | | | ENYCE | 25 | JESSIE AND D LILA LLC | GBG Sean John LLC | |
| Paraguay | 16131 | | Unfiled | | | ENYCE | 25 | JESSIE AND D LILA LLC | GBG Sean John LLC | |
| Paraguay | 435116 | | Registered | 280474 | Jul 29, 2005 | ENYCE | 25 | L.C. Licensing, Inc | GBG Sean John LLC | Jul 29, 2025 |
| Paraguay | 747692017 | | Registered | 303218 | Oct 5, 2007 | UNFORGIVABLE SEAN JOHN | 03 | Christian Casey LLC | GBG Sean John LLC | Oct 5, 2027 |
| Peru | 2006269862 | | Registered | P00076610 | Nov 26, 2001 | SEAN JOHN | 25 | Sean Combs | GBG Sean John LLC | Nov 26, 2021 |
| Peru | 2283412005 | | Registered | P00105375 | May 6, 2005 | ENYCE | 25 | L.C. Licensing, Inc | GBG Sean John LLC | May 6, 2025 |
| Peru | 2283902005 | | Registered | P00104533 | Apr 13, 2005 | ENYCE | 03 | L.C. Licensing, Inc | GBG Sean John LLC | Apr 13, 2025 |
| Peru | 2966362006 | | Registered | P00124752 | Feb 15, 2007 | UNFORGIVABLE SEAN JOHN | 03 | Christian Casey LLC | GBG Sean John LLC | Feb 15, 2027 |
| Philippines | 1201264 | Mar 13, 2014 | Registered | 1201264 | Mar 13, 2014 | 3AM | 03 | Christian Casey LLC | | Mar 13, 2024 |
| Poland | Z194752 | Nov 24, 1998 | Registered | R134811 | Jan 31, 2002 | EE ENYCE DESIGN II | 25 | L.C. Licensing, Inc | GBG Sean John LLC | Nov 24, 2028 |
| Qatar | 34166 | | Registered | 34166 | Feb 18, 2010 | ENYCE | 25 | JESSIE AND D LILA LLC | GBG Sean John LLC | Nov 16, 2024 |
| Republic of Korea | 1201264 | Mar 13, 2014 | Registered | 1201264 | Mar 13, 2014 | 3AM | 03 | Christian Casey LLC | | Mar 13, 2024 |
| Romania | M200407277 | Aug 27, 2004 | Registered | 069315 | Aug 27, 2004 | ENYCE | 03, 09, 14, 18, 25 | ENYCE LLC | GBG Sean John LLC | Aug 27, 2024 |
| Russian Federation | 2004711144 | May 21, 2004 | Registered | 285475 | Mar 29, 2005 | SEAN JOHN | 03, 18, 25 | Sean Combs | GBG Sean John LLC | May 21, 2024 |
| Russian Federation | 2006700016 | | Registered | 322942 | Mar 21, 2007 | UNFORGIVABLE SEAN JOHN (STYLIZED) | 03 | Christian Casey LLC | GBG Sean John LLC | Jul 11, 2025 |
| Russian Federation | 2008702411 | Jan 31, 2008 | Registered | 374876 | Mar 19, 2009 | I AM KING SEAN JOHN | 03 | Christian Casey LLC | GBG Sean John LLC | Jan 31, 2028 |
| Saudi Arabia | 142704880 | | Registered | 142704880 | Nov 3, 2007 | UNFORGIVABLE | 03 | Christian Casey LLC | GBG Sean John LLC | Nov 20, 2025 |
| Saudi Arabia | 40303203 | | Registered | 79499 | Jul 18, 2005 | ENYCE | 25 | L.C. Licensing, Inc | GBG Sean John LLC | Jan 23, 2024 |
| Saudi Arabia | 89804 | | Registered | 77729 | Apr 9, 2005 | SEAN JOHN | 03 | Christian Casey LLC | GBG Sean John LLC | Oct 16, 2023 |

| Country | Number | Date | Status | Reg Number | Date | Mark | Class | Owner | Owner 2 | Expiry |
|---|---|---|---|---|---|---|---|---|---|---|
| Singapore | 1249425 | Apr 7, 2015 | Registered | 1249425 | Apr 7, 2015 | ENYCE | 03, 18, 25 | GBG Sean John LLC | | Apr 7, 2025 |
| South Africa | 199817155 | | Registered | 9817155 | Jan 3, 2002 | EE ENYCE DESIGN II | 25 | ENYCE INC | GBG Sean John LLC | Sep 25, 2028 |
| South Africa | 199921929 | | Registered | 199921929 | May 16, 2003 | SEAN JOHN | 25 | Sean Combs | GBG Sean John LLC | |
| South Africa | 200408176 | | Registered | 200408176 | Oct 1, 2009 | SEAN JOHN | 03 | Christian Casey LLC | GBG Sean John LLC | May 21, 2024 |
| South Africa | 200419997 | | Registered | 200419997 | Aug 4, 2010 | ENYCE | 03 | JESSIE AND D LILA LLC | GBG Sean John LLC | Nov 3, 2024 |
| South Africa | 200419998 | | Registered | 200419998 | Aug 4, 2010 | ENYCE | 09 | JESSIE AND D LILA LLC | GBG Sean John LLC | Nov 3, 2024 |
| South Africa | 200419999 | | Registered | 200419999 | Aug 4, 2010 | ENYCE | 14 | JESSIE AND D LILA LLC | GBG Sean John LLC | Nov 3, 2024 |
| South Africa | 200420000 | | Registered | 200420000 | Aug 4, 2010 | ENYCE | 18 | JESSIE AND D LILA LLC | GBG Sean John LLC | Nov 3, 2024 |
| South Africa | 200420001 | | Registered | 200420001 | Aug 4, 2010 | ENYCE | 25 | JESSIE AND D LILA LLC | GBG Sean John LLC | Nov 3, 2024 |
| South Africa | 200801897 | | Registered | 200801897 | Jul 20, 2010 | I AM KING SEAN JOHN | 03 | Christian Casey LLC | GBG Sean John LLC | Jan 29, 2028 |
| Switzerland | 078621998 | Sep 23, 1998 | Registered | P460241 | Apr 7, 1999 | EE ENYCE DESIGN II | 25 | GBG Sean John LLC | GBG Sean John LLC | Sep 23, 2028 |
| Switzerland | 34602000 | Mar 22, 2000 | Registered | P475036 | Aug 10, 2000 | SEAN JOHN JEANS COMPANY | 09, 25 | GBG Sean John LLC | GBG Sean John LLC | Mar 22, 2030 |
| Switzerland | 510262008 | Jan 25, 2008 | Registered | 574032 | Jul 7, 2008 | I AM KING SEAN JOHN | 03 | GBG Sean John LLC | GBG Sean John LLC | Jan 25, 2028 |
| Switzerland | 534292004 | May 24, 2004 | Registered | P523341 | Jun 30, 2004 | SEAN JOHN | 03, 25 | GBG Sean John LLC | GBG Sean John LLC | May 24, 2024 |
| Switzerland | 555742005 | Jul 7, 2005 | Registered | P538348 | Sep 29, 2005 | UNFORGIVABLE | 03 | GBG Sean John LLC | GBG Sean John LLC | Jul 7, 2025 |
| Switzerland | 563052004 | Sep 17, 2004 | Registered | P529878 | Jan 20, 2005 | LADY ENYCE | 03, 09, 14, 18, 25 | GBG Sean John LLC | GBG Sean John LLC | Sep 17, 2024 |
| Switzerland | 585942004 | Dec 14, 2004 | Registered | P530691 | Feb 15, 2005 | ENYCE | 03, 09, 14, 18, 25 | GBG Sean John LLC | GBG Sean John LLC | Dec 14, 2024 |
| Tanganyika | 2008708 | | Registered | TZT2008708 | May 12, 2009 | SEAN JOHN | 03 | CHRISTIAN CASEY, LLC | GBG Sean John LLC | Sep 2, 2025 |
| Turkey | 200414947 | May 25, 2004 | Registered | 200414947 | Sep 5, 2005 | SEAN JOHN | 03, 25 | Sean Combs | GBG Sean John LLC | May 25, 2024 |
| United Arab Emirates | 106705 | | Registered | 131405 | Feb 6, 2011 | I AM KING SEAN JOHN | 03 | Christian Casey LLC | GBG Sean John LLC | Feb 6, 2028 |
| United Arab Emirates | 234908 | | Registered | 234908 | Nov 8, 2015 | SEAN JOHN | 09 | Christian Casey LLC | GBG Sean John LLC | May 28, 2025 |
| United Arab Emirates | 234909 | | Registered | 234909 | Nov 8, 2015 | SEAN JOHN | 14 | Christian Casey LLC | GBG Sean John LLC | May 28, 2025 |
| United Arab Emirates | 234910 | | Registered | 234910 | Nov 8, 2015 | SEAN JOHN | 18 | Christian Casey LLC | GBG Sean John LLC | May 28, 2025 |
| United Arab Emirates | 234911 | May 28, 2015 | Registered | 234911 | Nov 8, 2015 | SEAN JOHN | 25 | Christian Casey LLC | GBG Sean John LLC | May 28, 2025 |
| United Arab Emirates | 234912 | | Registered | 234912 | Nov 8, 2015 | SEAN JOHN | 35 | Christian Casey LLC | GBG Sean John LLC | May 28, 2025 |
| United Arab Emirates | 49254 | | Registered | 41675 | Aug 5, 2003 | SEAN JOHN | 25 | Christian Casey LLC | GBG Sean John LLC | Sep 4, 2022 |
| United Arab Emirates | 61014 | | Registered | 506679 | Jan 16, 2005 | SEAN JOHN | 03 | Christian Casey LLC | GBG Sean John LLC | May 24, 2024 |
| United Kingdom | 000786012 | Mar 31, 1998 | Registered | UK00900786012 | Aug 3, 1999 | ENYCE | 09, 14, 16, 18, 20, 25 | GBG Sean John LLC | GBG Sean John LLC | Mar 31, 2028 |
| United Kingdom | 000802553 | Apr 17, 1998 | Registered | UK00900802553 | Aug 9, 1999 | enyce & device | 25 | GBG Sean John LLC | GBG Sean John LLC | Apr 17, 2028 |
| United Kingdom | 000943662 | Sep 30, 1998 | Registered | UK00900943662 | Apr 19, 2001 | ENYCE (STYLIZED) II | 25 | GBG Sean John LLC | GBG Sean John LLC | Sep 30, 2028 |
| United Kingdom | 003796067 | Apr 27, 2004 | Registered | UK00903796067 | Jul 28, 2005 | ENYCE | 03, 06, 35 | GBG Sean John LLC | GBG Sean John LLC | Apr 27, 2024 |
| United Kingdom | 004461455 | Jun 23, 2005 | Registered | UK00904461455 | Jun 20, 2006 | SEAN JOHN UNFORGIVABLE | 03 | GBG Sean John LLC | GBG Sean John LLC | Jun 23, 2025 |
| United Kingdom | 004484325 | Jul 7, 2005 | Registered | UK00904484325 | Jun 20, 2006 | SEAN JOHN | 03 | GBG Sean John LLC | GBG Sean John LLC | Jul 7, 2025 |
| United Kingdom | 005620505 | Jan 17, 2007 | Registered | UK00905620505 | Oct 9, 2008 | SEAN JOHN (STYLIZED II) | 03, 09, 14, 18, 25 | GBG Sean John LLC | GBG Sean John LLC | Jan 17, 2027 |
| United Kingdom | 10265445 | Sep 14, 2011 | Registered | UK00910265445 | Feb 17, 2012 | ENYCE SPORT AND DESIGN | 14, 18, 25 | GBG Sean John LLC | GBG Sean John LLC | Sep 14, 2031 |
| United Kingdom | 012567129 | Feb 5, 2014 | Registered | UK00912567129 | Mar 6, 2014 | UNFORGIVABLE ELECTRIC | 03 | GBG Sean John LLC | GBG Sean John LLC | Feb 5, 2024 |
| United Kingdom | 017417635 | Oct 31, 2017 | Registered | UK00917417635 | Feb 25, 2018 | SEAN JOHN DENIM | 25 | GBG Sean John LLC | GBG Sean John LLC | Oct 31, 2027 |
| United Kingdom | 6610984 | Jan 25, 2008 | Registered | UK0096610984 | Jan 20, 2009 | I AM KING SEAN JOHN | 03 | GBG Sean John LLC | GBG Sean John LLC | Jan 25, 2028 |
| United Kingdom | 756544 | Feb 26, 1998 | Registered | UK009756544 | Aug 4, 2000 | SEAN JOHN | 03, 09, 14, 18, 25 | GBG Sean John LLC | GBG Sean John LLC | Feb 26, 2028 |
| United Arab Emirates | 66268 | | Unfiled | | | ENYCE | 25 | L.C. Licensing, Inc | GBG Sean John LLC | Jan 2, 2025 |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| United States of America | 75561843 | Sep 29, 1998 | Registered | 2778092 | Oct 28, 2003 | SEAN JOHN | 35 | GBG Sean John LLC | GBG Sean John LLC | Oct 28, 2023 |
| United States of America | 75976355 | Jun 24, 1996 | Registered | 2093751 | Sep 2, 1997 | ENYCE | 25 | GBG Sean John LLC | GBG Sean John LLC | Sep 2, 2027 |
| United States of America | 75979813 | Aug 27, 1997 | Registered | 2466699 | Jul 3, 2001 | SEAN JOHN | 25 | GBG Sean John LLC | GBG Sean John LLC | Jul 3, 2021 |
| United States of America | 75979883 | Jun 12, 1998 | Registered | 2409545 | Nov 28, 2000 | SEAN JOHN (STYLIZED SIGNATURE I) | 25 | GBG Sean John LLC | GBG Sean John LLC | Nov 28, 2030 |
| United States of America | 77368603 | Jan 10, 2008 | Registered | 3785290 | May 4, 2010 | I AM KING SEAN JOHN | 03 | GBG Sean John LLC | GBG Sean John LLC | May 4, 2030 |
| United States of America | 77370526 | Jan 14, 2008 | Registered | 3785293 | May 4, 2010 | I AM KING | 03 | GBG Sean John LLC | GBG Sean John LLC | May 4, 2030 |
| United States of America | 77424505 | Mar 18, 2008 | Registered | 3769477 | Mar 30, 2010 | BOTTLE DESIGN I | 03 | GBG Sean John LLC | GBG Sean John LLC | Mar 30, 2030 |
| United States of America | 77435986 | Mar 31, 2008 | Registered | 5286469 | Sep 12, 2017 | SEAN JOHN | 03, 09, 18, 25 | GBG Sean John LLC | GBG Sean John LLC | Sep 12, 2027 |
| United States of America | 77627566 | Dec 5, 2008 | Registered | 3733421 | Jan 5, 2010 | SEAN JOHN | 35 | GBG Sean John LLC | GBG Sean John LLC | Jan 5, 2030 |
| United States of America | 77976479 | Jan 14, 2008 | Registered | 3584479 | Mar 3, 2009 | I AM KING | 03 | GBG Sean John LLC | GBG Sean John LLC | Mar 3, 2029 |
| United States of America | 77976485 | Jan 10, 2008 | Registered | 3584481 | Mar 3, 2009 | I AM KING SEAN JOHN | 03 | GBG Sean John LLC | GBG Sean John LLC | Mar 3, 2029 |
| United States of America | 77982760 | Sep 21, 2009 | Registered | 4088506 | Jan 17, 2012 | ENYCE STACKED DESIGN | 25 | GBG Sean John LLC | GBG Sean John LLC | Jan 17, 2022 |
| United States of America | 78235399 | Apr 8, 2003 | Registered | 3419686 | Apr 29, 2008 | SEAN JOHN | 18, 25 | GBG Sean John LLC | GBG Sean John LLC | Apr 29, 2028 |
| United States of America | 78641212 | Jun 1, 2005 | Registered | 3320089 | Oct 23, 2007 | UNFORGIVABLE | 03 | GBG Sean John LLC | GBG Sean John LLC | Oct 23, 2027 |
| United States of America | 78694668 | Aug 17, 2005 | Registered | 3286929 | Aug 28, 2007 | SJ AND DESIGN | 03 | GBG Sean John LLC | GBG Sean John LLC | Aug 28, 2027 |
| United States of America | 78977198 | May 20, 2004 | Registered | 3143636 | Sep 12, 2006 | ENYCE | 18, 25 | GBG Sean John LLC | GBG Sean John LLC | Sep 12, 2026 |
| United States of America | 78977399 | May 20, 2004 | Registered | 3160971 | Oct 17, 2006 | SEAN JOHN | 03 | GBG Sean John LLC | GBG Sean John LLC | Oct 17, 2026 |
| United States of America | 78977506 | May 20, 2004 | Registered | 3164179 | Oct 24, 2006 | SEAN JOHN (STYLIZED SIGNATURE II) | 03 | GBG Sean John LLC | GBG Sean John LLC | Oct 24, 2026 |
| United States of America | 78978810 | Jul 8, 2005 | Registered | 3295817 | Sep 18, 2007 | UNFORGIVABLE | 03 | GBG Sean John LLC | GBG Sean John LLC | Sep 18, 2027 |
| United States of America | 78979148 | Apr 8, 2003 | Registered | 3342213 | Nov 20, 2007 | SEAN JOHN | 03, 09, 18, 25 | GBG Sean John LLC | GBG Sean John LLC | Nov 20, 2027 |
| United States of America | 85031483 | May 6, 2010 | Registered | 4179914 | Jul 24, 2012 | I AM KING OF MIAMI | 03 | GBG Sean John LLC | GBG Sean John LLC | Jul 24, 2022 |
| United States of America | 85411858 | Aug 31, 2011 | Registered | 4764801 | Jun 30, 2015 | ENYCE SPORT AND DESIGN | 25 | GBG Sean John LLC | GBG Sean John LLC | Jun 30, 2025 |
| United States of America | 86220245 | Mar 13, 2014 | Registered | 4791468 | Aug 11, 2015 | 3AM | 03 | GBG Sean John LLC | GBG Sean John LLC | Aug 11, 2025 |
| United States of America | 86512887 | Jan 23, 2015 | Registered | 4952513 | May 3, 2016 | 3AM ANYTHING CAN HAPPEN | 03 | GBG Sean John LLC | GBG Sean John LLC | May 3, 2026 |
| United States of America | 86581144 | Mar 30, 2015 | Registered | 4970199 | May 31, 2016 | ENYCE | 03 | GBG Sean John LLC | GBG Sean John LLC | May 31, 2026 |
| United States of America | 86624009 | May 8, 2015 | Registered | 5481365 | May 29, 2018 | EE ENYCE DESIGN III | 25 | GBG Sean John LLC | GBG Sean John LLC | May 29, 2028 |
| United States of America | 86624017 | May 8, 2015 | Registered | 5370454 | Jan 2, 2018 | EE ENYCE DESIGN III DOTTED | 25 | GBG Sean John LLC | GBG Sean John LLC | Jan 2, 2028 |

| Country | App No. | Filing Date | Status | Reg No. | Reg Date | Mark | Classes | Owner | Owner 2 | Expiry Date |
|---|---|---|---|---|---|---|---|---|---|---|
| United States of America | 86636585 | May 20, 2015 | Pending | | | SJ DREAM BIG | 25, 35 | GBG Sean John LLC | GBG Sean John LLC | |
| United States of America | 86801982 | Oct 28, 2015 | Registered | 5266669 | Aug 15, 2017 | SEAN JOHN (STYLIZED SIGNATURE II) | 09, 18, 25 | GBG Sean John LLC | GBG Sean John LLC | Aug 15, 2027 |
| United States of America | 88679181 | Nov 4, 2019 | Pending | | | VOTE OR DIE | 25, 26 | GBG Sean John LLC | | |
| Uruguay | 359490 | Jan 10, 2005 | Registered | 359490 | Sep 26, 2008 | ENYCE | 03, 25 | L.C. Licensing, Inc | GBG Sean John LLC | Sep 26, 2028 |
| Uruguay | 375720 | Nov 14, 2006 | Registered | 375720 | Jan 30, 2008 | UNFORGIVABLE SEAN JOHN | 03 | Christian Casey LLC | GBG Sean John LLC | Jan 30, 2028 |
| Uruguay | 403410 | Jan 11, 1998 | Registered | 403410 | Jul 7, 1999 | EE ENYCE DESIGN II | 25 | L.C. Licensing, Inc | GBG Sean John LLC | Oct 22, 2020 |
| Uruguay | 403410 | Jan 11, 1998 | Registered | 403410 | Jul 7, 1999 | EE ENYCE DESIGN II | 25 | L.C. Licensing, Inc | GBG Sean John LLC | Jul 7, 2029 |
| Uruguay | 403410 | Jan 11, 1998 | Registered | 403410 | Jul 7, 1999 | EE ENYCE DESIGN II | 25 | L.C. Licensing, Inc | GBG Sean John LLC | Oct 22, 2030 |
| Uruguay | 431808 | | Registered | 431808 | Jan 9, 2002 | SEAN JOHN | 25 | Christian Casey LLC | GBG Sean John LLC | Oct 22, 2020 |
| Uruguay | 431808 | | Registered | 431808 | Jan 9, 2002 | SEAN JOHN | 25 | Christian Casey LLC | GBG Sean John LLC | Jan 9, 2022 |
| Uruguay | 431808 | | Registered | 431808 | Jan 9, 2002 | SEAN JOHN | 25 | Christian Casey LLC | GBG Sean John LLC | Oct 22, 2030 |
| Venezuela | 129982004 | | Unfiled | | | ENYCE | 25 | L.C. Licensing, Inc | GBG Sean John LLC | |
| Venezuela | 1999000399 | | Registered | P223217 | Aug 17, 2000 | EE ENYCE DESIGN II | 25 | ENYCE INC | GBG Sean John LLC | Aug 17, 2025 |
| Venezuela | 2004007589 | | Registered | P260222 | Apr 15, 2005 | SEAN JOHN | 03 | Sean Combs | GBG Sean John LLC | Apr 15, 2030 |
| Venezuela | 2004012997 | | Registered | P266421 | Dec 19, 2005 | ENYCE | 03 | L.C. Licensing, Inc | GBG Sean John LLC | Dec 19, 2030 |
| Venezuela | 2006000403 | | Registered | P276977 | Feb 21, 2007 | UNFORGIVABLE SEAN JOHN (STYLIZED) | 03 | Christian Casey LLC | GBG Sean John LLC | Feb 21, 2032 |
| Venezuela | 2008001937 | | Registered | P289763 | Nov 24, 2008 | I AM KING SEAN JOHN | 03 | Christian Casey LLC | GBG Sean John LLC | Nov 24, 2023 |
| Venezuela | 2014006728 | | Unfiled | | | 3AM | 03 | Christian Casey LLC | GBG Sean John LLC | |
| Zambia | 7232008 | | Registered | 7232008 | Sep 4, 2008 | SEAN JOHN | 03 | Christian Casey LLC | GBG Sean John LLC | Sep 4, 2029 |
| Zanzibar | ZNT2008000425 | | Registered | ZNT2008000425 | May 27, 2009 | SEAN JOHN | 03 | Christian Casey LLC | GBG Sean John LLC | Sep 11, 2022 |

752 results displayed.

Schedule 1.4(i)
Open Purchase Orders

Attached hereto as <u>Schedule 1.4(i)</u>.



| PO Creation date | Season Year Description | Plant | Gender De | Brand Description | Profit Center | PO Number | Vendor Code | Vendor Name | Goods Supplier Name | Freight Fwder Name | Ordering Party Name | C.O.O. | X-Port Date | Ship Mode | Port of Exit Name | Port of Entry Name | St Loc | Delivery Date | Line numb | Style Number | Material | Material Description | Color Description | Tot PO Qty | Tot PO Amount in FOB | Tot PO Amount in Std Cost |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2/9/2021 | Summer 2021 | 1140 | Male | Sean John | 0000000783 | 4500455348 | 0008012854 | SAKTHI INFRA TEX PRIVATE LIMITED | V.R. KNITWEARS LLP | LF Logistics | LF CENTENNIAL-INDIA-U38 | IN | 6/4/2021 | Ocean | INMAA-Sea-Chennai | USLAX-Sea-Los Angeles/San Pedro, CA | GB01 | 7/18/2021 | 10 | MT212022 | 15MT212022115 | FLYING TIGER | BRIGHT WHITE | 744.000 | 4,278.00 | 5,356.80 |
| 2/9/2021 | Summer 2021 | 1140 | Male | Sean John | 0000000783 | 4500455348 | 0008012854 | SAKTHI INFRA TEX PRIVATE LIMITED | V.R. KNITWEARS LLP | LF Logistics | LF CENTENNIAL-INDIA-U38 | IN | 6/4/2021 | Ocean | INMAA-Sea-Chennai | USLAX-Sea-Los Angeles/San Pedro, CA | GB01 | 7/18/2021 | 20 | MT212022 | 15MT212022115 | FLYING TIGER | BRIGHT WHITE | 300.000 | 1,725.00 | 2,160.00 |
| 2/9/2021 | Summer 2021 | 1140 | Male | Sean John | 0000000783 | 4500455348 | 0008012854 | SAKTHI INFRA TEX PRIVATE LIMITED | V.R. KNITWEARS LLP | LF Logistics | LF CENTENNIAL-INDIA-U38 | IN | 6/4/2021 | Ocean | INMAA-Sea-Chennai | USLAX-Sea-Los Angeles/San Pedro, CA | GB01 | 7/18/2021 | 30 | MT212022 | 15MT212022115 | FLYING TIGER | BRIGHT WHITE | 100.000 | 575.00 | 720.00 |
| 2/9/2021 | Summer 2021 | 1140 | Male | Sean John | 0000000783 | 4500455348 | 0008012854 | SAKTHI INFRA TEX PRIVATE LIMITED | V.R. KNITWEARS LLP | LF Logistics | LF CENTENNIAL-INDIA-U38 | IN | 6/4/2021 | Ocean | INMAA-Sea-Chennai | USLAX-Sea-Los Angeles/San Pedro, CA | GB01 | 7/18/2021 | 40 | MT212026 | 15MT212026115 | HOPE | BRIGHT WHITE | 761.000 | 4,984.55 | 6,217.37 |
| 2/9/2021 | Summer 2021 | 1140 | Male | Sean John | 0000000783 | 4500455348 | 0008012854 | SAKTHI INFRA TEX PRIVATE LIMITED | V.R. KNITWEARS LLP | LF Logistics | LF CENTENNIAL-INDIA-U38 | IN | 6/4/2021 | Ocean | INMAA-Sea-Chennai | USLAX-Sea-Los Angeles/San Pedro, CA | GB01 | 7/18/2021 | 50 | MT212026 | 15MT212026403 | HOPE | NIGHT SKY | 611.000 | 4,002.05 | 4,991.87 |
| 2/9/2021 | Summer 2021 | 1140 | Male | Sean John | 0000000783 | 4500455348 | 0008012854 | SAKTHI INFRA TEX PRIVATE LIMITED | V.R. KNITWEARS LLP | LF Logistics | LF CENTENNIAL-INDIA-U38 | IN | 6/4/2021 | Ocean | INMAA-Sea-Chennai | USLAX-Sea-Los Angeles/San Pedro, CA | GB01 | 7/18/2021 | 60 | MT212026 | 15MT212026115 | HOPE | BRIGHT WHITE | 300.000 | 1,965.00 | 2,451.00 |
| 2/9/2021 | Summer 2021 | 1140 | Male | Sean John | 0000000783 | 4500455348 | 0008012854 | SAKTHI INFRA TEX PRIVATE LIMITED | V.R. KNITWEARS LLP | LF Logistics | LF CENTENNIAL-INDIA-U38 | IN | 6/4/2021 | Ocean | INMAA-Sea-Chennai | USLAX-Sea-Los Angeles/San Pedro, CA | GB01 | 7/18/2021 | 70 | MT212026 | 15MT212026403 | HOPE | NIGHT SKY | 216.000 | 1,414.80 | 1,764.72 |
| 2/9/2021 | Summer 2021 | 1140 | Male | Sean John | 0000000783 | 4500455348 | 0008012854 | SAKTHI INFRA TEX PRIVATE LIMITED | V.R. KNITWEARS LLP | LF Logistics | LF CENTENNIAL-INDIA-U38 | IN | 6/4/2021 | Ocean | INMAA-Sea-Chennai | USLAX-Sea-Los Angeles/San Pedro, CA | GB01 | 7/18/2021 | 80 | MT212026 | 15MT212026115 | HOPE | BRIGHT WHITE | 100.000 | 655.00 | 817.00 |
| 2/9/2021 | Summer 2021 | 1140 | Male | Sean John | 0000000783 | 4500455348 | 0008012854 | SAKTHI INFRA TEX PRIVATE LIMITED | V.R. KNITWEARS LLP | LF Logistics | LF CENTENNIAL-INDIA-U38 | IN | 6/4/2021 | Ocean | INMAA-Sea-Chennai | USLAX-Sea-Los Angeles/San Pedro, CA | GB01 | 7/18/2021 | 90 | MT212026 | 15MT212026403 | HOPE | NIGHT SKY | 75.000 | 491.25 | 612.75 |
| 2/9/2021 | Summer 2021 | 1140 | Male | Sean John | 0000000783 | 4500455348 | 0008012854 | SAKTHI INFRA TEX PRIVATE LIMITED | V.R. KNITWEARS LLP | LF Logistics | LF CENTENNIAL-INDIA-U38 | IN | 6/4/2021 | Ocean | INMAA-Sea-Chennai | USLAX-Sea-Los Angeles/San Pedro, CA | GB01 | 7/18/2021 | 140 | MT212023 | 15MT212023403 | LINEAR TIGER HEAD | NIGHT SKY | 754.000 | 5,127.20 | 6,386.38 |
| 2/9/2021 | Summer 2021 | 1140 | Male | Sean John | 0000000783 | 4500455348 | 0008012854 | SAKTHI INFRA TEX PRIVATE LIMITED | V.R. KNITWEARS LLP | LF Logistics | LF CENTENNIAL-INDIA-U38 | IN | 6/4/2021 | Ocean | INMAA-Sea-Chennai | USLAX-Sea-Los Angeles/San Pedro, CA | GB01 | 7/18/2021 | 150 | MT212023 | 15MT212023403 | LINEAR TIGER HEAD | NIGHT SKY | 300.000 | 2,040.00 | 2,541.00 |
| 2/9/2021 | Summer 2021 | 1140 | Male | Sean John | 0000000783 | 4500455348 | 0008012854 | SAKTHI INFRA TEX PRIVATE LIMITED | V.R. KNITWEARS LLP | LF Logistics | LF CENTENNIAL-INDIA-U38 | IN | 6/4/2021 | Ocean | INMAA-Sea-Chennai | USLAX-Sea-Los Angeles/San Pedro, CA | GB01 | 7/18/2021 | 160 | MT212023 | 15MT212023115 | LINEAR TIGER HEAD | BRIGHT WHITE | 100.000 | 680.00 | 847.00 |
| 2/9/2021 | Summer 2021 | 1140 | Male | Sean John | 0000000783 | 4500455348 | 0008012854 | SAKTHI INFRA TEX PRIVATE LIMITED | V.R. KNITWEARS LLP | LF Logistics | LF CENTENNIAL-INDIA-U38 | IN | 6/4/2021 | Ocean | INMAA-Sea-Chennai | USLAX-Sea-Los Angeles/San Pedro, CA | GB01 | 7/18/2021 | 170 | MT212027 | 15MT212027900 | UNSTOPPABLE | JET BLACK | 751.000 | 4,280.70 | 5,362.14 |
| 2/9/2021 | Summer 2021 | 1140 | Male | Sean John | 0000000783 | 4500455348 | 0008012854 | SAKTHI INFRA TEX PRIVATE LIMITED | V.R. KNITWEARS LLP | LF Logistics | LF CENTENNIAL-INDIA-U38 | IN | 6/4/2021 | Ocean | INMAA-Sea-Chennai | USLAX-Sea-Los Angeles/San Pedro, CA | GB01 | 7/18/2021 | 180 | MT212027 | 15MT212027900 | UNSTOPPABLE | JET BLACK | 225.000 | 1,282.50 | 1,606.50 |
| 2/9/2021 | Summer 2021 | 1140 | Male | Sean John | 0000000783 | 4500455348 | 0008012854 | SAKTHI INFRA TEX PRIVATE LIMITED | V.R. KNITWEARS LLP | LF Logistics | LF CENTENNIAL-INDIA-U38 | IN | 6/4/2021 | Ocean | INMAA-Sea-Chennai | USLAX-Sea-Los Angeles/San Pedro, CA | GB01 | 7/18/2021 | 190 | MT212027 | 15MT212027900 | UNSTOPPABLE | JET BLACK | 100.000 | 570.00 | 714.00 |
| 2/9/2021 | Summer 2021 | 1140 | Male | Sean John | 0000000783 | 4500455348 | 0008012854 | SAKTHI INFRA TEX PRIVATE LIMITED | V.R. KNITWEARS LLP | LF Logistics | LF CENTENNIAL-INDIA-U38 | IN | 6/4/2021 | Ocean | INMAA-Sea-Chennai | USLAX-Sea-Los Angeles/San Pedro, CA | GB01 | 7/18/2021 | 200 | MT212027 | 15MT212027115 | UNSTOPPABLE | BRIGHT WHITE | 100.000 | 570.00 | 714.00 |
| 2/9/2021 | Summer 2021 | 1140 | Male | Sean John | 0000000783 | 4500455348 | 0008012854 | SAKTHI INFRA TEX PRIVATE LIMITED | V.R. KNITWEARS LLP | LF Logistics | LF CENTENNIAL-INDIA-U38 | IN | 6/4/2021 | Ocean | INMAA-Sea-Chennai | USLAX-Sea-Los Angeles/San Pedro, CA | GB01 | 7/18/2021 | 240 | MT212021 | 15MT212021403 | PANTHER ROAR | NIGHT SKY | 590.000 | 4,513.50 | 5,605.00 |
| 2/9/2021 | Summer 2021 | 1140 | Male | Sean John | 0000000783 | 4500455348 | 0008012854 | SAKTHI INFRA TEX PRIVATE LIMITED | V.R. KNITWEARS LLP | LF Logistics | LF CENTENNIAL-INDIA-U38 | IN | 6/4/2021 | Ocean | INMAA-Sea-Chennai | USLAX-Sea-Los Angeles/San Pedro, CA | GB01 | 7/18/2021 | 250 | MT212021 | 15MT212021403 | PANTHER ROAR | NIGHT SKY | 252.000 | 1,927.80 | 2,394.00 |
| 2/9/2021 | Summer 2021 | 1140 | Male | Sean John | 0000000783 | 4500455348 | 0008012854 | SAKTHI INFRA TEX PRIVATE LIMITED | V.R. KNITWEARS LLP | LF Logistics | LF CENTENNIAL-INDIA-U38 | IN | 6/4/2021 | Ocean | INMAA-Sea-Chennai | USLAX-Sea-Los Angeles/San Pedro, CA | GB01 | 7/18/2021 | 260 | MT212021 | 15MT212021403 | PANTHER ROAR | NIGHT SKY | 75.000 | 573.75 | 712.50 |
| 2/9/2021 | Summer 2021 | 1140 | Male | Sean John | 0000000783 | 4500455348 | 0008012854 | SAKTHI INFRA TEX PRIVATE LIMITED | V.R. KNITWEARS LLP | LF Logistics | LF CENTENNIAL-INDIA-U38 | IN | 6/4/2021 | Ocean | INMAA-Sea-Chennai | USLAX-Sea-Los Angeles/San Pedro, CA | GB01 | 7/18/2021 | 270 | MT212021 | 15MT212021900 | PANTHER ROAR | JET BLACK | 100.000 | 765.00 | 950.00 |
| 2/9/2021 | Summer 2021 | 1140 | Male | Sean John | 0000000783 | 4500455348 | 0008012854 | SAKTHI INFRA TEX PRIVATE LIMITED | V.R. KNITWEARS LLP | LF Logistics | LF CENTENNIAL-INDIA-U38 | IN | 6/4/2021 | Ocean | INMAA-Sea-Chennai | USLAX-Sea-Los Angeles/San Pedro, CA | GB01 | 7/18/2021 | 280 | MT212023 | 15MT212023403 | LINEAR TIGER HEAD | NIGHT SKY | 100.000 | 680.00 | 847.00 |
| 2/9/2021 | Summer 2021 | 1140 | Male | Sean John | 0000000783 | 4500455349 | 0008012854 | SAKTHI INFRA TEX PRIVATE LIMITED | V.R. KNITWEARS LLP | LF Logistics | LF CENTENNIAL-INDIA-U38 | IN | 6/4/2021 | Ocean | INMAA-Sea-Chennai | USLAX-Sea-Los Angeles/San Pedro, CA | GB01 | 7/18/2021 | 40 | MT212032 | 15MT212032115 | DREAM BIG RAISED | BRIGHT WHITE | 706.000 | 4,306.60 | 5,379.72 |
| 2/9/2021 | Summer 2021 | 1140 | Male | Sean John | 0000000783 | 4500455349 | 0008012854 | SAKTHI INFRA TEX PRIVATE LIMITED | V.R. KNITWEARS LLP | LF Logistics | LF CENTENNIAL-INDIA-U38 | IN | 6/4/2021 | Ocean | INMAA-Sea-Chennai | USLAX-Sea-Los Angeles/San Pedro, CA | GB01 | 7/18/2021 | 50 | MT212032 | 15MT212032115 | DREAM BIG RAISED | BRIGHT WHITE | 300.000 | 1,830.00 | 2,286.00 |
| 2/9/2021 | Summer 2021 | 1140 | Male | Sean John | 0000000783 | 4500455349 | 0008012854 | SAKTHI INFRA TEX PRIVATE LIMITED | V.R. KNITWEARS LLP | LF Logistics | LF CENTENNIAL-INDIA-U38 | IN | 6/4/2021 | Ocean | INMAA-Sea-Chennai | USLAX-Sea-Los Angeles/San Pedro, CA | GB01 | 7/18/2021 | 60 | MT212032 | 15MT212032115 | DREAM BIG RAISED | BRIGHT WHITE | 100.000 | 610.00 | 762.00 |
| 2/9/2021 | Summer 2021 | 1140 | Male | Sean John | 0000000783 | 4500455349 | 0008012854 | SAKTHI INFRA TEX PRIVATE LIMITED | V.R. KNITWEARS LLP | LF Logistics | LF CENTENNIAL-INDIA-U38 | IN | 6/4/2021 | Ocean | INMAA-Sea-Chennai | USLAX-Sea-Los Angeles/San Pedro, CA | GB01 | 7/18/2021 | 70 | MT212032 | 15MT212032900 | DREAM BIG RAISED | JET BLACK | 75.000 | 457.50 | 571.50 |
| | | | | | | | | | | | | | | | | | | | | | | | | 7,835.000 | $50,305.20 | $62,770.25 |

Schedule 3.3(a)
<u>No Conflicts or Consents</u>

Pursuant to the Operating Agreement of the Company, dated as of November 4, 2016, Christian Casey LLC and Jessie D Lila LLC must consent to a sale of the assets of the Company, which consent has been obtained as of the date hereof.

Schedule 3.3(b)
<u>Permits and Approvals</u>

None.

.

Schedule 3.7
<u>Inventory</u>

Attached hereto as <u>Schedule 3.7</u>.

| Plant | Storage loc | Profit Center | Brand | Material | Material Description | Season Code | Product Ca | Product Su | Total Stock Qty EA | Total Stock Val $ |
|---|---|---|---|---|---|---|---|---|---|---|
| 1140 | GB01 | 783 | Sean John | Sean John | 15FJ194863KBT088PC | SPKT JEANS | Fall 2019 | Bottoms | Jeans | 1 | 16 |
| 1140 | GB01 | 783 | Sean John | Sean John | 15FK181522-001-PC | Logo Taping Neoprene Track Jacket | ALL | Jackets | Jackets | 107 | 1,989 |
| 1140 | GB01 | 783 | Sean John | Sean John | 15FK181522-083-PC | Logo Taping Neoprene Track Jacket | Spring 2019 | Jackets | Jackets | 1 | 18 |
| 1140 | GB01 | 783 | Sean John | Sean John | 15FK181522-186-PC | Logo Taping Neoprene Track Jacket | Spring 2020 | Jackets | Jackets | 18 | 352 |
| 1140 | GB01 | 783 | Sean John | Sean John | 15FK181522-339-PC | Logo Taping Neoprene Track Jacket | Fall 2020 | Jackets | Jackets | 2 | 40 |
| 1140 | GB01 | 783 | Sean John | Sean John | 15FK181522060 | Logo Taping Neoprene Track Jacket | Fall 2020 | Jackets | Jackets | 43 | 799 |
| 1140 | GB01 | 783 | Sean John | Sean John | 15FK181522136 | Logo Taping Neoprene Track Jacket | Spring 2021 | Jackets | Jackets | 15 | 263 |
| 1140 | GB01 | 783 | Sean John | Sean John | 15FK181522147 | Logo Taping Neoprene Track Jacket | Spring 2021 | Jackets | Jackets | 10 | 182 |
| 1140 | GB01 | 783 | Sean John | Sean John | 15FK181522403 | Logo Taping Neoprene Track Jacket | Fall 2020 | Jackets | Jackets | 1 | 18 |
| 1140 | GB01 | 783 | Sean John | Sean John | 15FK181522604 | Logo Taping Neoprene Track Jacket | Fall 2020 | Jackets | Jackets | 3 | 54 |
| 1140 | GB01 | 783 | Sean John | Sean John | 15FK181522627 | Logo Taping Neoprene Track Jacket | Fall 2020 | Jackets | Jackets | 45 | 837 |
| 1140 | GB01 | 783 | Sean John | Sean John | 15FK181522822 | Logo Taping Neoprene Track Jacket | Spring 2021 | Jackets | Jackets | 1 | 18 |
| 1140 | GB01 | 783 | Sean John | Sean John | 15FK181622-001-PC | LOGO TAPING NEOPRENE TRACK PANT | ALL | Bottoms | Pants | 43 | 670 |
| 1140 | GB01 | 783 | Sean John | Sean John | 15FK181622-083-PC | LOGO TAPING NEOPRENE TRACK PANT | Spring 2019 | Bottoms | Pants | 4 | 63 |
| 1140 | GB01 | 783 | Sean John | Sean John | 15FK181622-186-PC | Logo taping neoprene track pant | Spring 2020 | Bottoms | Sweatpants | 4 | 66 |
| 1140 | GB01 | 783 | Sean John | Sean John | 15FK181622-402-PC | Logo taping neoprene track pant | Spring 2020 | Bottoms | Sweatpants | 1 | 16 |
| 1140 | GB01 | 783 | Sean John | Sean John | 15FK181622060 | Logo taping neoprene track pant | Fall 2020 | Bottoms | Sweatpants | 5 | 78 |
| 1140 | GB01 | 783 | Sean John | Sean John | 15FK181622136 | Logo taping neoprene track pant | Spring 2021 | Bottoms | Sweatpants | 1 | 15 |
| 1140 | GB01 | 783 | Sean John | Sean John | 15FK181622147 | Logo taping neoprene track pant | Spring 2021 | Bottoms | Sweatpants | 5 | 74 |
| 1140 | GB01 | 783 | Sean John | Sean John | 15FK181622403 | Logo taping neoprene track pant | Fall 2020 | Bottoms | Sweatpants | 2 | 31 |
| 1140 | GB01 | 783 | Sean John | Sean John | 15FK181622604 | Logo taping neoprene track pant | Fall 2020 | Bottoms | Sweatpants | 1 | 16 |
| 1140 | GB01 | 783 | Sean John | Sean John | 15FK181622627 | Logo taping neoprene track pant | Fall 2020 | Bottoms | Sweatpants | 3 | 47 |
| 1140 | GB01 | 783 | Sean John | Sean John | 15FK183517-064-PC | DROPPED SHOULDER CREW NECK SWEATSHIRT | Fall 2018 | Tops | Sweatshirts | 1 | 12 |
| 1140 | GB01 | 783 | Sean John | Sean John | 15FK183517BT001-PC | DROPPED SHOULDER CREW NECK SWEATSHIRT | Fall 2018 | Tops | Sweatshirts | 1 | 15 |
| 1140 | GB01 | 783 | Sean John | Sean John | 15FK189559-817-PC | FLIGHT TEE | Spring 2019 | Tops | Shirts | 53 | 183 |
| 1140 | GB01 | 783 | Sean John | Sean John | 15FK190524900 | VELOUR TRACK JACKET WITH PIPING | Fall 2020 | Jackets | Jackets | 15 | 265 |
| 1140 | GB01 | 783 | Sean John | Sean John | 15FK190624038 | VELOUR JOGGER WITH NEOPRENE AND PIPING | Fall 2020 | Bottoms | Sweatpants | 3 | 49 |
| 1140 | GB01 | 783 | Sean John | Sean John | 15FK190624900 | VELOUR JOGGER WITH NEOPRENE AND PIPING | Fall 2020 | Bottoms | Sweatpants | 38 | 591 |
| 1140 | GB01 | 783 | Sean John | Sean John | 15FK191500-068-PC | BLOCKED BOMBER JACKET | Fall 2019 | Jackets | Jackets | 1 | 17 |
| 1140 | GB01 | 783 | Sean John | Sean John | 15FK191503-818-PC | SJ TIGER EMBOIDERY SWEATSHIRT | Fall 2019 | Tops | Sweatshirts | 1 | 11 |
| 1140 | GB01 | 783 | Sean John | Sean John | 15FK191600-068-PC | BLOCKED JOGGER | Fall 2019 | Bottoms | Sweatpants | 1 | 15 |
| 1140 | GB01 | 783 | Sean John | Sean John | 15FK191602-900-PC | CRAWLING TIGER TRACK PANT | Fall 2019 | Bottoms | Sweatpants | 2 | 42 |
| 1140 | GB01 | 783 | Sean John | Sean John | 15FK191603-349-PC | HERRINGBONE TAPING FLIGHT SHORT | Fall 2019 | Bottoms | Shorts | 3 | 35 |
| 1140 | GB01 | 783 | Sean John | Sean John | 15FK192508-403-PC | NEOPRENE AND CORDUROY TRACK JACKET | Fall 2019 | Jackets | Jackets | 1 | 21 |
| 1140 | GB01 | 783 | Sean John | Sean John | 15FK192509-064-PC | VARSITY TRACK JACKET | Fall 2019 | Jackets | Jackets | 2 | 33 |
| 1140 | GB01 | 783 | Sean John | Sean John | 15FK192509BT064-PC | VARSITY TRACK JACKET | Fall 2019 | Jackets | Jackets | 1 | 19 |
| 1140 | GB01 | 783 | Sean John | Sean John | 15FK192509X064-PC | VARSITY TRACK JACKET | Fall 2019 | Jackets | Jackets | 1 | 16 |
| 1140 | GB01 | 783 | Sean John | Sean John | 15FK192514-403-PC | VARSITY PAISLEY PANTHER SPLIT TRACK JKT | Fall 2019 | Jackets | Jackets | 2 | 54 |
| 1140 | GB01 | 783 | Sean John | Sean John | 15FK192608-403-PC | NEOPRENE AND CORDUROY TRACK PANT | Fall 2019 | Bottoms | Sweatpants | 1 | 19 |
| 1140 | GB01 | 783 | Sean John | Sean John | 15FK192609-064-PC | VARSITY TRACK PANT | Fall 2019 | Bottoms | Sweatpants | 2 | 27 |
| 1140 | GB01 | 783 | Sean John | Sean John | 15FK192614-403-PC | VARSITY PANTHERS TRACK PANT | Fall 2019 | Bottoms | Sweatpants | 1 | 18 |
| 1140 | GB01 | 783 | Sean John | Sean John | 15FK193517-215-PC | CAMO BLOCKED TRACK JACKET | Fall 2019 | Jackets | Jackets | 1 | 20 |
| 1140 | GB01 | 783 | Sean John | Sean John | 15FK193533-064-PC | BOMBER TRACK | Fall 2019 | Jackets | Jackets | 2 | 37 |
| 1140 | GB01 | 783 | Sean John | Sean John | 15FK193536-818-PC | SEAN JOHN HOODIE | Fall 2019 | Tops | Sweatshirts | 1 | 15 |
| 1140 | GB01 | 783 | Sean John | Sean John | 15FK193536-900-PC | SEAN JOHN HOODIE | Fall 2019 | Tops | Sweatshirts | 2 | 30 |
| 1140 | GB01 | 783 | Sean John | Sean John | 15FK193617-215-PC | CAMO BLOCKED TRACK PANT | Fall 2019 | Bottoms | Sweatpants | 3 | 44 |
| 1140 | GB01 | 783 | Sean John | Sean John | 15FK193633-064-PC | BOMBER TRACK PANT | Fall 2019 | Bottoms | Sweatpants | 2 | 30 |
| 1140 | GB01 | 783 | Sean John | Sean John | 15FK194530-900-PC | PAISLEY CREW | Fall 2019 | Tops | Sweatshirts | 1 | 17 |
| 1140 | GB01 | 783 | Sean John | Sean John | 15FK194531-115-PC | Y/D RIB INSERT HOODIE | Fall 2019 | Tops | Sweatshirts | 1 | 13 |
| 1140 | GB01 | 783 | Sean John | Sean John | 15FK194531-900-PC | Y/D RIB INSERT HOODIE | Fall 2019 | Tops | Sweatshirts | 3 | 26 |
| 1140 | GB01 | 783 | Sean John | Sean John | 15FK194538-627-PC | TIGER EMBROIDERY HOODIE | Fall 2019 | Tops | Sweatshirts | 13 | 248 |
| 1140 | GB01 | 783 | Sean John | Sean John | 15FK194540-064-PC | COLOR BLOCK TRACK JACKET | Fall 2019 | Jackets | Jackets | 4 | 52 |
| 1140 | GB01 | 783 | Sean John | Sean John | 15FK194540-627-PC | COLOR BLOCK TRACK JACKET | Fall 2019 | Jackets | Jackets | 6 | 78 |
| 1140 | GB01 | 783 | Sean John | Sean John | 15FK194540-900-PC | COLOR BLOCK TRACK JACKET | Fall 2019 | Jackets | Jackets | 2 | 25 |
| 1140 | GB01 | 783 | Sean John | Sean John | 15FK194640-064-PC | COLOR BLOCKED JOGGER | Fall 2019 | Bottoms | Sweatpants | 3 | 33 |
| 1140 | GB01 | 783 | Sean John | Sean John | 15FK194640-627-PC | COLOR BLOCKED JOGGER | Fall 2019 | Bottoms | Sweatpants | 5 | 55 |
| 1140 | GB01 | 783 | Sean John | Sean John | 15FK194640-900-PC | COLOR BLOCKED JOGGER | Fall 2019 | Bottoms | Sweatpants | 6 | 66 |
| 1140 | GB01 | 783 | Sean John | Sean John | 15FT152030B-008 | ARC EAGLE | Fall 2015 | T-Shirts | Screen Print | 1 | 7 |
| 1140 | GB01 | 783 | Sean John | Sean John | 15FT183014-001-PC | LEGACY | Fall 2018 | Tops | Tops | 1 | 7 |
| 1140 | GB01 | 783 | Sean John | Sean John | 15FT183019-115-PC | BIG EAGLE TEE | Fall 2018 | Tops | Tops | 1 | 7 |
| 1140 | GB01 | 783 | Sean John | Sean John | 15FT189091-090-PC | BLOCKED LOGO V-NECK TEE | Spring 2019 | T-Shirts | Solid | 6 | 13 |
| 1140 | GB01 | 783 | Sean John | Sean John | 15FT191001-900-PC | PROVE THEM WRONG GOTHIC TEE | Fall 2019 | T-Shirts | Screen Print | 3 | 16 |
| 1140 | GB01 | 783 | Sean John | Sean John | 15FT191003-900-PC | LEGACY STRIPES TEE | Fall 2019 | T-Shirts | Screen Print | 1 | 7 |
| 1140 | GB01 | 783 | Sean John | Sean John | 15FT192015-403-PC | REVOLUTION AND BROTHERHOOD TEE | Fall 2019 | T-Shirts | Screen Print | 1 | 6 |
| 1140 | GB01 | 783 | Sean John | Sean John | 15FT192016-403-P9 | DREAM BELIEVE TEE | Fall 2019 | T-Shirts | Screen Print | 18 | 109 |
| 1140 | GB01 | 783 | Sean John | Sean John | 15FT192021-122-PC | ALL OVER PRIDE TEE | Fall 2019 | T-Shirts | Screen Print | 1 | 7 |
| 1140 | GB01 | 783 | Sean John | Sean John | 15FT192026-122-PC | KING PAISLEY PANTHER TEE | Fall 2019 | T-Shirts | Screen Print | 1 | 7 |
| 1140 | GB01 | 783 | Sean John | Sean John | 15FT193043-215-PC | CHENILLE SKULL TEE | Fall 2019 | T-Shirts | Screen Print | 2 | 14 |
| 1140 | GB01 | 783 | Sean John | Sean John | 15FT193045-115-PC | STING LIKE TEE | Fall 2019 | T-Shirts | Screen Print | 1 | 7 |
| 1140 | GB01 | 783 | Sean John | Sean John | 15FT193048-122-PC | FEAR NONE TEE | Fall 2019 | T-Shirts | Screen Print | 1 | 6 |
| 1140 | GB01 | 783 | Sean John | Sean John | 15FT194020-900-PC | BROTHERHOOD TEE | Fall 2019 | T-Shirts | Screen Print | 1 | 7 |
| 1140 | GB01 | 783 | Sean John | Sean John | 15FT194035-115-PC | DEFIANT 1 TEE | Fall 2019 | T-Shirts | Screen Print | 1 | 8 |
| 1140 | GB01 | 783 | Sean John | Sean John | 15FT194035-900-PC | DEFIANT 1 TEE | Fall 2019 | T-Shirts | Screen Print | 2 | 16 |
| 1140 | GB01 | 783 | Sean John | Sean John | 15FT194036-900-PC | LIGHTNING PANTHER TEE | Fall 2019 | T-Shirts | Screen Print | 1 | 6 |
| 1140 | GB01 | 783 | Sean John | Sean John | 15FT194037-900-PC | KING CHAIN TEE | Fall 2019 | T-Shirts | Screen Print | 1 | 8 |
| 1140 | GB01 | 783 | Sean John | Sean John | 15FT1940378T900-PC | KING CHAIN TEE | Fall 2019 | T-Shirts | Screen Print | 1 | 9 |
| 1140 | GB01 | 783 | Sean John | Sean John | 15FT194041-900-PC | WAR NO MORE TEE | Fall 2019 | T-Shirts | Screen Print | 2 | 15 |
| 1140 | GB01 | 783 | Sean John | Sean John | 15FT201075900 | BLACK IS BEAUTIFUL TEE | Fall 2020 | T-Shirts | Screen Print | 5 | 57 |
| 1140 | GB01 | 783 | Sean John | Sean John | 15FW140463T-026 | S/S SOLID TWILL SHIRT | Fall 2014 | Tops | Shirts | 1 | 11 |
| 1140 | GB01 | 783 | Sean John | Sean John | 15FW192205-214-PC | EPAULETTE CORDUROY PANT | Fall 2019 | Bottoms | Pants | 1 | 17 |
| 1140 | GB01 | 783 | Sean John | Sean John | 15FW192401-493-PC | L/S PAISLEY PATCH OXFORD SHIRT | Fall 2019 | Tops | Shirts | 1 | 14 |
| 1140 | GB01 | 783 | Sean John | Sean John | 15FW192415-122-PC | L/S HERRINGBONE WOVEN SHIRT | Fall 2019 | Tops | Shirts | 6 | 70 |
| 1140 | GB01 | 783 | Sean John | Sean John | 15FW192416-314-PC | L/S MINI CHECK Y/D SHIRT | Fall 2019 | Tops | Shirts | 4 | 46 |
| 1140 | GB01 | 783 | Sean John | Sean John | 15FW193407-213-PC | L/S UTILITY FLIGHT SHIRT | Fall 2019 | Tops | Shirts | 3 | 47 |

| 1140 | GB01 | 783 | Sean John - Sean John | 1SFW193407-215-PC | L/S UTILITY FLIGHT SHIRT | Fall 2019 | Tops | Shirts | 1 | 14 |
| 1140 | GB01 | 783 | Sean John - Sean John | 1SFW193407-259-PC | L/S UTILITY FLIGHT SHIRT | Fall 2019 | Tops | Shirts | 1 | 14 |
| 1140 | GB01 | 783 | Sean John - Sean John | 1SFW193409-259-PC | L/S BLOCKED TWILL SHIRT | Fall 2019 | Tops | Shirts | 1 | 15 |
| 1140 | GB01 | 783 | Sean John - Sean John | 1SFW194412-900-PC | L/S OPULENCE PANTHER SHIRT | Fall 2019 | Tops | Shirts | 3 | 44 |
| 1140 | GB01 | 783 | Sean John - Sean John | 1SFW194418-627-PC | L/S BUFFALO PLAID SHIRT | Fall 2019 | Tops | Shirts | 1 | 12 |
| 1140 | GB01 | 783 | Sean John - Sean John | 1SFW194419-064-PC | L/S HEATHER FLANNEL SHIRT | Fall 2019 | Tops | Shirts | 6 | 70 |
| 1140 | GB01 | 783 | Sean John - Sean John | 1SFW199485BT-115 | S/S SOLID TWILL SHIRT | Spring 2020 | Tops | Shirts | 1 | 8 |
| 1140 | GB01 | 783 | Sean John - Sean John | 1SFW199485BT-286 | S/S SOLID TWILL SHIRT | Spring 2020 | Tops | Shirts | 2 | 16 |
| 1140 | GB01 | 783 | Sean John - Sean John | 1SFW199485BT-403 | S/S SOLID TWILL SHIRT | Spring 2020 | Tops | Shirts | 2 | 16 |
| 1140 | GB01 | 783 | Sean John - Sean John | 1SHJ181841-468-PCA | BASQUIAT PEZ DENIM JACKET | Holiday 2018 | Outerwear | Jackets | 1 | 20 |
| 1140 | GB01 | 783 | Sean John - Sean John | 1SHJ191801-074-PC | GREY RESIN RAW | Holiday 2019 | Bottoms | Jeans | 1 | 14 |
| 1140 | GB01 | 783 | Sean John - Sean John | 1SHJ191803BT077-PC | RAVEN LIGHT WASH | Holiday 2019 | Bottoms | Jeans | 1 | 23 |
| 1140 | GB01 | 783 | Sean John - Sean John | 1SHJ191807-997-PC | REEF WASH | Holiday 2019 | Bottoms | Jeans | 3 | 46 |
| 1140 | GB01 | 783 | Sean John - Sean John | 1SHJ192800-900-PC | BLACK DENIM WITH TAPING | Holiday 2019 | Bottoms | Jeans | 1 | 16 |
| 1140 | GB01 | 783 | Sean John - Sean John | 1SHJ193805-494-PC | BREAKER WASH | Holiday 2019 | Bottoms | Jeans | 2 | 33 |
| 1140 | GB01 | 783 | Sean John - Sean John | 1SHK152536-090 | FLEECE DOUBLE COLLAR | Holiday 2015 | Tops | Sweatshirts | 1 | 14 |
| 1140 | GB01 | 783 | Sean John - Sean John | 1SHK181510-122-PCA | SLEEVE TAP TOP | Holiday 2018 | Tops | Tops | 5 | 72 |
| 1140 | GB01 | 783 | Sean John - Sean John | 1SHK181513-068-PCA | RIB STRIPED INSERT CREW | Holiday 2018 | Tops | Tops | 1 | 11 |
| 1140 | GB01 | 783 | Sean John - Sean John | 1SHK181527-900-PCA | RIB INSERT TEE | Holiday 2018 | Tops | Tops | 1 | 10 |
| 1140 | GB01 | 783 | Sean John - Sean John | 1SHK181549-115-PCA | HOODIE WITH CITY SCRIPT | ALL | Tops | Tops | 5 | 114 |
| 1140 | GB01 | 783 | Sean John - Sean John | 1SHK181549-627-PC | HOODIE WITH CITY SCRIPT | ALL | Tops | Tops | 1 | 17 |
| 1140 | GB01 | 783 | Sean John - Sean John | 1SHK181549-900-PC | HOODIE WITH CITY SCRIPT | ALL | Tops | Tops | 2 | 35 |
| 1140 | GB01 | 783 | Sean John - Sean John | 1SHK181552-312-PCA | BASQUIAT CHENILLE SWEATSHIRT | Holiday 2018 | Tops | Sweatshirts | 33 | 471 |
| 1140 | GB01 | 783 | Sean John - Sean John | 1SHK181552-627-PCA | BASQUIAT CHENILLE SWEATSHIRT | Holiday 2018 | Tops | Sweatshirts | 1 | 14 |
| 1140 | GB01 | 783 | Sean John - Sean John | 1SHK181553-068-PC | BASQUIAT T-REX HOODIE | Holiday 2018 | Tops | Tops | 1 | 22 |
| 1140 | GB01 | 783 | Sean John - Sean John | 1SHK182520-122-PCA | ZIP DETAIL CREW | Holiday 2018 | Tops | Tops | 1 | 13 |
| 1140 | GB01 | 783 | Sean John - Sean John | 1SHK182544-900-PCA | TIGER STITCHED HEAD | Holiday 2018 | Tops | Tops | 2 | 15 |
| 1140 | GB01 | 783 | Sean John - Sean John | 1SHK182545BT900-PC | NEOPRENE BOMBER | Holiday 2018 | Jackets | Bombers | 2 | 48 |
| 1140 | GB01 | 783 | Sean John - Sean John | 1SHK183555-068-PC | JMB FLEECE HOODY | Spring 2019 | Tops | Tops | 4 | 80 |
| 1140 | GB01 | 783 | Sean John - Sean John | 1SHK183555-900-PC | JMB FLEECE HOODY | Spring 2019 | Tops | Tops | 4 | 80 |
| 1140 | GB01 | 783 | Sean John - Sean John | 1SHK183665-068-PC | JMB FLEECE JOGGER | Spring 2019 | Bottoms | Pants | 5 | 100 |
| 1140 | GB01 | 783 | Sean John - Sean John | 1SHK183665-900-PC | JMB FLEECE JOGGER | Spring 2019 | Bottoms | Pants | 6 | 120 |
| 1140 | GB01 | 783 | Sean John - Sean John | 1SHK191504-064-PC | L/S EMBROIDERED TIGER CREW | Holiday 2019 | Tops | Sweatshirts | 2 | 28 |
| 1140 | GB01 | 783 | Sean John - Sean John | 1SHK191507-064-PC | RUGBY SWEATSHIRT | Holiday 2019 | Tops | Polos | 1 | 14 |
| 1140 | GB01 | 783 | Sean John - Sean John | 1SHK191509-038-PC | VELOUR PULL OVER HOODIE | Holiday 2019 | Tops | Sweatshirts | 2 | 32 |
| 1140 | GB01 | 783 | Sean John - Sean John | 1SHK191509-207-PC | VELOUR PULL OVER HOODIE | Holiday 2019 | Tops | Sweatshirts | 2 | 32 |
| 1140 | GB01 | 783 | Sean John - Sean John | 1SHK191609-038-PC | VELOUR JOGGER | Holiday 2019 | Bottoms | Sweatpants | 2 | 31 |
| 1140 | GB01 | 783 | Sean John - Sean John | 1SHK192510-900-PC | LINEAR SJ TRACK JACKET | Holiday 2019 | Jackets | Jackets | 2 | 32 |
| 1140 | GB01 | 783 | Sean John - Sean John | 1SHK192512-900-PC | SKULL RHINESTONE HOODIE | Holiday 2019 | Tops | Sweatshirts | 2 | 36 |
| 1140 | GB01 | 783 | Sean John - Sean John | 1SHK192514-627-PC | STATEMENTS CREW NECK | Holiday 2019 | Tops | Sweatshirts | 2 | 26 |
| 1140 | GB01 | 783 | Sean John - Sean John | 1SHK193522-115-PC | S/S YARN DYE RIBBING POLO | Holiday 2019 | Tops | Polos | 1 | 10 |
| 1140 | GB01 | 783 | Sean John - Sean John | 1SHK193618-403-PC | COLORBLOCKED NEOPRENE TRACK PANT | Holiday 2019 | Bottoms | Sweatpants | 1 | 28 |
| 1140 | GB01 | 783 | Sean John - Sean John | 1SHK201535627 | BLM FLAG CREW NECK SWEATSHIRT | Holiday 2020 | Tops | Sweatshirts | 1 | 13 |
| 1140 | GB01 | 783 | Sean John - Sean John | 1SHK201535900 | BLM FLAG CREW NECK SWEATSHIRT | Holiday 2020 | Tops | Sweatshirts | 3 | 39 |
| 1140 | GB01 | 783 | Sean John - Sean John | 1SHK201536064 | BLACK EXCELLENCE CREW NECK SWEATSHIRT | Holiday 2020 | Tops | Sweatshirts | 69 | 918 |
| 1140 | GB01 | 783 | Sean John - Sean John | 1SHK201536900 | BLACK EXCELLENCE CREW NECK SWEATSHIRT | Holiday 2020 | Tops | Sweatshirts | 61 | 811 |
| 1140 | GB01 | 783 | Sean John - Sean John | 1SHK201537627 | COLOR TEXTURE BLOCK CREW NECK SWEATSHIRT | Holiday 2020 | Tops | Sweatshirts | 1 | 14 |
| 1140 | GB01 | 783 | Sean John - Sean John | 1SHK201539064 | EMPOWER SCRIPT HOODIE | Holiday 2020 | Tops | Sweatshirts | 27 | 528 |
| 1140 | GB01 | 783 | Sean John - Sean John | 1SHK201539627 | EMPOWER SCRIPT HOODIE | Holiday 2020 | Tops | Sweatshirts | 96 | 1,879 |
| 1140 | GB01 | 783 | Sean John - Sean John | 1SHK201539900 | EMPOWER SCRIPT HOODIE | Holiday 2020 | Tops | Sweatshirts | 138 | 2,701 |
| 1140 | GB01 | 783 | Sean John - Sean John | 1SHS170101-001-PC | MULTIDIRECTIONAL RIB ZIP CARDI | Holiday 2017 | Sweaters | Cardigans | 2 | 24 |
| 1140 | GB01 | 783 | Sean John - Sean John | 1SHS170103-001-PC | COLOR BLOCK INTARSIA SHAWL | Holiday 2017 | Sweaters | Cardigans | 58 | 702 |
| 1140 | GB01 | 783 | Sean John - Sean John | 1SHS170104-001-PC | TEXTURED STITCH SHAWL | Holiday 2017 | Sweaters | Cardigans | 2 | 22 |
| 1140 | GB01 | 783 | Sean John - Sean John | 1SHS190101-183-PC | MOTTO RIB SHAWL NECK SWEATER | Fall 2019 | Sweaters | Pullovers | 24 | 261 |
| 1140 | GB01 | 783 | Sean John - Sean John | 1SHS190101-207-PC | MOTTO RIB SHAWL NECK SWEATER | Fall 2019 | Sweaters | Pullovers | 1 | 11 |
| 1140 | GB01 | 783 | Sean John - Sean John | 1SHS190101-900-PC | MOTTO RIB SHAWL NECK SWEATER | Fall 2019 | Sweaters | Pullovers | 130 | 1,414 |
| 1140 | GB01 | 783 | Sean John - Sean John | 1SHS190105-900-PC | MOTO CREW SWEATER | Fall 2019 | Sweaters | Pullovers | 1 | 11 |
| 1140 | GB01 | 783 | Sean John - Sean John | 1SHS190106-900-P9 | TEXTURED CHEVRON FULL ZIP MOCK NK | Fall 2019 | Sweaters | Pullovers | 18 | 231 |
| 1140 | GB01 | 783 | Sean John - Sean John | 1SHS190112-312-PC | CAMO SHAWL NECK SWEATER | Fall 2019 | Sweaters | Pullovers | 58 | 740 |
| 1140 | GB01 | 783 | Sean John - Sean John | 1SHS190119-083-PC | CABLE TURTLE NECK SWEATER | Fall 2019 | Sweaters | Pullovers | 1 | 14 |
| 1140 | GB01 | 783 | Sean John - Sean John | 1SHS190121-900-PC | THE OLD WORLD CREW NECK | Fall 2019 | Sweaters | Pullovers | 1 | 12 |
| 1140 | GB01 | 783 | Sean John - Sean John | 1SHS191108BT122-PC | DIDDY SHAWL PULL OVER | Holiday 2019 | Sweaters | Pullovers | 2 | 70 |
| 1140 | GB01 | 783 | Sean John - Sean John | 1SHS192120-900-PC | JACQUARD TIGER SWEATER | Holiday 2019 | Sweaters | Pullovers | 1 | 15 |
| 1140 | GB01 | 783 | Sean John - Sean John | 1SHT181032-001-PC | TRI SKULLER | Fall 2018 | T-Shirts | Solid | 103 | 763 |
| 1140 | GB01 | 783 | Sean John - Sean John | 1SHT181070-409-PCA | SEAN JOHN SCRIPT TEE | Holiday 2018 | Tops | Tops | 1 | 7 |
| 1140 | GB01 | 783 | Sean John - Sean John | 1SHT181070-627-PCA | SEAN JOHN SCRIPT TEE | Holiday 2018 | Tops | Tops | 1 | 7 |
| 1140 | GB01 | 783 | Sean John - Sean John | 1SHT181070-900-PCA | SEAN JOHN SCRIPT TEE | Holiday 2018 | Tops | Tops | 1 | 7 |
| 1140 | GB01 | 783 | Sean John - Sean John | 1SHT181075-900-PCA | BASQUIAT SIGNATURE TEE | Holiday 2018 | T-Shirts | Solid | 2 | 15 |
| 1140 | GB01 | 783 | Sean John - Sean John | 1SHT191004-900-PC | ROARING FURY TEE | Fall 2020 | T-Shirts | Screen Print | 30 | 296 |
| 1140 | GB01 | 783 | Sean John - Sean John | 1SHT191006-115-PC | POSITIVE VIBES TEE | Holiday 2019 | T-Shirts | Screen Print | 1 | 7 |
| 1140 | GB01 | 783 | Sean John - Sean John | 1SHT191006-900-PC | POSITIVE VIBES TEE | Holiday 2019 | T-Shirts | Screen Print | 1 | 7 |
| 1140 | GB01 | 783 | Sean John - Sean John | 1SHT192012-900-PC | LOVE AND ROSES TEE | Holiday 2019 | T-Shirts | Screen Print | 3 | 24 |
| 1140 | GB01 | 783 | Sean John - Sean John | 1SHT192015-900-PC | SEQUINS SKULL TEE | Holiday 2019 | T-Shirts | Screen Print | 1 | 11 |
| 1140 | GB01 | 783 | Sean John - Sean John | 1SHT192018-900-PC | PYTHON FEARLESS TEE | Holiday 2019 | T-Shirts | Screen Print | 3 | 25 |
| 1140 | GB01 | 783 | Sean John - Sean John | 1SHT192019-900-PC | BLACK EXCELLENCE TEE | Holiday 2019 | T-Shirts | Screen Print | 20 | 162 |
| 1140 | GB01 | 783 | Sean John - Sean John | 1SHT192029-900-PC | RAISE YOUR VOICE TEE | Holiday 2019 | T-Shirts | Screen Print | 1 | 7 |
| 1140 | GB01 | 783 | Sean John - Sean John | 1SHT192035-900-PC | LABEL US TEE | Holiday 2019 | T-Shirts | Screen Print | 1 | 9 |
| 1140 | GB01 | 783 | Sean John - Sean John | 1SHT193030-403-PC | POSITIVE VIBES ONLY TEE | Holiday 2019 | T-Shirts | Screen Print | 1 | 7 |
| 1140 | GB01 | 783 | Sean John - Sean John | 1SHT201030115 | POSITIVE VIBES ONLY | Spring 2021 | T-Shirts | Screen Print | 45 | 293 |
| 1140 | GB01 | 783 | Sean John - Sean John | 1SHT201030900 | POSITIVE VIBES ONLY | Spring 2021 | T-Shirts | Screen Print | 58 | 377 |
| 1140 | GB01 | 783 | Sean John - Sean John | 1SHW181210-001-PC | LEATHER TRACK TOP | Holiday 2018 | Outerwear | Outerwear | 23 | 4,427 |
| 1140 | GB01 | 783 | Sean John - Sean John | 1SHW181211-001-PC | LEATHER TRACK PANT | Holiday 2018 | Bottoms | Bottoms | 1 | 166 |
| 1140 | GB01 | 783 | Sean John - Sean John | 1SHW181212-001-PC | SUEDE COVERALL SUIT | Holiday 2018 | Outerwear | Outerwear | 11 | 2,984 |
| 1140 | GB01 | 783 | Sean John - Sean John | 1SHW191402-091-PC | L/S CAMO FLIGHT SHIRT | Holiday 2019 | Tops | Shirts | 2 | 38 |
| 1140 | GB01 | 783 | Sean John - Sean John | 1SHW191403-064-PC | L/S CAMO PIECED SHIRT | Holiday 2019 | Tops | Shirts | 2 | 30 |

| 1140 | GB01 | 783 | Sean John - Sean John | 15HW191421-058-PC | S/S MULTI CHECK PLAID SHIRT | Holiday 2019 | Tops | Shirts | 2 | 26 |
|------|------|-----|-----------------------|-------------------|-----------------------------|--------------|------|--------|---|----|
| 1140 | GB01 | 783 | Sean John - Sean John | 15HW192414-900-PC | L/S STRIPE PRINTED SHIRT | Holiday 2019 | Tops | Shirts | 1 | 12 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15HW192416-627-PC | L/S BUFFALO PLAID OUT DOOR SHIRT | Holiday 2019 | Tops | Shirts | 1 | 11 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15HW193420-402-PC | S/S CHAMBRAY BLOCKED SHIRT | Holiday 2019 | Tops | Shirts | 1 | 11 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15J913-013-PC | Athlein Jean | ALL | Bottoms | Jeans | 5 | 82 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15J913-079-PC | ATHLETIC JEAN | ALL | Bottoms | Jeans | 52 | 686 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15J913-115-PC | ATHLETIC JEAN | ALL | Bottoms | Jeans | 2,425 | 37,515 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15J913-401-PC | ATHLETIC JEAN | ALL | Bottoms | Jeans | 2 | 31 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15J913-420-PC | ATHLETIC JEAN | ALL | Bottoms | Jeans | 2 | 32 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15J913-435-PC | ATHLETIC JEAN | ALL | Bottoms | Jeans | 171 | 2,919 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15J913-457-PC | ATHLETIC JEAN | ALL | Bottoms | Jeans | 17 | 283 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15J913-461-PC | ATHLETIC JEAN | ALL | Bottoms | Jeans | 9 | 150 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15J913-909-PC | ATHLETIC JEAN | ALL | Bottoms | Jeans | 45 | 653 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15J913BT-013-PC | ATHLETIC JEAN | ALL | Bottoms | Jeans | 3 | 57 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15J913BT-079-PC | ATHLETIC JEAN | ALL | Bottoms | Jeans | 3 | 45 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15J913BT-909-PC | ATHLETIC JEAN | ALL | Bottoms | Jeans | 2 | 33 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15J915-122-PC | EPAULETTE JEAN | ALL | Bottoms | Jeans | 3 | 43 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15J915-312-PC | EPAULETTE JEAN | ALL | Bottoms | Jeans | 5 | 75 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15J915-900-PC | EPAULETTE JEAN | ALL | Bottoms | Jeans | 3 | 41 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15J915-952-PC | EPAULETTE JEAN | ALL | Bottoms | Jeans | 15 | 224 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15J916-079-PC | PATCH PKT JEAN | ALL | Bottoms | Jeans | 20 | 267 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15J916-460-PC | PATCH PKT JEAN | ALL | Bottoms | Jeans | 6 | 79 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15J916-461-PC | 5PKT JEANS | ALL | Bottoms | Jeans | 2 | 34 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15J916-949-PC | PATCH PKT JEAN | ALL | Bottoms | Jeans | 21 | 327 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15J916-956-PC | PATCH PKT JEAN | ALL | Bottoms | Jeans | 5 | 79 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15K528-115-PC | FLIGHT KNIT | ALL | Tops | Shirts | 2 | 13 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15K530-286-PC | L/S BLOCKED FLIGHT KNIT | ALL | T-Shirts | Solid | 2 | 17 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15K5503-115-PC | SJ CLASSIC VELOUR TRACK JACKET | ALL | Tops | Tops | 1 | 22 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15K5503-167-PC | SJ CLASSIC VELOUR TRACK JACKET | ALL | Tops | Tops | 1 | 22 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15K5503-916-PC | SJ CLASSIC VELOUR TRACK JACKET | ALL | Tops | Tops | 3 | 67 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15K600-064-PC | FLIGHT KNIT SHORT | ALL | Bottoms | Shorts | 1 | 8 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15K600-952-PC | FLIGHT KNIT SHORT | ALL | Bottoms | Shorts | 1 | 8 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15K6503-115-PC | SJ CLASSIC VELOUR TRACK PANT | ALL | Bottoms | Pants | 1 | 17 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15K6503-167-PC | SJ CLASSIC VELOUR TRACK PANT | ALL | Bottoms | Pants | 3 | 52 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15K6503-916-PC | SJ CLASSIC VELOUR TRACK PANT | ALL | Bottoms | Pants | 2 | 35 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15MJ203800077 | RAVEN WASH DENIM | Summer 2020 | Bottoms | Jeans | 606 | 9,405 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15MK191515-083-PC | S/S SHOULDER TO SHOULDER | Spring 2019 | Tops | Tops | 419 | 3,566 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15MK192504-115-PC | S/S TEXTURED BLOCKED TEE | Summer 2019 | T-Shirts | Color Block | 12 | 135 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15MK192507-430-PC | S/S TERRY TRACK JACKET | Summer 2019 | Jackets | Jackets | 4 | 54 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15MK192516-115-PC | S/S TERRY POLO | Summer 2019 | Tops | Polos | 4 | 44 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15MK192606-430-PC | TERRY CLOTH BASKETBALL SHORTS | Summer 2019 | Bottoms | Shorts | 3 | 41 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15MK192624-115-PC | BASQUIAT SHORTS | Summer 2019 | Bottoms | Shorts | 62 | 549 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15MK193508-115-PC | TEE WITH YARN DYE RIBBING INSERT | Summer 2019 | T-Shirts | Screen Print | 3 | 35 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15MK193509-115-PC | S/S PRINTED STARS AND STRIPES TEE | Summer 2019 | Tops | Tops | 77 | 562 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15MK193510-115-PC | S/S STAR PIECED TEE | Summer 2019 | T-Shirts | All Over Print | 19 | 206 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15MK202525115 | YARNDYE STRIPE RIB AND TAPING KNIT | Summer 2020 | Tops | Tops | 1 | 13 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15MK202625115 | STRIPE TAPING SHORT | Summer 2020 | Bottoms | Sweatpants | 1 | 14 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15MS192102-403-PC | S/S ZIG ZAG SWEATER KNIT POLO | Summer 2019 | Polos | Polos | 15 | 184 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15MS201101403 | S/S MICRO CHENILLE SWEATER KNIT POLO | Summer 2020 | Sweaters | Pullovers | 1 | 14 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15MT171029-001-PC | POSITIVE VIBES GOLD | Fall 2017 | T-Shirts | Solid | 1 | 5 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15MT191025-475-PC | LAMOUR TEE | Summer 2019 | T-Shirts | Screen Print | 1 | 7 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15MT191028-083-PC | EXPOSED FLORAL TEE | Spring 2019 | T-Shirts | Screen Print | 3 | 19 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15MT192031-115-PC | WOLFGANG TEE | Summer 2019 | T-Shirts | Screen Print | 1 | 7 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15MT192035-430-PC | ABSTRACT GEO TEE | Summer 2019 | T-Shirts | Screen Print | 1 | 6 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15MT192060-115-PC | LUXE LIFE TEE | Summer 2019 | T-Shirts | Screen Print | 1 | 7 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15MT192070-115-PC | WHITE PARTY SPLIT CAMO TEE | Summer 2019 | T-Shirts | Screen Print | 1 | 7 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15MT192071-900-PC | POSITIVE VIBES ONLY TEE | Summer 2019 | T-Shirts | Screen Print | 2 | 13 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15MT192104-064-PC | PLAYBOY CHAMP | Summer 2019 | T-Shirts | Screen Print | 1 | 7 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15MT193038-403-PC | SJ BISON TEE | Summer 2019 | T-Shirts | Screen Print | 1 | 7 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15MT193040-403-PC | GLORY EAGLE TEE | Summer 2019 | T-Shirts | Screen Print | 1 | 7 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15MT193042-403-PC | DREAM BIG TEE | Summer 2019 | T-Shirts | Screen Print | 1 | 6 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15MT193062-627-PC | S/S KNIT | Summer 2019 | T-Shirts | Screen Print | 2 | 10 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15MT200077115 | BLACK EXCELLENCE TEE | Summer 2020 | T-Shirts | Screen Print | 11 | 66 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15MT201050115 | PROVE THEM SCRIPT TEE | Summer 2020 | T-Shirts | Screen Print | 1 | 6 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15MT201050403 | PROVE THEM SCRIPT TEE | Summer 2020 | T-Shirts | Screen Print | 1 | 6 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15MT201056115 | TIE DYE SPLIT TEE | Summer 2020 | T-Shirts | Screen Print | 13 | 89 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15MT201111115 | PROVE THEM WRONG | Spring 2021 | T-Shirts | Screen Print | 52 | 338 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15MT201111403 | PROVE THEM WRONG | Spring 2021 | T-Shirts | Screen Print | 4 | 26 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15MT202003627 | PROVE THEM WRONG TEE | Summer 2020 | T-Shirts | Screen Print | 19 | 117 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15MT202005403 | RISE TEE | Summer 2020 | T-Shirts | Screen Print | 2 | 16 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15MT202005627 | RISE TEE | Summer 2020 | T-Shirts | Screen Print | 13 | 104 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15MT202115115 | LEGACY TEE | Summer 2020 | T-Shirts | Mixed Media | 1 | 11 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15MT202151403 | LEGACY TEE | Summer 2020 | T-Shirts | Mixed Media | 3 | 32 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15MT202151820 | LEGACY TEE | Summer 2020 | T-Shirts | Mixed Media | 14 | 99 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15MT203025900 | POSITIVE VIBES ONLY TEE | Summer 2020 | T-Shirts | Screen Print | 84 | 477 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15MT211004403 | UNITE | Summer 2021 | T-Shirts | Mixed Media | 72 | 492 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15MT211007403 | TIGER ROAR | Summer 2021 | T-Shirts | Mixed Media | 105 | 744 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15MT211010115 | GEO PANTHER HEAD | Summer 2021 | T-Shirts | Screen Print | 105 | 757 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15MT211019115 | WATERCOLOR TIGER | Summer 2021 | T-Shirts | Screen Print | 83 | 437 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15MT212029115 | IMAGINE BELIEVE ACHIEVE | Summer 2021 | T-Shirts | Screen Print | 37 | 262 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15MT212031115 | UNITE | Summer 2021 | T-Shirts | Screen Print | 211 | 1,492 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15MT212031900 | UNITE | Summer 2021 | T-Shirts | Screen Print | 101 | 714 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15MW191201-428-PC | CHAMBRAY CARGO SHORTS | Summer 2019 | Bottoms | Shorts | 1,398 | 19,935 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15MW191401-083-PC | S/S COTE DAZUR SHIRT | Spring 2019 | Tops | Shirts | 1 | 9 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15MW191401-403-PC | S/S COTE DAZUR SHIRT | Summer 2019 | Tops | Shirts | 2 | 23 |

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| 1140 | GB01 | 783 | Sean John - Sean John | 15MW192204-115-PC | S/S ZIP FRONT HOODIE | Summer 2019 | Tops | Shirts | 14 | 214 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15MW192207-115-PC | SANTORINI LINEN JOGGER | Summer 2019 | Bottoms | Pants | 14 | 186 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15MW192404-115-PC | S/S WHITE PARTY LINEN SHIRT | Summer 2019 | Tops | Shirts | 1 | 12 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15MW192407-115-PC | S/S GREEK GOD SHIRT | Summer 2019 | Tops | Shirts | 76 | 933 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15MW192408-115-PC | L/S LINEN SANTORINI SHIRT | Summer 2019 | Tops | Shirts | 26 | 351 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15MW193418-115-PC | S/S ABSTRACT NYC SHIRT | Summer 2019 | Tops | Shirts | 1 | 11 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15MW201200115 | LINEN TRUCKER JACKET | Summer 2020 | Jackets | Jackets | 218 | 5,263 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15MW201201115 | LINEN MOTO DETAIL PANT | Summer 2020 | Bottoms | Pants | 57 | 854 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15MW201202115 | SLEEVELESS CONTRAST ZIP UP HOODIE | Summer 2020 | Tops | Shirts | 383 | 6,584 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15MW201204115 | LINEN UTILITY JOGGER | Summer 2020 | Bottoms | Pants | 587 | 8,922 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15MW201205115 | LINEN UTILITY SHORT | Summer 2020 | Bottoms | Pants | 7 | 89 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15MW201400115 | S/S CONTRAST TUXEDO LINEN SHIRT | Summer 2020 | Tops | Shirts | 4 | 40 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15MW201408143 | S/S OVERSIZE PLAID SHIRT | Summer 2020 | Tops | Shirts | 12 | 115 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15MW201408475 | S/S OVERSIZE PLAID SHIRT | Summer 2020 | Tops | Shirts | 8 | 77 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15MW201408960 | S/S OVERSIZE PLAID SHIRT | Summer 2020 | Tops | Shirts | 3 | 29 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15MW211206115 | SJ MONOGRAM SHORT | Summer 2021 | Bottoms | Shorts | 40 | 550 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15MW211206403 | SJ MONOGRAM SHORT | Summer 2021 | Bottoms | Shorts | 45 | 619 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15MW211206811 | SJ MONOGRAM SHORT | Summer 2021 | Bottoms | Shorts | 36 | 495 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15MW211207403 | ALL OVER PRINTED SHORT | Summer 2021 | Bottoms | Shorts | 24 | 369 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15MW211405115 | LINEN RESORT SHIRT | Summer 2021 | Tops | Shirts | 8 | 81 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15MW211406115 | SJ MONOGRAM RESORT SHIRT | Summer 2021 | Tops | Shirts | 54 | 920 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15MW211406403 | SJ MONOGRAM RESORT SHIRT | Summer 2021 | Tops | Shirts | 22 | 375 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15MW211406811 | SJ MONOGRAM RESORT SHIRT | Summer 2021 | Tops | Shirts | 34 | 579 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15OPFK150513-001 | XV 1998 CREWNECK | Fall 2015 | Tops | Jackets | 2 | 16 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15SJ192805BT452-PC | REVOLUTION JEAN | Spring 2019 | Bottoms | Jeans | 110 | 2,757 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15SJ192808-900-PC | BLACK ON BLACK JEAN | Spring 2019 | Bottoms | Jeans | 1 | 13 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15SJ199830-115-PC | 5PK JEAN BRIGHT WHITE | Spring 2019 | Bottoms | Jeans | 15 | 112 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15SJ199839-071-PC | 5PK JEAN STATIC WASH | Spring 2019 | Bottoms | Jeans | 1 | 11 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15SJ201804422 | WHITE JACKET | Spring 2020 | Outerwear | Jackets | 147 | 2,414 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15SJ201806943 | 5PKT DENIM | Spring 2020 | Bottoms | Jeans | 13 | 214 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15SJ201806BT-943 | 5PKT DENIM | Spring 2020 | Bottoms | Jeans | 1 | 19 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15SJ201806BT-943P6 | 5PKT DENIM | Spring 2020 | Bottoms | Jeans | 6 | 116 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15SJ201807-422 | 5PKT DENIM | Spring 2020 | Bottoms | Jeans | 17 | 264 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15SJ202802-115 | MOTO JEAN | Spring 2020 | Bottoms | Jeans | 68 | 1,178 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15SJ202802BT-115 | MOTO JEAN | Spring 2020 | Bottoms | Jeans | 1 | 20 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15SJ203811BT-925 | 5PKT JEANS | Spring 2020 | Bottoms | Jeans | 1 | 18 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15SK190114-115-PC | S/S OTTOMAN KNIT | Spring 2019 | T-Shirts | Solid | 2 | 24 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15SK190114-900-PC | S/S OTTOMAN KNIT | Spring 2019 | Bottoms | Solid | 2 | 24 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15SK190614-627-PC | S/S OTTOMAN SHORT | Spring 2019 | Bottoms | Shorts | 3 | 35 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15SK190614-900-PC | S/S OTTOMAN SHORT | Spring 2019 | Bottoms | Shorts | 1 | 12 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15SK191107-083-PC | CONTRASTED PIECED ZIP BOMBER | Spring 2019 | Tops | Tops | 2 | 34 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15SK191511-430-PC | SJ POP OVER HOODIE | Spring 2019 | Tops | Tops | 1 | 15 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15SK191518-083-PC | CHEVRON PIECEDSTRIPE CREWNECK SWEATSHIRT | Spring 2019 | Tops | Sweatshirts | 4 | 69 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15SK192106BT115-PC | REVOLT PANTHER | Spring 2019 | Tops | T-Shirts | 378 | 3,485 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15SK192529-900-PC | PROTEST TRACK JACKET | Spring 2019 | Jackets | Jackets | 8 | 180 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15SK192532-900-PC | DUAL PANTHER CREW NECK | Spring 2019 | Tops | Tops | 4 | 62 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15SK192535-900-PC | PROTEST CREW NECK | Spring 2019 | Tops | Tops | 2 | 28 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15SK192539BT115-PC | MUHAMMAD ALI CREW | Spring 2019 | Tops | Tops | 4 | 80 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15SK192600-900-PC | PROTEST TRACK PANT | Spring 2019 | Bottoms | Pants | 2 | 40 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15SK193504-403-PC | TRI PRINT JACKET | Spring 2019 | Jackets | Jackets | 1 | 14 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15SK193510-403-PC | PLAID CHEVTON BLOCKED TRACK JACKET | Spring 2019 | Jackets | Jackets | 15 | 342 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15SK193604-403-PC | TRI PRINT PANT | Spring 2019 | Bottoms | Pants | 1 | 14 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15SK193610-403-PC | SIDE PANEL BLOCKED PANT | Spring 2019 | Bottoms | Pants | 4 | 70 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15SK199117-900-P24 | BASIC LOGO SIDE TAPE TEE | Spring 2019 | Tops | Tops | 144 | 543 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15SK199117-900-PC | BASIC LOGO SIDE TAPE TEE | Spring 2019 | Tops | Tops | 2 | 8 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15SK199588-001-PC | LS/S KNIT TOP SOLID | Spring 2019 | Tops | Tops | 1 | 6 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15SK199650-403-PC | BLOCKED KNIT SHORT | Fall 2018 | Bottoms | Shorts | 5 | 27 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15SK199651BT115PC | CONTRAST PIECING WITH POCKETS | Fall 2018 | Bottoms | Shorts | 1 | 6 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15SK201500-083 | ANGLED COLOR BLOCKED TRACK JACKET | Spring 2020 | Jackets | Jackets | 1 | 19 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15SK201600-064 | ANGLED COLOR BLOCKED TRACK PANT | Spring 2020 | Bottoms | Sweatpants | 2 | 33 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15SK201602-403-P11 | EXTENDED ZIPPER POCKETS JOGGER | Spring 2020 | Bottoms | Sweatpants | 22 | 413 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15SK202512-403-P11 | CURVED COLOR BLOCKED TRACK JACKET | Spring 2020 | Jackets | Jackets | 22 | 476 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15SK202513-403 | S/S CURVED COLOR BLOCKED TEE | Spring 2020 | T-Shirts | Mixed Media | 1 | 10 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15SK202513-403-P9 | S/S CURVED COLOR BLOCKED TEE | Spring 2020 | T-Shirts | Mixed Media | 18 | 192 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15SK202514-115-P9 | S/S CURVED LINES PRINTED POLO | Spring 2020 | Tops | Polos | 18 | 227 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15SK202619-403 | ALL OVER CURVE PRINT TRACK SHORT | Spring 2020 | Bottoms | Shorts | 3 | 45 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15SK203521-115-P9 | S/S YARN DYE STRIPE TEE | Spring 2020 | T-Shirts | Mixed Media | 36 | 248 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15SK203527-115 | S/S PINSTRIPE BLOCKED TEE | Spring 2020 | Tops | Tops | 17 | 142 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15SK211501064 | YARN DYE RIB TRACK JACKET | Spring 2021 | Jackets | Jackets | 29 | 569 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15SK211503083 | ZIP KANGAROO POCKET HOODIE | Spring 2021 | Tops | Sweatshirts | 51 | 984 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15SK211508900 | PANTHER SWEATSHIRT | Spring 2021 | Tops | Sweatshirts | 8 | 152 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15SK211509633 | MURAL SWEATSHIRT | Spring 2021 | Tops | Sweatshirts | 15 | 278 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15SK211601064 | YARN DYE RIB JOGGER | Spring 2021 | Bottoms | Sweatpants | 12 | 215 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15SK212510403 | COLOR BLOCKED TRACK JACKET | Spring 2021 | Jackets | Jackets | 50 | 941 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15SK212610403 | COLOR BLOCKED JOGGER | Spring 2021 | Bottoms | Sweatpants | 33 | 521 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15SS203100-680 | S/S JACQUARD CURVE LINES SWEATER POLO | Spring 2020 | Tops | Polos | 90 | 1,193 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15ST181030BT001-PC | S/S CANT STOP WONT STOP | Spring 2018 | Tops | Shirts | 4 | 29 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15ST191052-115-PC | POP CUBISM | Spring 2019 | Tops | Tops | 9 | 60 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15ST192043-627-PC | UNITE TEE | Spring 2019 | Tops | T-Shirts | 1 | 7 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15ST192044-900-PC | SJ PATCH TEE | Spring 2019 | Tops | T-Shirts | 1 | 6 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15ST193152-403-PC | TIGER STUD | Spring 2019 | Tops | T-Shirts | 1 | 6 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15ST193153BT403-PC | TIGER STUD | Spring 2019 | Tops | T-Shirts | 2 | 15 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15ST199087BT001P24 | POSITIVE VIBES ONLY | Fall 2018 | T-Shirts | Solid | 72 | 416 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15ST201008-403 | LOVE | Spring 2020 | T-Shirts | Screen Print | 7 | 40 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15ST201008-403-P9 | LOVE | Spring 2020 | T-Shirts | Screen Print | 234 | 1,346 |

| 1140 | GB01 | 783 | Sean John - Sean John | 15ST201014-819 | GRAFFITI STATEMENT | Spring 2020 | T-Shirts | Screen Print | 2 | 11 |
|---|---|---|---|---|---|---|---|---|---|---|
| 1140 | GB01 | 783 | Sean John - Sean John | 15ST201045-115-P9 | DREAM BIG | Spring 2020 | T-Shirts | Screen Print | 36 | 167 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15ST202020-115-P9 | SJ RAINBOW BLOCK | Spring 2020 | T-Shirts | Screen Print | 18 | 116 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15ST202020-900-P9 | SJ RAINBOW BLOCK | Spring 2020 | T-Shirts | Screen Print | 18 | 116 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15ST202021-716 | UNITE | Spring 2020 | T-Shirts | Screen Print | 11 | 67 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15ST202022-115 | POSITIVE VIBES ONLY | Spring 2020 | T-Shirts | Screen Print | 1 | 6 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15ST202022-115-P9 | POSITIVE VIBES ONLY | Spring 2020 | T-Shirts | Screen Print | 54 | 341 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15ST202024-115 | ELEVATE | Spring 2020 | T-Shirts | Screen Print | 7 | 44 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15ST202024-430 | ELEVATE | Spring 2020 | T-Shirts | Screen Print | 1 | 6 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15ST202026-115 | ABSTRACT | Spring 2020 | T-Shirts | Screen Print | 1 | 5 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15ST202026-115-P9 | ABSTRACT | Spring 2020 | T-Shirts | Screen Print | 72 | 384 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15ST202043-623 | TIGER SPLATTER | Spring 2020 | T-Shirts | Screen Print | 9 | 56 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15ST202043-623-P9 | TIGER SPLATTER | Spring 2020 | T-Shirts | Screen Print | 18 | 112 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15ST202044-403-P9 | GALLERY | Spring 2020 | T-Shirts | Screen Print | 126 | 673 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15ST202056-115-P9 | PROVE THEM TRANSIT | Spring 2020 | T-Shirts | Screen Print | 18 | 112 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15ST202056-430-P9 | PROVE THEM TRANSIT | Spring 2020 | T-Shirts | Screen Print | 72 | 448 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15ST203034-115 | CHILL | Spring 2020 | T-Shirts | Screen Print | 3 | 18 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15ST203034-115-P9 | CHILL | Spring 2020 | T-Shirts | Screen Print | 72 | 433 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15ST203035-900 | KEEP PROVING THEM WRONG | Spring 2020 | T-Shirts | Screen Print | 9 | 61 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15ST203037-115 | DREAM BIG | Spring 2020 | T-Shirts | Screen Print | 4 | 27 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15ST203037-115-P9 | DREAM BIG | Spring 2020 | T-Shirts | Screen Print | 54 | 360 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15ST203040-900 | SJ ALL OVER PRINT | Spring 2020 | T-Shirts | Screen Print | 2 | 12 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15ST203042-680 | TROPICAL PRINT | Spring 2020 | T-Shirts | Screen Print | 5 | 27 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15ST203042-680-P9 | TROPICAL PRINT | Spring 2020 | T-Shirts | Screen Print | 72 | 385 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15ST203050-403 | PROVE THEM WRONG | Spring 2020 | T-Shirts | Screen Print | 2 | 12 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15ST203061-115 | TIE DYE SCRIPT CITIES | Spring 2020 | T-Shirts | Screen Print | 1 | 8 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15ST203061-115-P9 | TIE DYE SCRIPT CITIES | Spring 2020 | T-Shirts | Screen Print | 18 | 135 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15ST21100311S | BLM FISTS | Spring 2021 | T-Shirts | Screen Print | 22 | 99 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15ST211004900 | STAND UNITED | Spring 2021 | T-Shirts | Screen Print | 2 | 10 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15ST211005900 | UNAPOLOGETICALLY BLACK | Spring 2021 | T-Shirts | Screen Print | 3 | 14 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15ST21101311S | CROWN NO JUSTICE NO PEACE | Spring 2021 | T-Shirts | Screen Print | 3 | 23 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15ST211020115 | BLACK EXCELLENCE TIGER HEAD | Spring 2021 | T-Shirts | Screen Print | 4 | 34 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15ST211023633 | SEEDS | Spring 2021 | T-Shirts | Screen Print | 16 | 128 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15ST21102411S | SCRIPT LOGO STATEMENT | Spring 2021 | T-Shirts | Screen Print | 1 | 7 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15ST211024822 | SCRIPT LOGO STATEMENT | Spring 2021 | T-Shirts | Screen Print | 2 | 13 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15ST211024900 | SCRIPT LOGO STATEMENT | Spring 2021 | T-Shirts | Screen Print | 39 | 254 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15ST21202811S | UNITE PANTHER EYES | Spring 2021 | T-Shirts | Screen Print | 50 | 325 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15ST212028900 | UNITE PANTHER EYES | Spring 2021 | T-Shirts | Screen Print | 17 | 111 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15ST21203111S | TRIBAL TIGER HEAD | Spring 2021 | T-Shirts | Mixed Media | 10 | 80 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15ST21203311S | GEO EMBELLISHED LION HEAD | Spring 2021 | T-Shirts | Screen Print | 14 | 102 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15ST212033904 | GEO EMBELLISHED LION HEAD | Spring 2021 | T-Shirts | Screen Print | 4 | 29 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15ST212035403 | PAINTBRUSH TIGER | Spring 2021 | T-Shirts | Screen Print | 1 | 7 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15ST212039633 | SPREAD LOVE | Spring 2021 | T-Shirts | Mixed Media | 68 | 442 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15ST212039904 | SPREAD LOVE | Spring 2021 | T-Shirts | Mixed Media | 22 | 143 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15ST212040900 | KING | Spring 2021 | T-Shirts | Screen Print | 22 | 143 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15SW170254-001 | FLIGHT SHORT ZIPPER | ALL | Bottoms | Shorts | 24 | 324 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15SW170254-078 | FLIGHT SHORT ZIPPER | Spring 2017 | Bottoms | Shorts | 4 | 50 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15SW170254-274-PC | FLIGHT SHORT ZIPPER | ALL | Bottoms | Shorts | 4 | 56 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15SW170254-312 | CONTRAST ZIP FLIGHT SHORT | ALL | Bottoms | Shorts | 1 | 14 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15SW190215-115-PC | LINEN SHORT | Spring 2019 | Bottoms | Shorts | 1 | 11 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15SW190215-286-PC | LINEN SHORT | Spring 2019 | Bottoms | Shorts | 1 | 11 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15SW190215BT001-PC | LINEN SHORT | Spring 2019 | Bottoms | Shorts | 1 | 13 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15SW190215BT403-PC | LINEN SHORT | Spring 2019 | Bottoms | Shorts | 1 | 13 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15SW190215BT475-PC | LINEN SHORT | Spring 2019 | Bottoms | Shorts | 1 | 13 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15SW190215BT957-PC | LINEN SHORT | Spring 2019 | Bottoms | Shorts | 1 | 13 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15SW190415-115-PC | S/S  LINEN SHIRT | Spring 2019 | Tops | Shirts | 1 | 11 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15SW190415-656-PC | S/S  LINEN SHIRT | Spring 2019 | Tops | Shirts | 1 | 11 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15SW190415BT430-PC | S/S  LINEN SHIRT | Spring 2019 | Tops | Shirts | 1 | 13 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15SW193421-083-PC | S/S SJ PRINTED WOVEN | Spring 2019 | Tops | Shirts | 1 | 11 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15SW199477-286-PC | LS COLOR BLOCK SHIRT | Spring 2019 | Tops | Shirts | 4 | 22 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15SW199482BT312-PC | LS YD LARGE PLAID | Spring 2019 | Tops | Shirts | 1 | 7 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15SW199493-490-PC | S/S PLAID SHIRT WITH TAPING | Spring 2019 | Tops | Shirts | 1 | 6 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15SW20143011SP9 | S/S FLIGHT SHIRT | Spring 2020 | Tops | Shirts | 36 | 634 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15SW203256403 | CONTRAST PIPING SHORTS | Spring 2020 | Bottoms | Shorts | 1,044 | 15,253 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15SW209220BT403 | LINEN CARGO SHORT | Spring 2020 | Bottoms | Shorts | 3 | 39 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15SW209220BT409P3 | LINEN CARGO SHORT | Spring 2020 | Bottoms | Shorts | 6 | 78 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15SW209453115 | S/S MULTI COLOR CHECK SHIRT | Spring 2020 | Tops | Shirts | 2 | 14 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15SW212205115 | NYLON TRACK JACKET | Spring 2021 | Jackets | Jackets | 12 | 340 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15SW212206115 | NYLON TRACK PANT | Spring 2021 | Bottoms | Sweatpants | 14 | 303 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15T099-068-PC | CITY SCRIPT TEE | ALL | T-Shirts | Solid | 1 | 6 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15T099-115-PC | SIGNATURE SCRIPT TEE | ALL | T-Shirts | Solid | 3 | 18 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15T099-186-PC | CITY SCRIPT LOGO 2020 TEE | Spring 2020 | T-Shirts | Solid | 3 | 18 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15T099-207-PC | CITY SCRIPT LOGO TEE | ALL | T-Shirts | Screen Print | 2 | 12 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15T099-286-PC | SIGNATURE SCRIPT TEE | ALL | Tops | Tops | 5 | 31 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15T099-430-PC | CITY SCRIPT LOGO 2020 TEE | ALL | T-Shirts | Screen Print | 1 | 6 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15T099-817-PC | CITY SCRIPT TEE | ALL | T-Shirts | Solid | 4 | 24 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15T099-900-PC | CITY SCRIPT TEE | ALL | T-Shirts | Solid | 1 | 6 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15W224P-018 | FLIGHT PANT | ALL | Bottoms | Pants | 5 | 60 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15W224P-101 | FLIGHT PANT | ALL | Bottoms | Pants | 1 | 12 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15W224P-111 | FLIGHT PANT | ALL | Bottoms | Jeans | 1 | 12 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15W224P-250 | FLIGHT PANT | ALL | Bottoms | Pants | 13 | 154 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15W224P-265 | FLIGHT PANT | ALL | Bottoms | Pants | 1 | 12 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15W224P-463 | FLIGHT PANT | ALL | Bottoms | Pants | 1 | 12 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15W225S-006-PC | CLASSIC FLIGHT SHORT | ALL | Bottoms | Shorts | 14 | 155 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15W225S-009-PC | FLIGHT SHORT | ALL | Bottoms | Shorts | 722 | 8,512 |

| 1140 | GB01 | 783 | Sean John - Sean John | 15W225S-063-PC | CLASSIC FLIGHT SHORT | ALL | Bottoms | Shorts | 1,033 | 12,179 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15W225S-101 | CLASSIC FLIGHT SHORT | ALL | Bottoms | Shorts | 1 | 12 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15W225S-115 | CLASSIC FLIGHT SHORT | ALL | Bottoms | Shorts | 106 | 1,204 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15W225S-213-PC | FLIGHT SHORT | ALL | Bottoms | Shorts | 68 | 802 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15W225S-250 | CLASSIC FLIGHT SHORT | ALL | Bottoms | Shorts | 763 | 9,049 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15W225S-286 | FLIGHT SHORT 2017 | ALL | Bottoms | Shorts | 187 | 2,126 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15W225S-403 | FLIGHT SHORT 2017 | ALL | Bottoms | Shorts | 697 | 7,925 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15W225S-430-PC | FLIGHT SHORT | ALL | Bottoms | Shorts | 254 | 2,885 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15W225S-477-PC | CLASSIC FLIGHT SHORT | ALL | Bottoms | Shorts | 443 | 4,904 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15W225S-627-PC | FLIGHT SHORT | ALL | Bottoms | Shorts | 63 | 716 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15W225S-628-PC | FLIGHT SHORT | ALL | Bottoms | Shorts | 34 | 401 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15W225S680 | CLASSIC FLIGHT SHORTS | ALL | Bottoms | Shorts | 424 | 4,312 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15W225S817 | CLASSIC FLIGHT SHORTS | ALL | Bottoms | Shorts | 78 | 793 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15W225SBT-009-PC | FLIGHT SHORT | ALL | Bottoms | Shorts | 2 | 28 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15W225SBT-063-PC | CLASSIC FLIGHT SHORT | ALL | Bottoms | Shorts | 11 | 155 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15W225SBT-115 | FLIGHT SHORT 2017 | ALL | Bottoms | Shorts | 1 | 14 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15W225SBT-286 | FLIGHT SHORT 2017 | ALL | Bottoms | Shorts | 9 | 122 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15W225SBT-477-PC | CLASSIC FLIGHT SHORT | ALL | Bottoms | Shorts | 1 | 13 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15W228-428 | CLASSIC FLIGHT SHORT | ALL | Bottoms | Shorts | 6 | 72 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15W236-001 | ANGLED POCKET LINEN SHORT 2016 | ALL | Bottoms | Shorts | 3 | 33 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15W236-250 | ANGLED POCKET LINEN SHORT 2016 | ALL | Bottoms | Shorts | 1 | 11 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15W236-314 | ANGLED POCKET LINEN SHORT 2016 | ALL | Bottoms | Shorts | 2 | 22 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15W238-001-PC | FLIGHT PANT | ALL | Bottoms | Pants | 1 | 14 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15W238-115-PC | FLIGHT PANT | ALL | Bottoms | Pants | 23 | 327 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15W238-403-PC | FLIGHT PANT | ALL | Bottoms | Pants | 12 | 171 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15W239115 | LINEN SHORT | ALL | Bottoms | Shorts | 87 | 894 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15W239146 | LINEN SHORT | Spring 2021 | Bottoms | Shorts | 10 | 104 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15W239294 | LINEN SHORT | ALL | Bottoms | Shorts | 105 | 1,079 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15W239403 | LINEN SHORT | ALL | Bottoms | Shorts | 113 | 1,162 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15W239680 | LINEN SHORT | ALL | Bottoms | Shorts | 4 | 41 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15W239680 | LINEN SHORT | ALL | Bottoms | Shorts | 747 | 7,679 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15W239718 | LINEN SHORT | ALL | Bottoms | Shorts | 525 | 5,397 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15W239900 | LINEN SHORT | ALL | Bottoms | Shorts | 91 | 935 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15W423-428 | S/S CHAMBRAY SHIRT 2016 | ALL | Tops | Shirts | 29 | 269 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15W426-001-PC | S/S FLIGHT SHIRT | ALL | Tops | Shirts | 15 | 141 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15W426-115-PC | S/S FLIGHT SHIRT | ALL | Tops | Shirts | 694 | 6,503 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15W427-001-PC | S/S LINEN SHIRT | ALL | Tops | Shirts | 254 | 2,629 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15W427-115-PC | S/S LINEN SHIRT | ALL | Tops | Shirts | 1 | 10 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15W427-621-PC | S/S LINEN SHIRT | ALL | Tops | Shirts | 1 | 10 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15W427115 | S/S FLIGHT LINEN SHIRT | ALL | Tops | Shirts | 146 | 1,269 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15W427115P9 | S/S FLIGHT LINEN SHIRT | Spring 2020 | Tops | Shirts | 18 | 156 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15W427146 | S/S FLIGHT LINEN SHIRT | Spring 2021 | Tops | Shirts | 29 | 273 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15W427294 | S/S FLIGHT LINEN SHIRT | ALL | Tops | Shirts | 259 | 2,251 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15W427403 | S/S FLIGHT LINEN SHIRT | ALL | Tops | Shirts | 133 | 1,156 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15W427409 | S/S FLIGHT LINEN SHIRT | ALL | Tops | Shirts | 2 | 17 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15W427680 | S/S FLIGHT LINEN SHIRT | ALL | Tops | Shirts | 3 | 26 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15W427718 | S/S FLIGHT LINEN SHIRT | ALL | Tops | Shirts | 6 | 52 |
| 1140 | GB01 | 783 | Sean John - Sean John | 15W427900 | S/S FLIGHT LINEN SHIRT | ALL | Tops | Shirts | 149 | 1,295 |
| | | | | | | | | | 22,105 | $  278,076 |

Schedule 3.8(a)
Material Customers

| Customer | Aggregate consideration for goods or services rendered FY ending March 2021 |
| --- | --- |
| Macy's | $4,022,912 |
| BURLINGTON | $1,202,995 |
| K & G Stores | $1,105,462 |
| AMAZON.COM | $322,285 |
| STEAL DEAL INC | $246,810 |
| FORMAN MILLS INC | $204,638 |

Schedule 3.8(b)
<u>Material Suppliers</u>

| Supplier Name | Aggregate consideration for goods or services rendered FY ending March 2021 |
|---|---|
| St. Wonderful International Group | $3,455,562 |
| Concept Creator Fashion | $2,239,528 |
| PORT LOGISTICS GROUP | $883,527 |
| Everlong Industrial Company Limited | $702,883 |
| LF LOGISTICS USA LLC | $612,561 |
| Citadel Apparel | $551,031 |
| Porta Asiatica Enterprises | $496,689 |
| GOOGLE, INC. | $413,533 |
| U.S. CUSTOMS AND BORDER PROTECTION | $342,583 |
| AREA TWELVE LLC | $337,181 |
| EL TORO INTERACTIVE, LLC | $281,842 |
| Sakthi Infra Tex | $154,047 |
| WICK CREATIVE LTD | $150,085 |
| BRAND STRATEGY, LLC | $140,500 |

Schedule 3.9
Legal Proceedings

1. Sean Combs v. GBG Sean John LLC, GBG USA Inc., Missguided Limited, and Missguided USA (Finance) Inc., US District Ct., Southern District NY. Index No. 21-cv-996. Plaintiff filed this lawsuit on February 4, 2021 alleging unauthorized usage of Mr. Combs' likeness or identify and violation of his common law right of publicity in connection with the launch of the Sean John/Missguided collaboration in September 2020. Mr. Combs is alleging damages of $25,000,000. GBG's answer in the action was filed on March 29, 2021.

2. Citizen One, Inc. d/b/a Citizen Change and CE Trademark, LLC v. GBG Sean John LLC, US District Ct., Southern District, NY. Index No. 21-CV-1199. Citizen One filed this lawsuit on February 10, 2021 alleging trademark infringement, unfair competition and other claims arising from the filing by GBG Sean John of a trademark application for the "VOTE OR DIE" mark, and the continued use of such mark after GBG Sean John allegedly agreed to convey its rights in the mark back to Citizen One. GBG's answer in the action was filed on March 29, 2021.

3. CE Trademark, LLC v. GBG Sean John LLC, Opp. No. 91267120. This is an opposition action filed in the Trademark Trial and Appeal Board on January 19, 2021 by CE Trademarks against GBG Sean John's application to register the mark "VOTE OR DIE" (Application No. 88679181) in class 25 for apparel. GBG Sean John has filed an answer in the action.

4. Andrew Baracco v. GBG USA, Inc., Superior Court of the State of California for the County of Los Angeles, Central District, Case No. 21STCV17206. This complaint was served on June 17, 2021. Plaintiff alleges that the Sean John website is not readily and fully accessible to and usable by blind and visually impaired individuals, in violation of the California Unruh Civil Rights Act. This complaint was never answered due to the Debtors' filing for bankruptcy shortly after receipt thereof.

Schedule 3.11(a)(i)
<u>Employees</u>

Attached hereto as <u>Schedule 3.11(a)(i)</u>.

| Empl ID | Status | Full Name | Status | Job Title | Annual Rate | Hire Date | Benefit Program | Group/Division Name | Exempt/Non | Regular/Temporary - Job Dta | Full/Part Time |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 122044 | Retained for Deal Close - Sean John | Kogan,Arkady | A | Senior Technical Designer | 105,585 | 09/01/2010 | AFE | Sean Jean | E | R | F |
| 133245 | Retained for Deal Close - Sean John | Elby,Tiffany | A | Manager, Marketing | 90,000 | 01/01/2017 | AFE | Total Marketing & Communications | E | R | F |
| 133249 | Retained for Deal Close - Sean John | Lafontant,Alain | A | VP, Division Head | 275,000 | 01/01/2017 | AFE | Sean Jean | E | R | F |
| 122048 | Retained for Deal Close - Sean John | Perez,Melissa | A | Manager, Operations | 65,200 | 09/01/2010 | AFE | Sean Jean | E | R | F |
| 143304 | Retained for Deal Close - Sean John | Tonleu,Nelly | A | Manager, Merchandising | 85,000 | 06/07/2021 | AFE | Sean Jean | E | R | F |
| 008382 | Retained for Deal Close - Tahari or Aqua | Kelley,Donna G | A | Manager, Order Management | 66,933 | 01/01/2008 | AFE | Logistics Total | E | R | F |

Schedule 3.11(a)(ii)
<u>Independent Contractors</u>

None.

Schedule 3.11(b)
<u>Multiemployer Plan</u>

None.

Schedule 3.11(c)
<u>WARN Act</u>

All employees received the WARN Act notices sent to all New York based employees prior to the Chapter 11 filings.

Schedule 3.12(a)
<u>Intellectual Property</u>

<u>Trademarks</u>

1. <u>Schedule 1.1(e) is incorporated herein by reference.</u>

<u>Domain Names</u>

1. seanjohn.com
2. sean-john.co.za
3. seanjohn-gbg.com
4. seanjohn-iamking.biz
5. seanjohn-iamking.com
6. seanjohn-iamking.info
7. seanjohn-iamking.net
8. seanjohn-iamking.org
9. seanjohn-iamking.us
10. seanjohn-lfusa.com
11. seanjohncombs.com
12. seanjohnfragrance.co.uk
13. seanjohnfragrance.uk
14. seanjohnfragrances.biz
15. seanjohnfragrances.co.uk
16. seanjohnfragrances.com.mx
17. seanjohnfragrances.gr
18. seanjohnfragrances.it
19. seanjohnfragrances.mx
20. seanjohnfragrances.net
21. seanjohnfragrances.uk
22. seanjohnfragrances.us

<u>Social Media Platforms</u>

1. Youtube
2. Instagram
3. Facebook
4. Twitter
5. ENYCESTYLE Instagram
6. Bazaarvoice (https://www.macysreviewsquad.com/authenticate)
7. Gmail
8. Pinterest
9. Brand 24
10. Hootsuite
11. Klavyio

Schedule 3.12(b)
<u>Intellectual Property Proceedings</u>

<u>Schedule 3.9</u> is incorporated herein by reference.

Schedule 3.14
<u>Taxes</u>

None.

Schedule 3.15
<u>Financial Information</u>

Attached hereto as <u>Schedule 3.15</u>.

| M_SJTOT |
|---|
| 2021.09 |
| USD |

GLOBAL BRANDS GROUP

**Trial Balance**
**2021 Sept - DRAFT**

| Account | C1140 - Pacific | C1410 - Sean John LLC |
|---|---|---|
| GOODWILL - Goodwill | - | - |
| NET_PPE - Net PP&E | - | - |
| FIN_ASSETS - Financial Assets Available for Sale | - | - |
| INV_SUBS - Investment in Subsidiaries | - | - |
| INT_ASSETS - Intangible Assets | - | - |
| NOTES_REC - Notes Receivable | - | - |
| LT_DEFERRED TAX ASSET - Long Term Deferred Tax Assets | - | - |
| LT_OTH_REC - Other Receivables and Deposits Long Term | - | - |
| NET_ROU - Net ROU Asset | - | - |
| LT_ASSETS - Non-Current Assets | - | - |
| INV_NET - Inventory, Net (Note A) | 308,676 | - |
| TRD_BILLS_REC2 - Trade & Bills Receivables - NET | 1,166,249 | - |
| DER_FIN_ASSET - Derivative Financial Asset | - | - |
| 1002201156 - Concentration Clearing Manual Postings | - | - |
| CASH - Cash & Equivalants | - | - |
| OTH_REC_PPD - Other Receivable, PPD, & Deposit | - | - |
| INTRA_REC_GBGUSA - Intracompany Recon USA | 209,213 | (530,520) |
| RELATED_REC - Related Party Receivables (Non-Trade) | (10,095) | - |
| ST_DEFERRED TAX ASSET - Short Term Deferred Tax Assets | - | - |
| CUR_ASSETS - Current Assets | 1,674,043 | (530,520) |
| TRD_BILLS_PAY - Trade & Bills Payable | 255,703 | - |
| 2003005010 - A/P Due to Millwork PTE LTD | 6,858,941 | |
| 2003005032 - Rebate – VVD MW PTE | 13,272 | |
| ACCR_CHG_SUNDRY_PAY - Accrued Charges & Sundry Payables | 4,573,886 | - |
| BANK_OD_TOT - Bank Overdraft Total | - | - |
| ST_LEASE_LIABILITY - ST Lease Liability | - | - |
| CUR_LIAB2 - Current Liabilities | 11,701,802 | - |
| Net Current Assets less Current Liabilities | (10,027,758) | (530,520) |
| NET_CUR_ASSETS_LESS_LIAB - Net Current Assets/(Liabilities) | (10,027,758) | (530,520) |
| 3924004045 - Capital Injection | - | - |
| SH_CAP - Share Capital | 2,138,918 | 11,228,783 |
| 3954101002 - Profit/Loss Current Year | - | - |
| 3954999999 - Retained Earnings - Current Year | - | - |
| NI_YTD - Net Income for Retained Earnings Calculation | (24,944) | 341,783 |
| RETEARN_CY_Input - Retained Earnings - Current Year_Input | - | - |
| RETEARN_PY_Input - Retained Earnings - Prior Year_Input | - | - |
| RETEARN_PY - Retained Earnings - Prior Year | (12,141,732) | (12,101,087) |
| RETEARN - Retained Earnings | (12,166,676) | (11,759,304) |
| LT_LEASE_LIABILITY - LT Lease Liability | - | - |
| NONCUR_LIAB - Non-Current Liabilities | - | - |
| BAL_SHEET - Balance Sheet | 0 | (0) |

*Note A  - Inventory is the only asset/liabilty that is not an excluded asset/liability*

Schedule 3.16
Related Party Transactions

 An affiliate of Seller, CAA-GBG LLP, provides brand management services to the Company, the terms of which are set forth in Section 4.1 of the Company Operating Agreement.

Schedule 6.1
Conduct of Business of the Company

None.